# EXHIBIT A

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

**ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE & CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, AND ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY,**

                              **PLAINTIFFS,**

**-against-**

**TATIANA M. RYBAK, OLEG RYBAK, FABIOLA G. PERNIER AS EXECUTOR OF THE ESTATE OF JEAN PIERRE CLAUDE PERNIER, M.D., FRANCOIS JULES PARISIEN, M.D., FRANCIS JOSEPH LACINA, M.D., KSENIA PAVLOVA, D.O., ALFORD A. SMITH, M.D., DARREN THOMAS MOLLO, D.C., CHARLES DENG, L.AC., MARIA SHEILA BUSLON a/k/a MARIA MASIGLA, P.T., JPC MEDICAL, P.C., JPF MEDICAL SERVICES, P.C., JULES MEDICAL, P.C. N/K/A GIBBONS MEDICAL, P.C., JP MEDICAL SERVICES P.C., JFL MEDICAL CARE P.C., ALLAY MEDICAL SERVICES, P.C., FJL MEDICAL SERVICES P.C., PFJ MEDICAL CARE P.C., RA MEDICAL SERVICES P.C., KP MEDICAL CARE P.C., ALFORD A. SMITH MD, P.C., STRATEGIC MEDICAL INITIATIVES P.C., ACH CHIROPRACTIC, P.C., ENERGY CHIROPRACTIC, P.C., ISLAND LIFE CHIROPRACTIC PAIN CARE, PLLC, CHARLES DENG ACUPUNCTURE, P.C., MSB PHYSICAL THERAPY, P.C., JOHN DOES 1 THROUGH 20, AND ABC CORPORATIONS 1 THROUGH 20,**

                              **DEFENDANTS.**

---

**22-CV-4441**

**COMPLAINT**

**(TRIAL BY JURY DEMANDED)**

---

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property & Casualty Insurance Company (collectively "Plaintiffs" or "Allstate"), by their attorneys, Morrison Mahoney LLP, for their Complaint against Defendants Tatiana M. Rybak, Oleg Rybak, Fabiola G. Pernier as executor of the Estate of Jean Pierre Claude Pernier, M.D., Francois Jules Parisien, M.D., Francis Joseph Lacina, M.D., Ksenia Pavlova, D.O., Alford A. Smith, M.D., Darren Thomas Mollo, D.C., Charles Deng, L.Ac., Maria Sheila Buslon a/k/a Maria Masigla, P.T., JPC Medical, P.C., JPF Medical Services, P.C., Jules Medical, P.C. n/k/a Gibbons Medical, P.C., JP Medical Services P.C., JFL Medical Care P.C.,

Allay Medical Services, P.C., FJL Medical Services P.C., PFJ Medical Care P.C., RA Medical Services P.C., KP Medical Care P.C., Alford A. Smith MD, P.C., Strategic Medical Initiatives P.C., ACH Chiropractic, P.C., Energy Chiropractic, P.C., Island Life Chiropractic Pain Care, PLLC, Charles Deng Acupuncture, P.C., MSB Physical Therapy, P.C., John Does 1 through 20 (the "John Doe Defendants"); and ABC Corporations 1 through 20 (the "ABC Corporations") (collectively, "Defendants"), allege as follows:

## PRELIMINARY STATEMENT

1.     On information and belief, from in or about January 2011 through the date of the filing of this Complaint, Defendants Tatiana Rybak, Oleg Rybak, and/or one or more of the John Doe Defendants (collectively the "Controllers"), presided over enterprises that systematically stole hundreds of thousands of dollars from automobile insurance companies, including Plaintiffs, through New York State's No-fault system via the submission of fraudulent claims for medical services submitted by JPC Medical, P.C., JPF Medical Services, P.C., Jules Medical, P.C. n/k/a Gibbons Medical, P.C., JP Medical Services P.C., JFL Medical Care P.C., Allay Medical Services, P.C., FJL Medical Services P.C., PFJ Medical Care P.C., RA Medical Services P.C., KP Medical Care P.C., Alford A. Smith MD, P.C., Strategic Medical Initiatives P.C., ACH Chiropractic, P.C., Energy Chiropractic, P.C., Island Life Chiropractic Pain Care, PLLC, Charles Deng Acupuncture, P.C., MSB Physical Therapy, P.C., and others unknown to Plaintiffs (hereinafter collectively referred to as the "Fraudulently Owned PCs"), each an entity formed and operated in violation of Article 15 of the New York Business Corporation Law (the "B.C.L."), Article 130 of the Education Law and the implementing regulations promulgated by the New York State Department of Financial Services (formerly known as the Department of Insurance) concerning the eligibility

requirements of health care providers seeking reimbursement under the No-fault Law (as defined herein).

2.       The Controllers, who are laypersons not licensed to practice medicine or to own medical professional corporations in the State of New York, and/or others unknown to Plaintiffs, orchestrated the fraud alleged herein, with the assistance, participation and agreement of Jean Pierre Claude Pernier, M.D., Francois Jules Parisien, M.D., Francis Joseph Lacina, M.D., Ksenia Pavlova, D.O., Alford A. Smith, M.D. (collectively the "Defendant Doctors"), Darren Thomas Mollo, D.C., Charles Deng, L.Ac., and Maria Sheila Buslon a/k/a Maria Masigla, P.T. (collectively with the Defendant Doctors, the "Paper Owners") through the creation of illegally owned, fraudulently incorporated, and improperly licensed professional corporations—the Fraudulently Owned PCs—that were used to fraudulently bill insurance companies in general, and Plaintiffs in particular.

3.       On information and belief, in furtherance of the scheme to defraud alleged herein, the Controllers, using the names and licenses of the Paper Owners, established medical mills at 1468 Flatbush Avenue, Brooklyn, New York, and 1786 Flatbush Avenue, Brooklyn, New York, that they utilized to fraudulently bill Allstate for bogus services, including but not limited to diagnostic testing, chiropractic, acupuncture, and physical therapy services.

4.       Each of the Paper Owners knowingly allowed fictitious bills to be submitted under their names, in their individual capacity, as well as in association with one or more of the Fraudulently Owned PCs named herein, each of which is a fraudulently owned and improperly licensed medical professional corporation that was used to fraudulently bill insurance companies in general, and Allstate in particular, for services purportedly rendered at 1468 Flatbush Avenue, 1786 Flatbush Avenue, and/or other locations.

5.      In *State Farm Mut. Auto. Ins. Co. v. Mallela*, 4 N.Y.3d 313, 827 N.E.2d 758, 794 N.Y.S.2d 700 (2005), the New York Court of Appeals held, in part, that: (1) a professional corporation not licensed in accordance with applicable New York state law is not entitled to recover benefits under the No-fault Law and implementing regulations irrespective of the date of service; and (2) an insurer is entitled to recover payments made to such an entity on or after April 4, 2002, the effective date of the amended No-fault regulations.

6.      In carrying out their fraudulent scheme, one or more of the Controllers used the names of one or more of the Paper Owners to fraudulently incorporate and/or own professional service corporations in which they engaged in the unlicensed practice of health care services and held out the Fraudulently Owned PCs to be legitimate professional service corporations that were properly licensed in accordance with applicable New York State and local law when in fact they were not.

7.      Each of the Fraudulently Owned PCs was established as a separate entity doing business under its own individual corporate name but rendered its services at the physical locations of 1486 Flatbush Avenue, Brooklyn, New York, 1786 Flatbush Avenue, Brooklyn, New York, and/or other locations.

8.      This action seeks to prevent the Defendants from continuing to illegally seek reimbursement of benefits under New York State's No-fault system through fraudulently owned professional corporations and/or pursuant to unlawful referral, fraudulent billing, and/or illegal fee-splitting schemes.

9.      In violation of Article 15 of the B.C.L. and the stringent eligibility and reimbursement requirements mandated under the No-fault Law and implementing regulations, one or more of the Controllers are and have been the illegal owners of one or more of the Fraudulently

Owned PCs, which are purportedly owned on paper as professional corporations by the Paper Owners.

10.     On information and belief, in violation of Article 15 of the B.C.L., one or more of the Controllers purchased or otherwise were permitted to use the names and licenses of the Paper Owners to fraudulently own, control and/or operate the Fraudulently Owned PCs.

11.     At all relevant times mentioned herein, one or more of the Controllers were the true beneficial owners of one or more of the Fraudulently Owned PCs, which they owned, controlled, and operated.

12.     At all relevant times mentioned herein, the Fraudulently Owned PCs submitted and/or continue to submit bills for payment, and/or have sought and/or continue to seek collection on such bills from No-fault insurers in general, and Plaintiffs in particular, for healthcare services.

13.     At all relevant times mentioned herein, although the Paper Owners were listed as the sole shareholders, officers, and directors of their respective Fraudulently Owned PCs on the certificates of incorporation filed with the Department of State pursuant to and in purported compliance with Section 1503 of the B.C.L., in fact the Paper Owners were nominal owners who abdicated and/or ceded any and all of their ownership interests therein and control to one or more of the Controllers who are not licensed to practice medicine or own medical professional corporations in the State of New York.

14.     At all relevant times mentioned herein, the Controllers used the Paper Owners names and licenses interchangeably, submitting or causing to be submitted fraudulent claims for reimbursement under the Paper Owners individual names, as well as through the Fraudulently Owned PCs.

15.     Defendant T. Rybak has a long history of engaging in schemes to defraud such as that alleged herein by fraudulently owning and controlling medical professional corporations, incorporated under the names of licensed healthcare professionals, despite not being legally authorized much less licensed to practice medicine or own medical professional corporations in the State of New York, and was described in 2000 by the New York Post as the "city's reigning czarina of auto-insurance fraud."

16.     By way of example and not limitation, in 1999, Defendant Tatiana Rybak ("T. Rybak") was indicted by a Kings County Grand Jury in a 140-count indictment charging her with Enterprise Corruption, insurance fraud, and fraudulently billing for medically unnecessary evaluations and therapy services, Durable Medical Equipment ("DME") and diagnostic testing, pursuant to which T. Rybak pled guilty to charges of attempted Enterprise Corruption in violation of N.Y. Penal Law 460.20(1)(a), participation in a scheme to defraud in the first degree in violation of N.Y. Penal Law 190.65(1)(a), and twelve counts of insurance fraud in violation of N.Y. Penal Law 176.05(1).

17.     By way of further example and not limitation, in January 2000, Allstate and other insurers brought a civil action alleging RICO and other claims against Defendant T. Rybak and several other healthcare providers to recover more than $5 million of damages arising out of activity at prior clinic locations. In granting plaintiff's motion for an attachment and preliminary injunction in the *TMR Medibill Inc*. matter, the District Court found that T. Rybak had orchestrated an "elaborate and sophisticated insurance fraud scheme," and that "[a]fter incorporating each of the clinics in the name of a nominal share-holder doctor, each defendant doctor transferred all effective interest, ownership, and control of the respective professional corporation to defendants

Rybak…[].” *Allstate Ins. Co. v. TMR Medibill Inc.*, 00-cv-0002 (CPS), 2000 WL 34011895, at *3 (E.D.N.Y. Jul. 13, 2000).

18.    By way of further example and not limitation, in August 2000, State Farm Mutual Auto Insurance Company also brought a civil action alleging fraud, unjust enrichment, and other claims against Defendant T. Rybak and several others. *State Farm Mutual Auto Insurance Co. v. Robert Mallela*, No. 00-cv-04923 (CPS) (E.D.N.Y.); *State Farm Mutual Automobile Insurance Company v. Robert Mallela*, 175 F. Supp. 2d 401 (E.D.N.Y. 2001), and in an action commenced in 2018, *State Farm Mut. Auto. Ins. Co., et al. v. Parisien, M.D., et al.,* 18-cv-00289-ILG-ST (E.D.N.Y.), State Farm similarly alleged that Defendant T. Rybak secretly and unlawfully owned and controlled medical professional corporations operating in Brooklyn, New York, with the support of Defendant Oleg Rybak

19.    Oleg Rybak is the son of T. Rybak and an attorney who was admitted to practice law in the State of New York in 2009.

20.    On information and belief, at all times relevant herein, O. Rybak participated in, and directed the affairs of the scheme to defraud by, among other things: (i) siphoning proceeds from the Fraudulently Owned PCs to or for the benefit of himself, T. Rybak and/or other family members; (ii) through his law firm, (the Rybak Firm), representing individuals who were purportedly treated at the Fraudulently Owned PCs to recover No-Fault Benefits and pursue claims and lawsuits for bodily injuries arising out of automobile accidents; (iii) recruiting one or more medical professionals to purportedly treat patients at the Fraudulently Owned PCs; (iv) filing, through the Rybak Firm, tens of thousands of claims and suits against insurers to recover payment for fraudulent services purportedly provided to patients of the Fraudulently Owned PCs; and (v)

directing, establishing and/or facilitating the medical services protocol at the Fraudulently Owned PCs.

21.     Under the fraudulent scheme described herein, the Fraudulently Owned PCs billed for professional services provided to persons who allegedly sustained injuries covered under the No-fault Law (hereinafter referred to as "Covered Persons") in violation of Article 15 of the B.C.L., which governs the corporate practice of medicine in New York State and requires any corporation that provides medical services to do so as a professional corporation owned and controlled exclusively by licensed physicians. The practice of medicine by one who is not a physician, as well as the sale of a medical license by a physician, are felonies pursuant to Section 6512 of the New York Education Law.

22.     On information and belief, in violation of Article 15 of the B.C.L., pursuant to the fraudulent scheme described herein, the Paper Owners abdicated and/or were divested of any and all attributes of true ownership and control of the Fraudulently Owned PCs, which were diverted and/or ceded to one or more of the Controllers and/or one or more of the ABC Corporations, in which one or more of the Controllers also maintained ownership and financial interests.

23.     The Controllers submitted claims through one or more of the Fraudulently Owned PCs for healthcare services purportedly rendered to Covered Persons. Under the No-fault Law, policyholders and others who sustain injuries in automobile accidents can obtain payments from the policyholders' automobile insurance companies for necessary medical care, including treatments, tests, and medical equipment ordered by the Covered Persons' physicians.

24.     Under the No-fault Law, Covered Persons can only assign the right to payment of such benefits directly to doctors and other licensed healthcare providers, enabling them to bill insurance companies directly for their services. Defendants exploited the No-fault system by

obtaining such assignments, and by billing insurers for healthcare services rendered by fraudulently incorporated professional corporations in violation of the No-fault Law.

25.     On information and belief, at all relevant times mentioned herein, the cash or other proceeds of Defendants' schemes was either funneled directly to the Controllers or to one or more of the ABC Corporations, through which such proceeds were then funneled to the Controllers.

26.     By using the names and licenses of the Paper Owners to fraudulently incorporate, own, operate, and control the Fraudulently Owned PCs, the Controllers held out one or more of the Fraudulently Owned PCs to be legitimate professional corporations in compliance with core licensing requirements when, in fact, they were not. In doing so, the Controllers perpetrated a fraud upon the public and Plaintiffs, among others.

27.     By allowing their names and licenses to be used to fraudulently incorporate, and/or to vest in one or more of the Controllers ownership, control and operation of the Fraudulently Owned PCs, the Paper Owners held out their respective Fraudulently Owned PCs to be legitimate professional corporations in compliance with core licensing requirements when, in fact, they were not. In doing so, the Paper Owners perpetrated a fraud upon the public and the Plaintiffs, among others.

28.     In contravention of the strong public policy concerns of the New York State Legislature in regulating the licensing of, and limiting the practice of, medicine to qualified professionals, the Controllers circumvented the laws of the State and have imperiled the welfare of the public by engaging in the wholesale purchase and/or misuse of the Paper Owners' respective professional licenses.

29.     On information and belief, the Fraudulently Owned PCs were created for the singular purpose of fraudulently billing insurance companies under the No-fault Law and

funneling the illicit profits gained therefrom to one or more of the Controllers through substantial, regular payments made by the Fraudulently Owned PCs, to among others, the ABC Corporations, which were owned and operated by one or more of the Controllers and/or others unknown to Plaintiffs.

30.     Separate and apart from their illegal corporate structure, the Defendants participated in massive billing fraud operations at the clinics located at 1468 Flatbush Avenue, 1786 Flatbush Avenue, and/or other locations, routinely submitting bills to insurers, in general, and Allstate in particular, for services that were never rendered, not of any diagnostic or treatment value and/or reflected a pattern of billing for services that were medically unnecessary.

31.     In addition to having a long history of unlawful ownership and control of medical professional corporations incorporated under the names of licensed healthcare professionals, Defendant T. Rybak similarly has a history of engaging in schemes to defraud in which she billed for services that were devoid of any diagnostic or treatment value and which reflect a pattern of billing for services that were medically unnecessary.

32.     By way of example and not limitation, T. Rybak admitted in her guilty plea that she submitted fraudulent insurance claims that included, among other things, falsified physical therapy progress notes and false bills and records for nerve block injections and DME.

33.     By way of further example and not limitation, as the District Court described in *TMR Medibill* with respect to T. Rybak, "defendants billed patients for medical visits, procedures, and diagnostic tests that were either never rendered or were medically unnecessary; altered test dates and results to justify extensive physical therapy and diagnostic testing; created false physical therapy progress notes reflecting treatments that were never rendered; and submitted fraudulent wholesale invoices to verify DME sales." *TMR Medibill*, 2000 WL 34011895, at *4.

34.     In furtherance of their scheme to defraud, Defendants concocted a sophisticated fraudulent billing and medical documentation scheme that created the impression that Covered Persons had serious injuries and medical conditions that required, among other things, chiropractic services, physical therapy, acupuncture, and diagnostic testing (collectively referred to herein as "Fraudulent Services"), when in fact no such injuries and/or conditions existed.

35.     On information and belief, one or more of the Controllers, directed and/or steered Covered Persons to one or more of the Fraudulently Owned PCs as part of an illegal referral arrangement without regard to medical necessity.

36.     On information and belief, Covered Persons' initial consultations and follow-up visits at the Fraudulently Owned PCs created and maintained the illusion of serious injuries, a misrepresented fact that was used to justify further consultations, testing, treatment, and referrals to other related providers operating out of the same location as the Fraudulently Owned PCs. By the conclusion of their treatment, many Covered Persons would receive virtually identical examinations and unwarranted referrals for, among other things, chiropractic services, physical therapy, and acupuncture, as well as range of motion testing, manual muscle testing and/or outcome assessment testing.

37.     On information and belief, the majority of Covered Persons who were purportedly treated by more than one of the Fraudulently Owned PCs were referred by another of the Fraudulently Owned PCs, operating at the direction and under the control of one or more of the Controllers, which provided all of the Fraudulently Owned PCs with a steady stream of Covered Persons to utilize to submit fraudulent billing to Plaintiffs.

38.     On information in belief, in furtherance of the scheme to defraud alleged herein, as a matter of practice, procedure, and protocol, one or more of the Defendants also billed Allstate

for unnecessary diagnostic tests, including digital range of motion tests ("ROM Tests"), computerized muscle strength tests ("Muscle Tests"), nerve conduction velocity tests ("NCVs"), electromyography tests ("EMGs"), somatosensory evoked potential tests ("SSEPs"), physical capacity evaluations ("Physical Capacity Testing"), and pain fiber nerve conduction studies ("V-sNCT") (collectively "Diagnostic Testing"), as well as for recommending and performing medically unnecessary trigger point injections and dry needling procedures.

39.     By submitting fictitious bills and reports for Diagnostic Testing, injections, and dry needling procedures, Defendants misrepresented the actual medical status of the Covered Persons and the services purportedly rendered, which were not provided as billed, if provided at all.

40.     Once the Controllers directed and/or steered Covered Persons to the Fraudulently Owned PCs and/or to the Paper Owners, Defendants billed No-fault insurers, in general, and Plaintiffs, in particular, for medical services, including but not limited to physical therapy, chiropractic care, diagnostic tests and/or acupuncture services, purportedly rendered to the Covered Persons.

41.     At all relevant times mentioned herein, the Defendants knew or should have known that the Covered Persons who the Controllers directed and/or caused to be directed and/or steered to the Fraudulently Owned PCs and/or the Paper Owners would be used to obtain payment from insurers in general, and Plaintiffs in particular, in connection with fraudulent claims.

42.     At all relevant times mentioned herein, the Defendant Paper Owners knew that the Covered Persons were directed for treatment and/or testing pursuant to a predetermined medical protocol, irrespective of medical necessity, that resulted from the financial arrangement or referral scheme they negotiated with one or more of the Controllers.

43. Because the Covered Persons purportedly treated by the Fraudulently Owned PCs and/or the Paper Owners had been directed and/or steered for services as a result of an unlawful referral scheme orchestrated by the Controllers, any bills submitted to Plaintiffs for such services were fraudulent and, as such, never eligible for reimbursement.

44. The No-fault Law is a statutory creation, in derogation of the common law, and must be strictly construed. This lawsuit seeks, among other things, to enforce the plain language of the No-fault Law and implementing regulations, as well as its underlying public policy, which limits reimbursement of No-fault benefits to properly licensed professional corporations that provide medically necessary services. In doing so, Plaintiffs seek compensatory damages and a declaratory judgment that Plaintiffs are not required to pay any No-fault claims from the Fraudulently Owned PCs that seek reimbursement for any medical services that resulted from: (1) the Fraudulently Owned PCs' fraudulent incorporation and/or control and/or ownership by laypersons; and/or (2) unlawful referral, fraudulent billing, and/or illegal fee-splitting schemes.

45. Such claims continue to be the subject of No-fault collection actions and/or arbitrations to recover benefits, and thus constitute a continuing harm to Plaintiffs.

46. By way of example and not limitation, annexed hereto as Exhibit "1" is a spreadsheet listing the No-fault claims on which Plaintiffs made payments to the Fraudulently Owned PCs and to which they are not entitled because of their fraudulent corporate structure and/or because they resulted from unlawful referral, fraudulent billing, and/or illegal fee-splitting schemes. By way of further example and not limitation, annexed hereto as Exhibit "2" is a spreadsheet listing the No-fault claims that form the basis of Plaintiffs' request for declaratory relief. Said spreadsheets are grouped by PC, claim number, date of service, and billing code used.

47. Every aspect of Defendants' fraudulent scheme was motivated by money and greed, without regard to the grave harm inflicted on the public at large by the Fraudulently Owned PCs, which held themselves out as being legitimate health care providers when, in fact, they were not.

48. The practices alleged herein were conducted willfully, with the sole object of converting money, in utter disregard of their impact on the premium-paying public and in flagrant disregard of the rules and laws governing provision of services under the No-fault Law.

49. The fraudulent billing activity described herein not only is an imminent and ongoing threat to consumers' health, but it drains the limited health care resources of this country, resources which are already under strain to meet legitimate healthcare needs. The New York State Department of Financial Services and insurance committees in both the New York State Senate and Assembly each estimate that No-fault insurance fraud is costing New York State consumers in excess of one billion dollars a year.

50. The duration, scope and nature of all Defendants' illegal conduct brings this case well within the realm of criminal conduct to which the Racketeer Influenced and Corrupt Organizations Act ("RICO") applies. Defendants did not engage in sporadic acts of fraud—although that would be troubling enough—they adopted a fraudulent blueprint as their business plan and used it to participate in a systematic pattern of racketeering activity. Every facet of Defendants' operations, from generating fraudulent supporting medical documents to record keeping to billing, was carried out for the purpose of committing fraud.

## **NATURE OF THE ACTION**

51.    This action is brought pursuant to:

      i)    The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, 1962(c), and 1964(c);

      ii)    New York state common law; and

      iii)    The Federal Declaratory Judgment Act; 28 U.S.C. §§ 2201, 2202.

## **NATURE OF RELIEF SOUGHT**

52.    Plaintiffs seek treble damages that they sustained as a result of the Defendants' schemes and artifices to defraud, and the Defendants' acts of mail fraud (pursuant to 18 U.S.C. § 1341), in connection with their use of the facilities of the No-fault system and its assignment of benefits mechanism to fraudulently obtain payments from Plaintiffs for medical services Defendants allegedly rendered to Covered Persons covered by Plaintiffs under New York State's No-fault Law.

53.    Plaintiffs seek compensatory damages to recover all payments made to the Fraudulently Owned PCs since their respective dates of incorporation and punitive damages as a result of Defendants' fraudulently obtaining payments from Plaintiffs for purported medical services rendered by fraudulently incorporated professional corporations to Covered Persons covered by Plaintiffs under New York State's No-fault Law.

54.    Plaintiffs also seek compensatory damages to recover payments made to the Defendants because they fraudulently obtained payments from Plaintiffs for services purportedly rendered pursuant to unlawful referral, fraudulent billing, and/or illegal fee-splitting schemes.

55.    Plaintiffs further seek recovery of the No-fault claim payments made under the independent theory of unjust enrichment.

56.    Plaintiffs also seek a judgment declaring that:

a. Plaintiffs are under no obligation to pay any of the Fraudulently Owned PCs' No-fault claims due to their fraudulent corporate structure;

b. The Fraudulently Owned PCs never had, and do not now have, standing to prosecute any claim for first-party No-fault benefits as an assignee of Covered Persons in any arbitration proceeding or lawsuit commenced in state or federal court due to their fraudulent corporate structure; and

c. Plaintiffs are under no obligation to pay any of the Fraudulently Owned PCs' No-fault claims because the billed-for services were performed as a result of unlawful referral, fraudulent billing, and/or illegal fee-splitting schemes.

57. As a result of Defendants' actions alleged herein, Plaintiffs were defrauded of an amount in excess of $1,800,000, the exact amount to be determined at trial, in payments which Defendants received for billing Plaintiffs for purported medical services provided by fraudulently incorporated professional corporations and/or pursuant to unlawful referral, fraudulent billing, and/or illegal fee-splitting schemes.

## THE PARTIES

### A. Plaintiffs

58. Plaintiff Allstate Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

59. Plaintiff Allstate Fire & Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

60. Plaintiff Allstate Indemnity Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

61.     Plaintiff Allstate Property & Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

62.     Allstate Insurance Company, Allstate Fire & Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property & Casualty Insurance Company are collectively referred to herein interchangeably as "Allstate" or "Plaintiffs."

63.     Plaintiffs are duly organized and licensed to engage in the writing of automobile insurance policies in the State of New York and provide automobile insurance coverage to their policyholders under and in accordance with New York state law.

**B.     The Defendant Controllers**

64.     On information and belief, Defendant Tatiana M. Rybak ("T. Rybak" or "Tatiana") is a natural person residing in the State of Florida who owned, controlled and operated, and is an undisclosed principal and owner of, the Fraudulently Owned PCs.  At all times mentioned herein, Tatiana was one of the masterminds of the Defendants' elaborate schemes to defraud Plaintiffs and, with the other Controllers, established the Fraudulently Owned PCs that fraudulently submitted bills to insurers, in general, and Allstate, in particular; entered into agreements on behalf of the Fraudulently Owned PCs to engage in unlawful referrals and fee-splitting and to ensure that the profits from their criminal enterprise were funneled to her and/or to the other Controllers; and solicited the Defendant Paper Owners to sell their names and/or the use of their licenses for a fee and/or other compensation in violation of the B.C.L.

65.     On information and belief, Defendant Oleg Rybak ("O. Rybak" or "Oleg") is a natural person residing in the State of New York, who owned, controlled and operated, and is an undisclosed principal and owner of, the Fraudulently Owned PCs. At all times mentioned herein, Oleg was one of the masterminds of the Defendants' elaborate schemes to defraud Plaintiffs and,

with the other Controllers, established the Fraudulently Owned PCs that fraudulently submitted bills to insurers, in general, and Allstate, in particular; entered into agreements on behalf of the Fraudulently Owned PCs to engage in unlawful referrals and fee-splitting, and to ensure that the profits from their criminal enterprise were funneled to him and/or to the other Controllers; and solicited the Defendant Paper Owners to sell their names and/or the use of their licenses for a fee and/or other compensation in violation of the B.C.L.

66.     O. Rybak is the son of T. Rybak, and is a lawyer admitted to practice law in New York since 2009. Oleg is the principal of a law firm called The Rybak Firm, PLLC, which has served as No-fault collection counsel for the Fraudulently Owned PCs.

## C.     The Defendant Paper Owners

67.     Defendant Fabiola G. Pernier is a natural person residing in the State of New York and is sued herein solely in her representative capacity as Executor of the Estate of Jean Pierre Claude Pernier, M.D. ("Pernier") who, until his death on or about September 19, 2017, was a natural person residing in the State of New York and had practiced medicine in the State of New York under license number 157407, issued by the New York State Education Department on or about February 27, 1984. Pernier was listed with the Departments of State and Education as the owner of JPC Medical, P.C. Pernier's services were billed to Allstate through JPC Medical, P.C.

68.     On information and belief, to facilitate the fraudulent incorporation and/or illegal corporate structure of JPC Medical, P.C., as well as unlawful referral, fraudulent billing, and/or illegal fee-splitting schemes, Pernier sold his name and/or the use of his license for a fee and/or other compensation to Defendants T. Rybak, O. Rybak, and/or John Doe Defendants 1 through 20, and provided the essential means for T. Rybak, O. Rybak, and/or John Doe Defendants 1 through 20 to fraudulently incorporate and/or operate JPC Medical, P.C., in violation of applicable New York law.

18

69.     On information and belief, at all relevant times mentioned herein, Pernier knowingly participated in the scheme to defraud, including but not limited to conspiring with the Controllers and others, to create unlawful referral, fraudulent billing, and/or illegal fee-splitting schemes, billing for services that were not medically necessary and preparing or causing to be prepared bills submitted to Plaintiffs for services that were the result of unlawful referral, fraudulent billing, and/or illegal fee-splitting schemes.

70.     Defendant Francois Jules Parisien, M.D. ("Parisien") is a natural person residing in the State of New York and has practiced medicine in the State of New York under license number 111735, issued by the New York State Education Department on or about January 25, 1972. Defendant Parisien is listed with the Departments of State and Education as the owner of JPF Medical Services, P.C., Jules Medical, P.C. n/k/a Gibbons Medical, P.C., JP Medical Services P.C., and PFJ Medical Care P.C. Defendant Parisien's services were billed to Allstate under his name and through JPF Medical Services, P.C., Jules Medical, P.C. n/k/a Gibbons Medical, P.C., JP Medical Services P.C., and PFJ Medical Care P.C.

71.     On information and belief, to facilitate the fraudulent incorporation and/or illegal corporate structure of JPF Medical Services, P.C., Jules Medical, P.C. n/k/a Gibbons Medical, P.C., JP Medical Services P.C., and PFJ Medical Care P.C., as well as unlawful referral, fraudulent billing, and/or illegal fee-splitting schemes, Defendant Parisien sold his name and/or the use of his license for a fee and/or other compensation to Defendants T. Rybak, O. Rybak, and/or John Doe Defendants 1 through 20, and provided the essential means for T. Rybak, O. Rybak, and/or John Doe Defendants 1 through 20 to fraudulently incorporate and/or operate JPF Medical Services, P.C., Jules Medical, P.C. n/k/a Gibbons Medical, P.C., JP Medical Services P.C., and PFJ Medical Care P.C., in violation of applicable New York law.

72. On information and belief, at all relevant times mentioned herein, Defendant Parisien knowingly participated in the scheme to defraud, including but not limited to conspiring with the Controllers and others to create unlawful referral, fraudulent billing, and/or illegal fee-splitting schemes, billing for services that were not medically necessary and preparing or causing to be prepared bills submitted to Plaintiffs for services that were the result of unlawful referral, fraudulent billing, and/or illegal fee-splitting schemes.

73. Defendant Francis Joseph Lacina, M.D. ("Lacina") is a natural person residing in the State of Florida and has practiced medicine in the State of New York under license number 266071, issued by the New York State Education Department on or about July 26, 2012. Defendant Lacina is listed with the Departments of State and Education as the owner of FJL Medical Services P.C., JFL Medical Care P.C., and RA Medical Services P.C. Defendant Lacina's services were billed to Allstate through FJL Medical Services P.C., JFL Medical Care P.C., and RA Medical Services P.C.

74. On information and belief, to facilitate the fraudulent incorporation and/or illegal corporate structure of FJL Medical Services P.C., JFL Medical Care P.C., and RA Medical Services P.C, as well as unlawful referral, fraudulent billing, and/or illegal fee-splitting schemes, Defendant Lacina sold his name and/or the use of his license for a fee and/or other compensation to Defendants T. Rybak, O. Rybak, and/or John Doe Defendants 1 through 20, and provided the essential means for T. Rybak, O. Rybak, and/or John Doe Defendants 1 through 20 to fraudulently incorporate and/or operate FJL Medical Services P.C., JFL Medical Care P.C., and RA Medical Services P.C, in violation of applicable New York law.

75. On information and belief, at all relevant times mentioned herein, Defendant Lacina knowingly participated in the scheme to defraud, including but not limited to conspiring with the

Controllers and others to create unlawful referral, fraudulent billing, and/or illegal fee-splitting schemes, billing for services that were not medically necessary and preparing or causing to be prepared bills submitted to Plaintiffs for services that were the result of unlawful referral, fraudulent billing, and/or illegal fee-splitting schemes.

76. Defendant Ksenia Pavlova, D.O. ("Pavlova") is a natural person residing in the State of New York and has practiced medicine in the State of New York under license number 270110, issued by the New York State Education Department on or about May 7, 2013. Defendant Pavlova is listed with the Departments of State and Education as the owner of Allay Medical Services, P.C., and KP Medical Care P.C. Defendant Pavlova is married to Sergey Rybak, who is Tatiana's son and Oleg's brother. Defendant Pavlova's services were billed to Allstate under her name, and through Allay Medical Services, P.C., and KP Medical Care P.C.

77. On information and belief, to facilitate the fraudulent incorporation and/or illegal corporate structure of Allay Medical Services, P.C., and KP Medical Care P.C., as well as unlawful referral, fraudulent billing, and/or illegal fee-splitting schemes, Defendant Pavlova sold her name and/or the use of her license for a fee and/or other compensation to Defendants T. Rybak, O. Rybak, and/or John Doe Defendants 1 through 20, and provided the essential means for T. Rybak, O. Rybak, and/or John Doe Defendants 1 through 20 to fraudulently incorporate and/or operate Allay Medical Services, P.C. and KP Medical Care P.C., in violation of applicable New York law.

78. On information and belief, at all relevant times mentioned herein, Defendant Pavlova knowingly participated in the scheme to defraud, including but not limited to conspiring with the Controllers and others to create unlawful referral, fraudulent billing, and/or illegal fee-splitting schemes, billing for services that were not medically necessary and preparing or causing

to be prepared bills submitted to Plaintiffs for services that were the result of unlawful referral, fraudulent billing, and/or illegal fee-splitting schemes.

79.     Defendant Alford A. Smith, M.D. ("Smith") is a natural person residing in the State of New York and has practiced medicine in the State of New York under license number 156297, issued by the New York State Education Department on or about October 17, 1983. Defendant Smith is listed with the Departments of State and Education as the owner of Alford A. Smith, MD, P.C., and Strategic Medical Initiatives P.C. Defendant Smith's services were billed to Allstate under his own tax identification number and through Alford A. Smith, MD, P.C., and Strategic Medical Initiatives P.C.

80.     On information and belief, to facilitate the fraudulent incorporation and/or illegal corporate structure of Alford A. Smith, MD, P.C., and Strategic Medical Initiatives P.C., as well as unlawful referral, fraudulent billing, and/or illegal fee-splitting schemes, Defendant Smith sold his name and/or the use of his license for a fee and/or other compensation to Defendants T. Rybak, O. Rybak, and/or John Doe Defendants 1 through 20, and provided the essential means for T. Rybak, O. Rybak, and/or John Doe Defendants 1 through 20 to fraudulently incorporate and/or operate Alford A. Smith, MD, P.C., and Strategic Medical Initiatives P.C., in violation of applicable New York law.

81.     On information and belief, at all relevant times mentioned herein, Defendant Smith knowingly participated in the scheme to defraud, including but not limited to conspiring with the Controllers and others to create unlawful referral, fraudulent billing, and/or illegal fee-splitting schemes, billing for services that were not medically necessary and preparing or causing to be prepared bills submitted to Plaintiffs for services that were the result of unlawful referral, fraudulent billing, and/or illegal fee-splitting schemes.

82.     Defendant Darren Thomas Mollo, D.C. ("Mollo") is a natural person residing in the State of New York and has practiced as a chiropractor in the State of New York under license number 009495, issued by the New York State Education Department on or about September 23, 1999. Defendant Mollo is listed with the Departments of State and Education as the owner of ACH Chiropractic, P.C., Energy Chiropractic, P.C., and Island Life Chiropractic Pain Care, PLLC. Defendant Mollo's services were billed to Allstate under his own tax identification number and through ACH Chiropractic, P.C., Energy Chiropractic, P.C., and Island Life Chiropractic Pain Care, PLLC.

83.     On information and belief, to facilitate the fraudulent incorporation and/or illegal corporate structure of ACH Chiropractic, P.C., Energy Chiropractic, P.C., and Island Life Chiropractic Pain Care, PLLC, as well as unlawful referral, fraudulent billing, and/or illegal fee-splitting schemes, Defendant Mollo sold his name and/or the use of his license for a fee and/or other compensation to Defendants T. Rybak, O. Rybak, and/or John Doe Defendants 1 through 20, and provided the essential means for T. Rybak, O. Rybak, and/or John Doe Defendants 1 through 20 to fraudulently incorporate and/or operate ACH Chiropractic, P.C., Energy Chiropractic, P.C., and Island Life Chiropractic Pain Care, PLLC, in violation of applicable New York law.

84.     On information and belief, at all relevant times mentioned herein, Defendant Mollo knowingly participated in the scheme to defraud, including but not limited to conspiring with the Controllers and others to create unlawful referral, fraudulent billing, and/or illegal fee-splitting schemes, billing for services that were not medically necessary and preparing or causing to be prepared bills submitted to Plaintiffs for services that were the result of unlawful referral, fraudulent billing, and/or illegal fee-splitting schemes.

85.     Defendant Charles Deng, L.Ac. ("Deng") is a natural person residing in the State of New York and has practiced as an acupuncturist in the State of New York under license number 000466, issued by the New York State Education Department on or about January 3, 1994. Defendant Deng is listed with the Departments of State and Education as the owner of Charles Deng Acupuncture, P.C. Defendant Deng's services were billed to Allstate under his name and through Charles Deng Acupuncture, P.C.

86.     On information and belief, to facilitate the fraudulent incorporation and/or illegal corporate structure of Charles Deng Acupuncture, P.C., as well as unlawful referral, fraudulent billing, and/or illegal fee-splitting schemes, Defendant Deng sold his name and/or the use of his license for a fee and/or other compensation to Defendants T. Rybak, O. Rybak, and/or John Doe Defendants 1 through 20, and provided the essential means for T. Rybak, O. Rybak, and/or John Doe Defendants 1 through 20 to fraudulently incorporate and/or operate Charles Deng Acupuncture, P.C., in violation of applicable New York law.

87.     On information and belief, at all relevant times mentioned herein, Defendant Deng knowingly participated in the scheme to defraud, including but not limited to conspiring with the Controllers and others to create unlawful referral, fraudulent billing, and/or illegal fee-splitting schemes, billing for services that were not medically necessary and preparing or causing to be prepared bills submitted to Plaintiffs for services that were the result of unlawful referral, fraudulent billing, and/or illegal fee-splitting schemes.

88.     Defendant Maria Sheila Buslon a/k/a Maria Masigla, P.T. ("Buslon") is a natural person residing in the State of Florida and has practiced as a physical therapist in the State of New York under license number 019591, issued by the New York State Education Department on or about March 24, 1999. Defendant Buslon is listed with the Departments of State and Education as

the owner of MSB Physical Therapy, P.C. Defendant Buslon's services were billed to Allstate under her name and through MSB Physical Therapy, P.C.

89.     On information and belief, to facilitate the fraudulent incorporation and/or illegal corporate structure of MSB Physical Therapy, P.C., as well as unlawful referral, fraudulent billing, and/or illegal fee-splitting schemes, Defendant Buslon sold her name and/or the use of her license for a fee and/or other compensation to Defendants T. Rybak, O. Rybak, and/or John Doe Defendants 1 through 20, and provided the essential means for T. Rybak, O. Rybak, and/or John Doe Defendants 1 through 20 to fraudulently incorporate and/or operate MSB Physical Therapy, P.C., in violation of applicable New York law.

90.     On information and belief, at all relevant times mentioned herein, Defendant Buslon knowingly participated in the scheme to defraud, including but not limited to conspiring with the Controllers and others to create unlawful referral, fraudulent billing, and/or illegal fee-splitting schemes, billing for services that were not medically necessary and preparing or causing to be prepared bills submitted to Plaintiffs for services that were the result of unlawful referral, fraudulent billing, and/or illegal fee-splitting schemes.

**D.     The Fraudulently Owned PCs**

91.     Defendant JPC Medical, P.C. was incorporated on or about October 19, 2016, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York. Pernier was the nominal Paper Owner of JPC Medical, P.C., and, on information and belief, received an agreed upon salary and/or other compensation for doing so from the Controllers and/or one or more of the ABC Corporations in exchange for allowing his name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of JPC Medical, P.C.

92.     At all relevant times mentioned herein, Defendant Controllers T. Rybak, O. Rybak, and/or John Doe Defendants 1 through 20 were the true owners of and in control of JPC Medical, P.C.

93.     Defendant JPF Medical Services, P.C., was incorporated on or about September 23, 2016, and purported to be a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York, until its dissolution on or about January 31, 2018. Defendant Parisien is the nominal Paper Owner of JPF Medical Services, P.C., and, on information and belief, received an agreed upon salary and/or other compensation for doing so from the Controllers and/or one or more of the ABC Corporations in exchange for allowing his name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of JPF Medical Services, P.C.

94.     At all relevant times mentioned herein, Defendant Controllers T. Rybak, O. Rybak, and/or John Doe Defendants 1 through 20 were the true owners of and in control of JPF Medical Services, P.C.

95.     Defendant Jules Medical, P.C. n/k/a Gibbons Medical, P.C. (hereinafter Jules Medical, P.C.), was incorporated on or about September 5, 2018, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York. Defendant Parisien is the nominal Paper Owner of Jules Medical, P.C., and, on information and belief, received an agreed upon salary and/or other compensation for doing so from the Controllers and/or one or more of the ABC Corporations, in exchange for allowing his name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of Jules Medical, P.C.

96.     At all relevant times mentioned herein, Defendant Controllers T. Rybak, O. Rybak, and/or John Doe Defendants 1 through 20 were the true owners of and in control of Jules Medical, P.C.

97.     Defendant JP Medical Services P.C. was incorporated on or about July 26, 2018, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York. Defendant Parisien is the nominal Paper Owner of JP Medical Services P.C. and, on information and belief, received an agreed upon salary and/or other compensation for doing so from the Controllers and/or one or more of the ABC Corporations, in exchange for allowing his name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of JP Medical Services P.C.

98.     At all relevant times mentioned herein, Defendant Controllers T. Rybak, O. Rybak, and/or John Doe Defendants 1 through 20 were the true owners of and in control of JP Medical Services P.C.

99.     Defendant JFL Medical Care P.C. was incorporated on or about September 23, 2016, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York. Defendant Lacina is the nominal Paper Owner of JFL Medical Care P.C. and, on information and belief, received an agreed upon salary and/or other compensation for doing so from the Controllers and/or one or more of the ABC Corporations in exchange for allowing his name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of JFL Medical Care P.C.

100. At all relevant times mentioned herein, Defendant Controllers T. Rybak, O. Rybak, and/or John Doe Defendants 1 through 20 were the true owners of and in control of JFL Medical Care P.C.

101. Defendant Allay Medical Services, P.C. was incorporated on or about June 29, 2015, and purported to be a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York, until its dissolution on or about September 11, 2017. Defendant Pavlova is the nominal Paper Owner of Allay Medical Services, P.C., and, on information and belief, received an agreed upon salary and/or other compensation for doing so from the Controllers and/or one or more of the ABC Corporations in exchange for allowing her name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of Allay Medical Services, P.C.

102. At all relevant times mentioned herein, Defendant Controllers T. Rybak, O. Rybak, and/or John Doe Defendants 1 through 20 were the true owners of and in control of Allay Medical Services, P.C.

103. Defendant FJL Medical Services P.C. was incorporated on or about June 24, 2016 and purported to be a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York, until its dissolution on or about January 29, 2018. Defendant Lacina is the nominal Paper Owner of FJL Medical Services P.C. and, on information and belief, received an agreed upon salary and/or other compensation for doing so from the Controllers and/or one or more of the ABC Corporations in exchange for allowing his name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of FJL Medical Services P.C.

104.     At all relevant times mentioned herein, Defendant Controllers T. Rybak, O. Rybak, and/or John Doe Defendants 1 through 20 were the true owners of and in control of FJL Medical Services P.C.

105.     Defendant PFJ Medical Care P.C. was incorporated on or about July 31, 2015 and purported to be a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York, until its dissolution on or about July 24, 2019. Defendant Parisien is the nominal Paper Owner of PFJ Medical Care P.C., and, on information and belief, received an agreed upon salary and/or other compensation for doing so from the Controllers and/or one or more of the ABC Corporations in exchange for allowing his name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of PFJ Medical Care P.C.

106.     At all relevant times mentioned herein, Defendant Controllers T. Rybak, O. Rybak, and/or John Doe Defendants 1 through 20 were the true owners of and in control of PFJ Medical Care P.C.

107.     Defendant RA Medical Services P.C. was incorporated on or about November 9, 2015, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York. Defendant Lacina is the nominal Paper Owner of RA Medical Services P.C., and, on information and belief, received an agreed upon salary and/or other compensation for doing so from the Controllers and/or one or more of the ABC Corporations in exchange for allowing his name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of RA Medical Services P.C.

108.     At all relevant times mentioned herein, Defendant Controllers T. Rybak, O. Rybak, and/or John Doe Defendants 1 through 20 were the true owners of and in control of RA Medical Services P.C.

109.     Defendant KP Medical Care P.C. was incorporated on or about October 28, 2016 and purported to be a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York, until its dissolution on or about December 18, 2019. Defendant Pavlova was the nominal Paper Owner of KP Medical Care P.C., and, on information and belief, received an agreed upon salary and/or other compensation for doing so from the Controllers and/or one or more of the ABC Corporations in exchange for allowing her name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of KP Medical Care P.C.

110.     At all relevant times mentioned herein, Defendant Controllers T. Rybak, O. Rybak, and/or John Doe Defendants 1 through 20 were the true owners of and in control of KP Medical Care P.C.

111.     Defendant Alford A. Smith, MD, P.C. was incorporated on or about December 8, 1992, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York. Defendant Smith is the nominal Paper Owner of Alford A. Smith, MD, P.C., and, on information and belief, received an agreed upon salary and/or other compensation for doing so from the Controllers and/or one or more of the ABC Corporations in exchange for allowing his name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of Alford A. Smith, MD, P.C.

112.    At all relevant times mentioned herein, Defendant Controllers T. Rybak, O. Rybak, and/or John Doe Defendants 1 through 20 were the true owners of and in control of Alford A. Smith, MD, P.C.

113.    Defendant Strategic Medical Initiatives P.C. was incorporated on or about March 14, 2005, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York. Defendant Smith is the nominal Paper Owner of Strategic Medical Initiatives P.C., and, on information and belief, received an agreed upon salary and/or other compensation for doing so from the Controllers and/or one or more of the ABC Corporations in exchange for allowing his name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of Strategic Medical Initiatives P.C.

114.    At all relevant times mentioned herein, Defendant Controllers T. Rybak, O. Rybak, and/or John Doe Defendants 1 through 20 were the true owners of and in control of Strategic Medical Initiatives P.C.

115.    Defendant ACH Chiropractic, P.C. was incorporated on or about September 28, 2015 and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York. Defendant Mollo is the nominal Paper Owner of ACH Chiropractic, P.C., and, on information and belief, received an agreed upon salary and/or other compensation for doing so from the Controllers and/or one or more of the ABC Corporations in exchange for allowing his name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of ACH Chiropractic, P.C.

116.     At all relevant times mentioned herein, Defendant Controllers T. Rybak, O. Rybak, and/or John Doe Defendants 1 through 20 were the true owners of and in control of ACH Chiropractic, P.C.

117.     Defendant Energy Chiropractic, P.C. was incorporated on or about October 21, 2016, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York. Defendant Mollo is the nominal Paper Owner of Energy Chiropractic, P.C., and, on information and belief, received an agreed upon salary and/or other compensation for doing so from the Controllers and/or one or more of the ABC Corporations in exchange for allowing his name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of Energy Chiropractic, P.C.

118.     At all relevant times mentioned herein, Defendant Controllers T. Rybak, O. Rybak, and/or John Doe Defendants 1 through 20 were the true owners of and in control of Energy Chiropractic, P.C.

119.     Defendant Island Life Chiropractic Pain Care, PLLC, was incorporated on or about September 2, 2010, and purports to be a professional service limited liability company authorized to do business in the State of New York, with its principal place of business located in New York. Defendant Mollo is the nominal Paper Owner of Island Life Chiropractic Pain Care, PLLC, and, on information and belief, received an agreed upon salary and/or other compensation for doing so from the Controllers and/or one or more of the ABC Corporations in exchange for allowing his name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of Island Life Chiropractic Pain Care, PLLC.

120.     At all relevant times mentioned herein, Defendant Controllers T. Rybak, O. Rybak, and/or John Doe Defendants 1 through 20 were the true owners of and in control of Island Life Chiropractic Pain Care, PLLC.

121.     Defendant Charles Deng Acupuncture, P.C. was incorporated on or about October 24, 2000, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York. Defendant Deng is the nominal Paper Owner of Charles Deng Acupuncture, P.C., and, on information and belief, received an agreed upon salary and/or other compensation for doing so from the Controllers and/or one or more of the ABC Corporations in exchange for allowing his name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of Charles Deng Acupuncture, P.C.

122.     At all relevant times mentioned herein, Defendant Controllers T. Rybak, O. Rybak, and/or John Doe Defendants 1 through 20 were the true owners of and in control of Charles Deng Acupuncture, P.C.

123.     Defendant MSB Physical Therapy, P.C. was incorporated on or about April 1, 2016, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York. Defendant Buslon is the nominal Paper Owner of MSB Physical Therapy, P.C., and, on information and belief, received an agreed upon salary and/or other compensation for doing so from the Controllers and/or one or more of the ABC Corporations in exchange for allowing her name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of MSB Physical Therapy, P.C.

124.     At all relevant times mentioned herein, Defendant Controllers T. Rybak, O. Rybak, and/or John Doe Defendants 1 through 20 were the true owners of and in control of MSB Physical Therapy, P.C.

**E.      The John Doe Defendants**

125.     John Doe Defendants 1 through 20 (the "John Doe Defendants") are individuals who conspired, participated, conducted and assisted in the fraudulent and unlawful conduct alleged herein. These individuals will be added as defendants when their names and the extent of their participation become known through discovery.

**F.      The ABC Corporations**

126.     Defendant ABC Corporations 1 through 20 (the "ABC Corporations") are additional companies that are unknown to Plaintiffs and are owned, controlled and operated by one or more of the Controllers, and which entered into ostensible agreements and other contracts with one or more of the Fraudulently Owned PCs and/or were used to funnel money to one or more of the Controllers.

127.     On information and belief, the ABC Corporations also are the alter egos of one or more of the Controllers and conspired and assisted in the fraudulent and unlawful conduct alleged herein.  These corporations will be added as Defendants when their names and the extent of their participation become known through discovery.

## JURISDICTION AND VENUE

128.     The jurisdiction of the Court arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*.; 28 U.S.C. §§ 1331; and principles of pendent jurisdiction.

129.     The Court has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a) and under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

130.     Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367 and New York CPLR § 302(a), this Court has personal jurisdiction over any non-domiciliary defendant.

131.     Venue lies in this District Court under the provisions of 28 U.S.C. § 1391, as the Eastern District of New York is the district where one or more of the Defendants reside and because this is the district where a substantial amount of the activities forming the basis of the Complaint occurred.

### FACTUAL ALLEGATIONS
### <u>APPLICABLE TO ALL CAUSES OF ACTION</u>

132.     Plaintiffs underwrite automobile insurance in New York State and participate as insurers in New York State's No-fault program.

133.     Under the Comprehensive Motor Vehicle Insurance Reparations Act of New York State, Ins. Law §§ 5101, *et seq.* (popularly known as the "No-fault Law"), Plaintiffs are required to pay, *inter alia*, for health service expenses that are reasonably incurred as a result of injuries suffered by Covered Persons that arise from the use or operation of such motor vehicles in the State of New York.

134.     Each of the Fraudulently Owned PCs are ostensibly each a healthcare provider that bills for treatments to, among others, individuals covered under the No-fault Law. In exchange for their services, the Fraudulently Owned PCs accept assignments of benefits from Covered Persons and submit claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

135.    Under the No-fault Law and implementing regulations, a provider of healthcare services is not eligible for reimbursement under Section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

### A.    Control / Ownership of Professional Corporations

136.    Section 1504(c) of the B.C.L. requires, among other things, that each report, diagnosis, prognosis, and prescription made or issued by a corporation practicing medicine, . . . physiotherapy or chiropractic shall bear the signature of one or more physicians, . . . physiotherapists, or chiropractors, respectively, who are in responsible charge of such report, diagnosis, prognosis, or prescription.

137.    Section 1507 of the B.C.L. prohibits a shareholder of a professional service corporation from issuing shares, entering into an agreement, granting proxies or transferring control to individuals who are not authorized by law to practice the profession for which the professional corporation is authorized to practice, and it further provides that "[a]ll shares issued, agreements made or proxies granted in violation of this section shall be void." B.C.L. § 1507(a).

138.    Similarly, under section 1508 of the B.C.L., no individual may be a director or officer of a professional service corporation unless that individual is authorized by law to practice in the same profession that the corporation is authorized to practice.

139.    Section 1503(b) of the B.C.L. requires that the certificates of incorporation for an entity seeking to practice as a professional service corporation state the profession to be practiced by such corporation and the names and resident addresses of all individuals who are to be the original shareholders, directors and officers of such corporation.

140.    The restrictions contained in Article 15 of the B.C.L. were meant to "ensure that a professional service corporation renders professional services only through qualified members of the professions and are *in fact controlled only by qualified members*." New York Legislative Annual 1970, p. 129 (emphasis added). Restrictions in Section 1507 of the B.C.L. in particular were designed to "ensure that a professional service corporation [such as the Fraudulently Owned PCs here] *could not be* controlled by a layperson." New York State Legislative Annual 1971, p. 130 (emphasis added). These are not mere technical requirements but are part of an important and long-established regulatory scheme specifically designed by the Legislature to protect patients' health and safety and to insure the ethical and competent practice of the profession of medicine. *See People v. Cole*, 219 N.Y. 98 (1916) (purpose of licensing provisions governing practice of medicine is to protect the public). Indeed, Section 6512 of the Education Law makes it a Class E felony to "fraudulently sell . . . any . . . license . . . purporting to authorize the practice of a profession." Moreover, the New York State Department of Health has determined that violating these important provisions constitutes "professional misconduct" that can result in the revocation of a physician's medical license. Moreover, the statutory scheme "prohibits a licensed physician from allowing a non-licensed person to form a service corporation, to be a shareholder of a professional service corporation, *or to control a professional service corporation*." Sept. 5, 2000 DOH Opinion (emphasis added).

141.    The implementing No-fault regulation promulgated by the Superintendent of Financial Services states, in relevant part, that "a provider of health care services is not eligible for reimbursement under section 5102(a)(l) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York…." 11 NYCRR 65-3.16(a)(12).

**B.**     **Unlawful Referral Scheme**

142.     Section 6530(18) of New York's Education Law prohibits "[d]irectly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or in connection with the performance of professional services…" Educ. Law § 6530(18), (19); see 8 NYCRR 29.1(b)(3)-(4)

143.     The payment by a healthcare practitioner or professional corporation to another party for the referral of a patient is a practice prohibited by New York state law.

**C.**     **Unlawful Fee Splitting with Non-Professionals**

144.     Pursuant to Sections 6509-a, 6530, and 6531 of the Education Law, neither a professional corporation nor its record owner may permit any person to share in fees that are generated by other than a partner, employee, associate in a professional firm or corporation, professional subcontractor or consultant authorized to practice medicine, or a legally authorized trainee practicing under the supervision of a licensee.

145.     Under Section 6530(19), the prohibition against the sharing of fees also applies to any arrangement or agreement with non-physicians involving the furnishing of space, equipment and/or services to the medical professional corporation.

146.     Section 6530(19) of New York's Education Law prohibits "[p]ermitting any person to share in the fees for professional services, other than: a partner, employee, associate in a professional firm or corporation, professional subcontractor or consultant authorized to practice medicine, or a legally authorized trainee practicing under the supervision of a licensee. This prohibition shall include any arrangement or agreement whereby the amount received in payment for furnishing space, facilities, equipment or personnel services used by a licensee constitutes a percentage of, or is otherwise dependent upon, the income or receipts of the licensee from such

practice, except as otherwise provided by law with respect to a facility licensed pursuant to article twenty-eight of the public health law or article thirteen of the mental hygiene law."

147.    Under Section 6530 of the Education Law and N.Y. Pub. Health Law § 230-a, fee splitting practices constitute professional misconduct and subjects a physician to serious penalties, including sanctions against a physician's medical license. New York's Business Corporation Law 1503(d) applies the Education Law's professional misconduct provisions to professional services corporations, which may have their certificates of incorporation suspended, revoked or annulled "for cause, in the same manner and to the same extent as is provided with respect to individuals and their licenses, certificates and registrations."

148.    Under 11 NYCRR § 65-3.16(a)(l2), a physician or professional incorporation engaged in fee-splitting is ineligible for reimbursement because such conduct constitutes a violation of a core licensing requirement.

149.    The splitting of professional fees by a physician, chiropractor, acupuncturist, or physical therapist, including any arrangement or agreement in which the amount received as payment for furnishing space, facilities, equipment, or personal services is dependent upon the income or receipts of the licensee from such practice, is a practice prohibited by New York state law.

**D.    Backdrop and the Fraudulently Owned PCs' Submission of Fraudulent Bills**

150.    In purported compliance with the No-fault Law and 11 NYCRR 65, *et seq*., the Fraudulently Owned PCs submitted proof of their claims to Plaintiffs, using the claim form prescribed by the New York State Department of Insurance (known as a "Verification of Treatment by Attending Physician or Other Provider of Health Service" or "NF-3").

151.     Pursuant to Section 403 of the New York Insurance Law, the claim forms submitted to Plaintiffs by the Fraudulently Owned PCs contained the following warning at the foot of the page:

> "Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime."

152.     To process and verify claims submitted by the Fraudulently Owned PCs, Plaintiffs required, and the Fraudulently Owned PCs submitted, to the extent applicable, narrative reports and other medical records relative to the alleged medical care and treatment rendered to Covered Persons, for which the Fraudulently Owned PCs were seeking payment from Plaintiffs.

153.     Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs are generally required to process claims for which a professional corporation has standing to submit, within 30 days of receipt of proof of claim.

154.     To fulfill their obligation to promptly process claims, Plaintiffs justifiably relied upon the bills and documentation submitted by Defendants in support of their claims, and paid Defendants based on the representations and information that they mailed to Plaintiffs.

155.     Under the scheme to defraud alleged herein, the Controllers used the names and licenses of the Paper Owners to enable the Fraudulently Owned PCs to bill for healthcare services throughout the metropolitan area of New York City.

156.     The Controllers, through their control, ownership and operation of the Fraudulently Owned PCs, became the centerpieces of schemes to fraudulently bill No-fault insurance carriers for services which were rendered by fraudulently owned and operated professional corporations.

157.     The Controllers are not licensed to practice medicine or own medical professional corporations in the State of New York, but purchased and/or otherwise were permitted to use the

name(s) and license(s) of the Paper Owners to fraudulently incorporate and/or otherwise own, control and operate the Fraudulently Owned PCs in violation of applicable New York state law, including Article 15 of the B.C.L., which prohibits ownership of a medical professional corporation by someone who is not licensed in medicine. By doing so, the Controllers concealed that they are the "true owners" of one or more of the Fraudulently Owned PCs, and fraudulently represented that the Fraudulently Owned PCs are legitimate professional corporations in compliance with core licensing requirements when, in fact, they are not.

158.    The Controllers used the Fraudulently Owned PCs, medical practices ostensibly owned by the Paper Owners, to bill No-fault insurance carriers for healthcare services that were provided by fraudulently owned professional corporations and/or professional corporations owned, controlled and operated in violation of New York state law, and by virtue thereof, were not and are not entitled to reimbursement of No-fault benefits.

159.    At all relevant times mentioned herein, the Fraudulently Owned PCs were medical offices in name only. In fact, the Fraudulently Owned PCs served as the alter egos for the Controllers and did not adhere to a separate and distinct function that would entitle them to be recognized as legitimate corporate entities. For all practical and legal purposes, the Fraudulently Owned PCs were created and used for the sole purpose of defrauding insurers into paying No-fault claims to fraudulently incorporated professional corporations and/or professional corporations that were not licensed in accordance with applicable New York state law.

160.    In violation of Article 15 of the B.C.L. and Article 130 of the Education Law, the Paper Owners had no control and/or ownership interest in the Fraudulently Owned PCs that they purportedly owned, the proceeds of which were diverted by and to the Controllers and/or one or more of the ABC Corporations.

161. Pursuant to the scheme to defraud alleged herein, the Paper Owners were divested of and/or voluntarily ceded any and all ownership and control of the Fraudulently Owned PCs.

162. The Fraudulently Owned PCs were owned and operated by the same layperson Controllers, including Defendants T. Rybak and O. Rybak, and did not adhere to separate and distinct functions or corporate structures that would entitle them to be recognized as legitimate corporate entities.

163. In violation of the B.C.L. and Education Law, the Paper Owners maintained little or no control over how the Fraudulently Owned PCs were operated and managed.

164. On information and belief, the Fraudulently Owned PCs' billing and collection activities were firmly controlled by the Controllers, and others under their direction, supervision and control. Through the Fraudulently Owned PCs, the Controllers prepared and caused to be mailed insurance claim forms in the Fraudulently Owned PCs' names. The claim forms prepared (or caused to be prepared) by the Controllers directed insurers to mail checks to locations that were designated by the Controllers, and the proceeds of those claims were either deposited in bank accounts under their control and/or later transferred to accounts under the control of the Controllers.

165. On information and belief, consistent with the fact that the Fraudulently Owned PCs were actually owned by one or more of the Controllers, the Controllers were not accountable to the Paper Owners with respect to the finances of the Fraudulently Owned PCs

166. On information and belief, the Controllers did not provide the Fraudulently Owned PCs with, nor did the Paper Owners require or ever request, daily, weekly, monthly or annual reports as to the Fraudulently Owned PCs' income and disbursements. In that regard, the interests of the Paper Owners in the Fraudulently Owned PCs were, at best, that of mere employees with

no ownership or financial interest tied into the profits of the Fraudulently Owned PCs, and the finances of the Fraudulently Owned PCs were irrelevant to the Paper Owners so long as they received their salary and/or any other agreed upon compensation.

167.  By selling and/or permitting the use of their names and licenses, the Paper Owners knowingly provided the essential means by which the Controllers, non-physicians, were able to own and control that in which they are prohibited by law from maintaining a financial interest, *to wit:* medical professional corporations that must be owned exclusively by a licensed professional licensed in medicine or like professionals acting within the scope of the professional corporations' authorized practice.

168.  On information and belief, during the time period relevant to the Complaint, the Fraudulently Owned PCs have funneled to one or more of the Controllers and/or one or more of the ABC Corporations, hundreds of thousands of dollars, essentially representing the gross billings that the Fraudulently Owned PCs collected.

169.  In accordance with the illegal transfer of ownership and control by the Paper Owners, and in contravention of Sections 1503, 1504(a) and (c), and 1508 of the B.C.L., the Controllers exercised control over all aspects of the Fraudulently Owned PC(s) with which they were associated, from billing, to hiring all employees and support staff to work for the Fraudulently Owned PC(s), to collecting and/or directing the collection of the medical bills submitted to insurance companies, to scheduling the purported services the Paper Owners would provide that were billed to insurance companies, to making personnel decisions, to retaining attorneys to pursue No-fault collections on behalf of the Fraudulently Owned PC(s), to establishing relationships with the Paper Owners to whom the Controllers referred their "patients" for healthcare services, to controlling the bank account(s) opened in the name of the Fraudulently Owned PC(s), to

determining what disbursements would be made from the Fraudulently Owned PC(s)' accounts and to whom and for how much, to determining what agreements would be entered into on behalf and/or in the name of the Fraudulently Owned PC(s), and to controlling and managing all other aspects of the finances of the Fraudulently Owned PC(s).

170.    The Fraudulently Owned PCs, the Paper Owners, and the Controllers were part of well-organized illegal enterprises that engaged in systematic and fraudulent practices that distinguished them from legitimate healthcare providers. For instance, the components of each enterprise followed practices that were part of a racketeering scheme dictated by one or more of the Controllers:

- Unlike legitimate providers, the Fraudulently Owned PCs submitted bills to insurers in general, and Allstate in particular, that represented that the Fraudulently Owned PCs were professional corporations owned solely by a medical doctor when, in fact, they were not;

- Unlike legitimate providers, the Fraudulently Owned PCs made false and misleading statements and/or provided false information regarding who owned, controlled and operated the Fraudulently Owned PCs

- Unlike legitimate providers, the Fraudulently Owned PCs made false and misleading statements and/or provided false information intended to mislead Plaintiffs into believing that the Fraudulently Owned PCs were being operated by the Paper Owners, whose names were listed on the certificates of incorporation, when, in fact, they were not;

- Unlike legitimate providers, the Fraudulently Owned PCs made false and misleading statements and/or provided false information intended to circumvent Article 15 of the B.C.L., which prohibits ownership by individuals not licensed to practice the profession for which a professional corporation was incorporated;

- Unlike legitimate providers, the Fraudulently Owned PCs concealed the fact that the Fraudulently Owned PCs were engaged in the illegal corporate practice of medicine in contravention of New York state law, and that they were billing for physician services through Fraudulently Owned PCs;

- Unlike legitimate medical practices, the Controllers, and/or other entities the Controllers owned or maintained a financial interest in, accepted kickbacks in exchange for providing a steady stream of persons who allegedly had been involved in motor vehicle accidents to the Fraudulently Owned PCs. The Fraudulently Owned PCs paid the kickbacks knowing that they could recover the amount of the kickbacks many times over through fraudulent billing;

- Unlike legitimate medical practices, the Fraudulently Owned PCs paid kickbacks to one or more of the Controllers and/or other entities owned or controlled by one or more of the Controllers, so that the Controllers would supply a steady stream of persons allegedly involved in traffic accidents for treatment. The Fraudulently Owned PCs paid the kickbacks knowing that they could recover the amount of the kickbacks many times over through fraudulent billing submitted to insurers, including Plaintiffs;

- Unlike legitimate providers, the Fraudulently Owned PCs misrepresented the existence or severity of any injuries that Covered Persons may have had and the course of any treatments;

- Unlike legitimate providers, the Fraudulently Owned PCs routinely submitted claims for Fraudulent Services that were medically unnecessary and/or performed in a sub-standard manner from which no useful medical information could be derived, and submitted false medical reports in support of those services;

- Unlike legitimate providers, the Fraudulently Owned PCs submitted claims for Fraudulent Services pursuant to a fraudulent protocol of treatment established by the Controllers;

- Unlike legitimate providers, rather than perform a valid test according to prevailing standards of medical care as they must, or refer to a legitimate practitioner, the Fraudulently Owned PCs performed invalid, medically unnecessary and bogus diagnostic tests that willfully misrepresented medical facts and potentially endangered the Covered Persons; and

- Unlike legitimate providers, the Fraudulently Owned PCs submitted bills, using the prescribed "NF-3" forms entitled "Verification of Treatment by Attending Physician or Other Provider of Health Services" wherein Defendants knowingly, with intent to deceive Allstate and induce payment as a result thereof, and falsely misrepresented the services reflected therein, when in fact the services were of no diagnostic or treatment value.

171.    By way of example and not limitation, on information and belief, in furtherance of the scheme to defraud alleged herein, the Controllers:

- Recruited the Paper Owners to serve as the nominal owners of the Fraudulently Owned PCs, divesting them of attributes of ownership in those medical professional corporations;

- Managed the day-to-day operations of the locations where the Fraudulently Owned PCs operated, including but not limited to hiring staff to work in the physical locations;

- Opened, maintained and/or controlled the Fraudulently Owned PCs' bank accounts;

- Determined the physical space from which the Fraudulently Owned PCs would (and did) purportedly maintain their operations;

- Maintained control over and/or caused those acting under their direction and control to maintain the books and records of the Fraudulently Owned PCs;

- Maintained control and/or supervision over the Fraudulently Owned PCs' finances, including the charges for and economic benefit from the services purportedly provided by the Fraudulently Owned PCs;

- Established and oversaw a fraudulent treatment protocol that each of the Fraudulently Owned PCs provided to Covered Persons that was medically unnecessary and/or of no diagnostic or treatment value;

- Prepared or caused to be prepared fraudulent bills and/or medical reports and sent them to Plaintiffs;

- Participated, or caused those acting under their direction to participate, in the preparation and mailing of bogus claims, knowing that they contained materially false and misleading information;

- Ensured that the profits from the criminal enterprise were funneled to themselves and others unknown to Plaintiffs;

- Entered into separate financial arrangements with one or more of the Fraudulently Owned PCs and/or Paper Owners, which operated out of the same location, to provide a referral source and patient population in exchange for kickbacks;

- Directed and/or caused to be directed and/or steered patients to the Fraudulently Owned PCs pursuant to a treatment protocol, irrespective of medical necessity in exchange for a kickback, fee or other financial incentive from the Fraudulently Owned PCs and/or the Paper Owners; and

- Unilaterally selected and retained attorney(s), including O. Rybak or his firm, Rybak PLLC, to pursue collection matters, including litigation and/or arbitration on behalf of the Fraudulently Owned PCs.

172. By way of example and not limitation, in furtherance of the scheme to defraud alleged herein, the Paper Owners:

- Sold their names and licenses for use by one or more of the Controllers;

- Provided the essential means through which one or more of the Controllers were able to own the Fraudulently Owned PCs in contravention of New York state law;

- Ceded ownership and control of the Fraudulently Owned PCs;

- Abdicated any and all attributes of ownership and control of the Fraudulently Owned PCs to one or more of the Controllers;

- Maintained no control over how Fraudulently Owned PCs were operated and managed;

- Allowed their names and licenses to be used to pursue fraudulent claims on behalf of the Fraudulently Owned PCs—fraudulently incorporated professional corporations that were unlawfully formed and operated by one or more of the Controllers;

- Allowed and facilitated the generation of fictitious medical records and bills that were submitted to Allstate under their names in association with the Fraudulently Owned PCs;

- Signed HCFA, NF-3 Forms and/or narrative reports, which falsely represented that they, or someone at their direction, actually rendered the health services for which the Fraudulently Owned PCs submitted bills, when in fact the services were medically unnecessary and/or of no diagnostic or treatment value; and

- Ordered Fraudulent Services for Covered Persons that were materially misrepresented, medically unnecessary and/or of no diagnostic or treatment value.

173.    At all relevant times mentioned herein, the Paper Owners knew or should have known that the fraudulent services for which the Fraudulently Owned PCs billed Plaintiffs were not performed as billed, were fabricated, were of no diagnostic value and/or were provided pursuant to a pre-determined fraudulent protocol, irrespective of medical necessity.

174.    At all relevant times mentioned herein, the Controllers, through the Fraudulently Owned PCs, directly or through others acting under and pursuant to their directions, instructions and control, submitted or caused to be submitted fraudulent bills for the fraudulent services, in furtherance of the scheme to defraud alleged herein, to obtain payment in connection with fraudulent claims.

175.    As a result of the Defendants' fraudulent billing scheme, Allstate has paid Defendants in excess of $1,800,000 in fraudulent and unnecessary medical services.

176.    Separate and apart from the foregoing, in furtherance of their scheme to defraud, in addition to seeking reimbursement for services provided by fraudulently incorporated professional corporations to which they were not entitled, the Controllers implemented a scheme through which, in exchange for funneling monies out of the Fraudulently Owned PCs, the Controllers directed and/or steered a patient population to the Paper Owners associated with one or more of the Fraudulently Owned PCs for acupuncture services, diagnostic tests, chiropractic care and/or other medical services pursuant to a predetermined course of treatment, irrespective of medical necessity.

177.    On information and belief, the Paper Owners who billed out of the 1786 Flatbush Avenue No-fault Clinic, and/or other addresses, could only gain access to the Covered Persons at that location by allowing the proceeds of their fraudulent billing scheme to be funneled to the

Controllers, who the Paper Owners knew or should have known were lay persons, were not licensed medical professionals, and who were not legally permitted to receive those proceeds.

178.    The Paper Owners allowed the Fraudulently Owned PCs to funnel the proceeds of the Fraudulently Owned PCs by making payments disguised as rent, utilities and/or other payments to one or more of the Controllers and/or others under the Controllers' supervision and/or control in order to continue to receive a patient source from the Controllers and/or others unknown to Plaintiffs and to "treat" patients at 1786 Flatbush Avenue, Brooklyn NY, where one or more of the Fraudulently Owned PCs maintained their operations, and/or at other locations.

179.    Together, the Controllers and one or more of the Paper Owners devised a scheme in which, in exchange for funneling the proceeds generated by the Fraudulently Owned PCs, the Controllers would systematically direct or cause to be directed Covered Persons to one or more of the Paper Owners. Thereafter, the Paper Owners would purportedly render physical therapy, acupuncture services, diagnostic tests, chiropractic care and/or other medical services to as many Covered Persons as possible that were purportedly directed and/or steered to them by the Controllers and/or others under the Controllers' supervision and/or control.

180.    The Controllers, directly and indirectly, steered and/or directed the Covered Persons to the Paper Owners and/or the Fraudulently Owned PCs as part of a medical protocol that they determined, without regard to medical necessity.

181.    Once the Covered Persons were directed and/or steered to the Fraudulently Owned PCs, the Fraudulently Owned PCs would bill insurance companies in general, and Plaintiffs in particular, for, among other things, physical therapy, acupuncture, diagnostic tests, chiropractic or other medical care rendered through the Fraudulently Owned PCs to the Covered Persons that had been directed and/or steered to them.

182.    At all relevant times mentioned herein, the Paper Owners conspired with one or more of the Controllers and knowingly participated in the scheme to defraud. By way of example and not limitation, the Paper Owners knowingly billed for services that were not medically necessary, submitted bills to insurers for services that were the result of the unlawful referral/illegal fee-splitting scheme, and allowed the proceeds of billings for services that were not medically necessary to be disguised as payments for rent, utilities, or other purported expenses, and thereby funneled to one or more of the Controllers and/or others under the Controllers' supervision and control.

183.    At all relevant times mentioned herein, the Paper Owners knew or should have known that Covered Persons were directed and/or steered to them pursuant to a medical protocol that resulted from the financial arrangement or unlawful referral and illegal fee-splitting scheme they agreed to participate in with one or more of the Controllers, irrespective of medical necessity.

184.    At all relevant times mentioned herein, the Controllers knowingly caused the Fraudulently Owned PCs to submit bills seeking reimbursement for services purportedly rendered to the Covered Persons, that the Controllers or others, acting pursuant to their directions, instructions and control, directed and/or steered to the Fraudulently Owned PCs, in furtherance of the scheme to defraud alleged herein.

185.    At all relevant times mentioned herein, the Controllers knew or should have known that the Covered Persons that were being directed and/or steered to the Fraudulently Owned PCs would be used by the Fraudulently Owned PCs to obtain payment from insurers in general, and Plaintiffs in particular, in connection with fraudulent claims.

186.    At all relevant times mentioned herein, the Controllers, acting in concert with the Paper Owners and the Fraudulently Owned PCs, participated in, conducted, controlled, conspired

together, aided and abetted and furthered the fraudulent schemes through a common course of conduct and purpose, which was to defraud insurers in general, and Plaintiffs in particular, of money.

187.    At all relevant times mentioned herein, by directing and/or steering their patient population to the Fraudulently Owned PCs in exchange for unlawful receipt of proceeds of medical billing to which the Controllers were not legally entitled, the Controllers, through one or more of the Fraudulently Owned PCs, provided the essential means for the Fraudulently Owned PCs (and their respective Paper Owners) to submit fraudulent claims in furtherance of the scheme to defraud alleged in this Complaint.

188.    At all relevant times mentioned herein, the Paper Owners knew or should have known that the services they provided to the Covered Persons, referred to the Fraudulently Owned PCs by one or more of the Controllers and/or others under the Controllers' supervision and control, were rendered pursuant to an unlawful referral and illegal fee-splitting scheme.

189.    At all relevant times mentioned herein, the Paper Owners, through their respective Fraudulently Owned PCs, knowingly allowed the Controllers to submit or cause to be submitted fraudulent bills for medically unnecessary services rendered as a result of an unlawful referral and illegal fee-splitting scheme, in furtherance of the scheme to defraud alleged herein, in order to obtain payment in connection with fraudulent claims.

190.    At all relevant times mentioned herein, the Paper Owners—acting in concert with their respective Fraudulently Owned PCs, and the Controllers and/or others unknown to Plaintiffs—participated in, conducted, controlled, conspired together, aided and abetted and furthered the fraudulent schemes through a common course of conduct and purpose, which was to defraud insurers in general, and Plaintiffs in particular, of money.

191.    At all relevant times mentioned herein, the unlawful referral and illegal fee-splitting scheme pursuant to which the Controllers, through the Fraudulently Owned PCs, directed and/or steered its patient population to the Fraudulently Owned PCs, provided the essential means by which the Paper Owners, through their respective Fraudulently Owned PCs, were able to further their scheme to defraud as alleged in this Complaint.

## A CENTRALIZED SCHEME TO DEFRAUD

**A.    Background of T. Rybak and the Scheme to Defraud**

192.    T. Rybak has been involved in No-fault insurance fraud schemes, such as alleged herein, for at least the past two decades.

193.    By way of example and not limitation, in 1999, a 140-count indictment was returned by a Kings County Grand Jury against T. Rybak, among others, charging her with Enterprise Corruption, insurance fraud, and fraudulently billing for medically unnecessary evaluations and therapy services, Durable Medical Equipment ("DME") and diagnostic testing services at No-fault clinics located at 1300 Flatbush Avenue, Brooklyn, NY.

194.    In connection with the indictment, T. Rybak pled guilty to charges of attempted Enterprise Corruption in violation of N.Y. Penal Law 460.20(1)(a), participation in a scheme to defraud in the first degree in violation of N.Y. Penal Law 190.65(1)(a), and twelve counts of insurance fraud in violation of N.Y. Penal Law 176.05(1). Kings County Indictment No. 4270/99 ("Indictment"); Transcript of Proceedings, *The People of the State of New York v. T. Rybuk* [sic], Indictment No. 4270-99 (Supreme Court, Kings Co. Criminal Term Oct. 27, 1999).

195.    T. Rybak admitted in her guilty plea that she submitted fraudulent No-fault insurance claims that included, among other things, falsified physical therapy progress notes and false bills and records for nerve block injections and durable medical equipment.

196.     In connection with her guilty plea, T. Rybak was sentenced to five years' probation, was ordered, among other things, to pay $1,000,000 million in restitution, and agreed that she would "not engage in any employment related to the insurance industry, including no-fault insurance, personal injury or health insurance" for a period of five years. Transcript of Proceedings, *The People of the State of New York v. T. Rybuk* [sic], Indictment No. 4270-99 (Supreme Court, Kings Co. Criminal Term Oct. 27, 1999).

197.     Subsequent to T. Rybak's guilty plea, in January 2000, Allstate and other insurers brought a civil action against T. Rybak seeking to recover more than $5,000,000 of damages arising out of fraudulent activity which T. Rybak engaged in at No-fault clinics which were the subject of the Indictment. See *Allstate Insurance Company v. TMR Medibill Inc.*, No. 00-cv-0002 (NGG) (VVP) (E.D.N.Y.).

198.     In granting plaintiff's motion for an attachment and preliminary injunction in the *TMR Medibill Inc.* matter, the District Court found that T. Rybak had orchestrated an "elaborate and sophisticated insurance fraud scheme," and that "[a]fter incorporating each of the clinics in the name of a nominal share-holder doctor, each defendant doctor transferred all effective interest, ownership, and control of the respective professional corporation to defendants Rybak…[]." *Allstate Ins. Co. v. TMR Medibill Inc.*, 00-cv-0002 (CPS), 2000 WL 34011895, at *3 (E.D.N.Y. Jul. 13, 2000).

199.     As a result of T. Rybak's scheme that was laid bare in *TMR Medibill Inc.*, she was described by the New York Post as the "city's reigning czarina of auto-insurance fraud" who "was motivated by money, and everything she did was intended to generate more and more cash" to furnish her lavish lifestyle of luxury apartments, yachts, Mercedes Benz automobiles, and

expensive diamond jewelry. Susan Edelman, "Czarina' Reigned Over Insure [sic] Scams — Rip-Offs Kept Her in Gems & Yachts", New York Post (June 26, 2000).

200.    In August 2000, State Farm Mutual Auto Insurance Company also brought a civil action alleging fraud, unjust enrichment, and other claims against T. Rybak, among others. *State Farm Mutual Auto Insurance Co. v. Robert Mallela*, No. 00-cv-04923 (CPS) (E.D.N.Y.); *State Farm Mutual Automobile Insurance Company v. Robert Mallela*, 175 F. Supp. 2d 401 (E.D.N.Y. 2001) relating to her illegal ownership and operation of medical professional corporations.

201.    In or about, January 8, 2005, Robert Mallela, M.D., one of the physicians who allowed his name and license to be used by T. Rybak to fraudulently own and control medical professional corporations, surrendered his medical license and admitted to practicing medicine with intent to defraud insurance companies and signed an affidavit stating that T. Rybak "owned" three medical professional corporations which were incorporated under his name.

202.    Notwithstanding that T. Rybak's criminal conviction prohibited her from any employment related to the No-Fault insurance industry for five years, within months of her 1999 guilty plea, T. Rybak began to secretly and unlawfully own and control No-fault clinics at 1468 Flatbush Avenue, Brooklyn, NY ("1468 Flatbush Avenue"), just a few blocks from the 1300 Flatbush Avenue location which was the subject of the Indictment.

203.    By way of example and not limitation, T. Rybak illegally owned and controlled at least three medical professional corporations at 1468 Flatbush Avenue which were owned on paper by Zenaida Reyes-Arguelles, M.D., (who is not a defendant in this matter), one of the doctors that T. Rybak admitted to conspiring with in connection with her 1999 criminal conviction. In that regard, in the matter of *Gov't Emps. Ins. Co. v. Zenaida Reyes-Arguelles, M.D.* et al., Case No. 1:12-cv-01953-CBA-RLM (E.D.N.Y.), Compl. ¶¶ 41, 58 (Dkt 1), it was credibly alleged that

Arguelles testified that (i) she did not know when her businesses at 1468 Flatbush Avenue opened, who incorporated them, whether they had written leases for the use of space, the amount of rent they paid, whether other providers operated at the location, the amount of overhead costs, the names of employees, the amount of profits, the location of the checkbook, or the names of the chiropractors who operated at the location and how much they paid in rent.

204.    On information and belief, T. Rybak owned the physical premises at the 1468 Flatbush Avenue location and entered into illegitimate "lease" arrangements with No-fault providers as a means to siphon their profits to T. Rybak, among others.

**B.      Background of Oleg Rybak and the Scheme to Defraud**

205.    O. Rybak is the son of T. Rybak and was admitted to practice law in the State of New York in 2009.

206.    In or about June 2009, less than two months after being licensed as an attorney, O. Rybak established the Rybak Law Firm.

207.    Upon the establishment of the Rybak Law Firm, O. Rybak, through the Rybak Law Firm, immediately began pursing civil actions on behalf of No-fault providers

208.    On information and belief, O. Rybak has participated in the scheme to defraud alleged herein since at least 2010.

209.    In or about that time, O. Rybak was the listed owner of a cosmetic surgery spa located in Miami, FL named the Anti-Aging Aesthetic and Laser Center Inc., ("Anti-Aging Center").

210.    On information and belief, notwithstanding that Arguelles had conspired with T. Rybak in connection with a massive No-fault scheme for which T. Rybak pled guilty, O. Rybak hired Arguelles to be the purported "medical director" at the Anti-Aging Center.

211.    In addition, O. Rybak also purportedly employed Gabriel Gutierrez, M.D. ("Gutierrez") (who is not a defendant in this matter), a medical doctor who was trained as a plastic surgeon, and performed Botox injections, laser, and other cosmetic surgery procedures to work as a doctor at the Anti-Aging Center, as well as T. Rybak, to work as a "facial specialist."

212.    On information and belief, in or about January 2011, notwithstanding that Gutierrez's training and background was in plastic surgery, and that he was purportedly employed by O. Rybak at the Anti-Aging Center, the Controllers recruited him to travel from Miami to Brooklyn to treat No-fault patients at 1468 Flatbush Avenue.

213.    On information and belief, Gutierrez initially treated patients, and submitted bills under his own name and social security number at 1468 Flatbush Avenue, however, in April and September 2011, respectively, Gutierrez, at the direction of T. Rybak and/or O. Rybak, formed Alleviation Medical Services P.C. ("Alleviation") and JGG Medical Care P.C., ("JGG"), which are not defendants in this matter.

214.    On information and belief, both Alleviation and JGG were secretly and unlawfully owned and controlled by the Controllers, and their profits were siphoned to T. Rybak and O. Rybak through a variety of means.

215.    On information and belief, Gutierrez, at the direction of one or more of the Controllers. entered into a sham billing arrangement with the Rybak Law Firm, which was used by the Controllers to exercise full and exclusive control over the finances of Gutierrez's and/or his professional corporation's billing.

216.    By way of example, and not limitation, Gutierrez has provided sworn testimony that the "Rybak Firm . . . pretty much ended up being controlling [sic] my whole practice, and that's not okay." "I was under the impression that I had full control of the corporation when in

reality I was not in full control. And I was living under an illusion of control, meaning that Natasha [Tokar, an employee of the Rybak Law Firm] was actually overseeing my billing and making decisions on my behalf without informing me what she was doing . . . by the order of Oleg Rybak, as I had been assured by Natasha herself."

217.    By way of further example and not limitation, Gutierrez has also provided sworn testimony stating that: (i) the Rybak Law Firm prepared [Gutierrez's] bills and both the firm and T. Rybak exercised control over the reimbursements he received from insurers for the healthcare services provided to patients; (ii) T. Rybak, O. Rybak, and the Rybak Law Firm exercised control over the funds received by [Gutierrez's] practice. Specifically, Tokar, an employee of the Rybak Law Firm, instructed Gutierrez to write checks to various individuals purportedly for employee payroll or other practice expenses; and (iii) O. Rybak requested that Dr. Gutierrez write checks as gifts, including to another attorney with whom O. Rybak was associated.

218.    On or about April 7, 2014, Gutierrez filed a civil lawsuit against O. Rybak, the Rybak Law Firm, and others in Bronx County Supreme Court. See *Jaime Gutierrez, et al. v. Oleg Rybak, et al.*, Index No. 260257/2014 (Supreme Ct. Bronx Co.) seeking an accounting of any escrow funds held by the Rybak Law Firm, a return of any business records, and an order voiding any liens over funds asserted by Rybak.  In the lawsuit, it is alleged that between 2011 and 2012, the Rybak Law Firm filed numerous lawsuits on behalf of Gutierrez and collected "millions" of dollars but had not paid the funds to Gutierrez. The suit also alleged that when the Rybak Law Firm moved offices in 2012, it took Dr. Gutierrez's patient records and never returned them.

219.    On information and belief, once the 1786 Flatbush Avenue scheme to defraud was established, O. Rybak participated in, and directed the affairs of the illegal enterprises by, among other things:

- Funneling proceeds of the fraudulent activity at the Fraudulently Owned PCs to or for the benefit of himself, T. Rybak and/or other family members;

- Representing individuals who were purportedly treated at the Fraudulently Owned PCs (and who were in staged accidents) to recover No-Fault Benefits and pursue claims and lawsuits for bodily injuries arising out of automobile accidents;

- Filing, through the Rybak Firm, more than 50,000 claims and suits against insurers to recover payment for fraudulent services purportedly provided to patients of the Fraudulently Owned PCs and supporting such suits with bogus legal documentation; and

- Recruiting one or more medical professionals to purportedly treat patients at the Fraudulently Owned PCs.

- Directing, establishing and/or facilitating the medical services protocol at the Fraudulently Owned PCs.

### C.   The Controllers Establish the 1786 Flatbush Avenue Scheme to Defraud

220.    In April 2012 and March 2013 respectively, GEICO Insurance Company filed two lawsuits based on activity at 1468 Flatbush Avenue against doctors and other healthcare professionals, medical professional corporations, and the office manager, alleging that healthcare professionals were not the true owners of their medical professional corporations; management, billing and lease agreements were used to siphon the proceeds of the clinic and control the medical professional corporations; and substantial payments were made out of the accounts of the medical professional corporations to secure the proceeds of the practice. *See Gov't Emps. Ins. Co. v. Zenaida Reyes-Arguelles, M.D., et al.*, Case No. 1:12-cv-01953-CBA-RLM (E.D.N.Y.); *Gov't Emps Ins. Co. v. Jean Claude Compas, M.D., et al.*, Case No. 1:13-cv-01290-CBA-RLM (E.D.N.Y.).

221.    On information and belief, with the two *GEICO* lawsuits in 2012 and 2013 drawing unwanted attention from insurers and others to the illegal activity taking place at 1468 Flatbush

Avenue, in 2013, the Controllers, including but not limited to T. Rybak and O. Rybak, began to phase out operations at 1468 Flatbush Avenue in lieu of the new location at 1786 Flatbush Avenue.

222.    At least seven medical professional and eight professional corporations that submitted bills for services at 1468 Flatbush Avenue continued to treat patients and bill for services at 1786 Flatbush Avenue, including but not limited to Defendants Parisien, Mollo, Deng, and Buslon, Allay Medical Services, P.C., PFJ Medical Care P.C., ACH Chiropractic, P.C., Energy Chiropractic, P.C., Island Life Chiropractic Pain Care, PLLC, and Charles Deng Acupuncture, P.C.

223.    On information and belief, as was the case with the 1468 Flatbush Avenue location, the Controllers' scheme to defraud at 1786 Flatbush Avenue depended on the control of the physical space at which the No-fault clinics which they illegally owned and controlled operated.

224.    On information and belief, in an attempt to insulate themselves from public knowledge of their illegal ownership and control of the No-fault clinics which they intended to illegally own and operate out of 1786 Flatbush Avenue, the Controllers solicited T. Rybak's daughter-in-law and O. Rybak's sister-in-law, Ksenia Pavlova, M.D. ("Pavlova") to lease the premises at 1786 Flatbush Avenue in Pavlova's name.

225.    Pavlova is a physician who purports to treat patients at 1786 Flatbush Avenue and is married to T. Rybak's son, Sergey Rybak.

226.    On information and belief, to ensure that ownership and control of the Fraudulently Owned PCs remained with the Controllers, the Fraudulently Owned PCs' true owners, one or more of the Controllers caused the Fraudulently Owned PCs to enter into one or more agreements with one or more of the ABC Corporations, which one or more of the Controllers also controlled and owned.

227.    By way of example and not limitation, the Fraudulently Owned PCs were required to pay rent, management and/or other fees that ensured that the Paper Owners had little or no real ownership interest in the Fraudulently Owned PCs, and the proceeds derived therefrom were diverted to the Controllers, the Fraudulently Owned PCs' true owners.

228.    The Controllers determined the terms and/or unilaterally established the manner and means through which they, and/or one or more of the ABC Corporations, would purportedly manage the Fraudulently Owned PCs' daily operations at 1786 Flatbush Avenue, as well as control the billing and collection services rendered on behalf of one or more of the Fraudulently Owned PCs.  As a result, the Controllers controlled and operated every aspect of the Fraudulently Owned PCs' business.

229.    On information and belief, pursuant to various agreements, the monies the Fraudulently Owned PCs at 1786 Flatbush Avenue paid to the Controllers and/or one or more of the ABC Corporations were never pursuant to a set fee or percentage, but increased and/or decreased year to year to ensure that the Fraudulently Owned PCs' gross billings were paid to the Controllers and/or one or more of the ABC Corporations and eventually funneled to the Controllers.

230.    On information and belief, the Controllers, not the Paper Owners, provided the start-up costs, capital contribution and investment capital to operate the Fraudulently Owned PCs at 1786 Flatbush Avenue.

231.    On information and belief, under the arrangement established with the Controllers, the Paper Owners' salary and/or other compensation from one or more of the Fraudulently Owned PCs remained fairly constant regardless of the amounts collected by the Fraudulently Owned PC.

232.     Moreover, the salary and/or other compensation the Paper Owners received would not change based on the revenue that was generated, or expenses incurred, by the Fraudulently Owned PCs, but rather remained the same regardless of the financial condition or profitability of the Fraudulently Owned PCs.  As a result, the Paper Owners did not have an ownership interest in the medical practices they purportedly owned.

233.     The sole purpose of the relationship between and among the Fraudulently Owned PCs, the Controllers, and/or one or more of the ABC Corporations was, after paying the Paper Owners their salary and/or other compensation, to funnel money from the Fraudulently Owned PCs to the Controllers or to other entities controlled by the Controllers, including but not limited to, one or more of the ABC Corporations.

234.     The Fraudulently Owned PCs provided the vehicle through which the Controllers were able to engage in a systematic billing scheme premised entirely on their ability to pass hundreds of thousands of dollars through fraudulently incorporated professional corporations.

235.     As part of the scheme to defraud, the Controllers operated, controlled and managed the Fraudulently Owned PCs, and generated, directed and/or employed personnel who were responsible for creating and generating their fraudulent bills, medical records, and No-fault forms to be submitted to insurance carriers.

236.     The Paper Owners did not (i) control the money and other assets of the professional corporation(s) which they purported to own; (ii) contribute any capital to the professional corporation(s) which they purported to own; (iii) negotiate any lease agreements relating to the physical premises and equipment for the professional corporation(s) which they purported to own; (iv) have any meaningful access to any bank accounts, financial or business ledgers or other related documents relating to the professional corporation(s) which they purported to own; (v) manage the

daily operations of the professional corporation(s) which they purported to own; (vi) hire any employees, professional or non-professional for the professional corporation(s) which they purported to own; (vii) negotiate or determine the salaries for any employees, professional or non-professional of the professional corporation(s) which they purported to own; or (viii) purchase, lease, select, or order any of the equipment housed at the location of the professional corporation(s) which they purported to own.

237.    The Controllers managed, supervised, participated in, conducted and oversaw the day-to-day billing and operations of the Fraudulently Owned PCs.  By way of example and not limitation, a nurse practitioner who worked at 1786 Flatbush Avenue from approximately September 2016 to approximately March 2017 stated in a sworn affidavit that:

- T. Rybak managed hiring and activity at 1786 Flatbush Avenue, directed the care that was provided to patients, and controlled the funds of the professional corporations that purported to treat patients at 1786 Flatbush Avenue.

- Services that she performed were billed to insurance companies through professional corporations, including PFJ Medical Care P.C. and JPF Medical Services, P.C. (owned on paper by Defendant Parisien) and KP Medical Care P.C. (owned on paper by a person she knew as Dr. Rybak, but who on information and belief was Defendant Pavlova) notwithstanding that the affiant never met Parisien or "Dr. Rybak" and never saw them at 1786 Flatbush Avenue.

- Neither Parisien nor Pavlova had any role in the day-to-day operations of the clinic or in any of the healthcare practices at 1786 Flatbush Avenue.

- The majority of patients that she saw at 1786 Flatbush Avenue had minor medical issues such as sprains or strains that required straightforward medical decision-making.

- She was instructed by the staff at 1786 Flatbush Avenue to perform initial evaluations on every patient even if the patient had already been seen by a medical doctor or another nurse practitioner at 1786 Flatbush Avenue.

- She performed trigger point injections and dry needling on patients despite having no prior experience doing so.

- Prior to working at 1786 Flatbush, she had never performed dry needling.

- T. Rybak instructed her to perform more dry needling because trigger points injections only paid $100 and were not considered treatment.

- A front desk worker at 1786 Flatbush Avenue instructed that she order MRIs that the affiant did not consider medically necessary.

238. By way of further example, two office employees of 1786 Flatbush asserted the Fifth Amendment at sworn depositions in response to questions about who controlled 1786 Flatbush, whether T. Rybak controlled the activity at 1786 Flatbush, and whether O. Rybak participated in the activity at 1786 Flatbush. In particular, the officer manager asserted the Fifth Amendment when asked if (i) T. Rybak was ultimately in charge of all the operations at 1786 Flatbush Avenue; (ii) all of the professional corporations that treated patients and billed for services at 1786 Flatbush Avenue were actually owned by T. Rybak, (iii) O. Rybak directed medical providers to form new business entities with new tax identification numbers at 1786 Flatbush Avenue to avoid connection to the fraudulent activity at 1468 Flatbush Avenue and (iv) if proceeds from billings at 1786 Flatbush Avenue were funneled to O. Rybak and T. Rybak.

239. Similarly, the receptionist asserted the Fifth Amendment when asked if (i) T. Rybak made all fundamental business decisions for and had ultimate control over the Defendant providers at 1786 Flatbush Avenue, including who they would hire and fire, what healthcare services they would provide to patients at 1786 Flatbush, what services they would bill insurers for, the billing codes, and amounts submitted, (ii) O. Rybak made all fundamental business decisions for and had ultimate control over the Defendant providers at 1786 Flatbush Avenue, including who they would hire and fire, what healthcare services they would provide to patients at 1786 Flatbush, what services they would bill insurers for, and the billing codes submitted, (iii) if O. Rybak controlled her activity at 1786 Flatbush Avenue and (iv) if O. Rybak directed medical providers to form new

business entities with new tax identification numbers at 1786 Flatbush to avoid connection to the fraudulent activity at 1468 Flatbush.

240.    Once the Fraudulently Owned PCs were created, the Controllers and/or one or more of the ABC Corporations generated, or caused to be generated, medical records, reports and bills for services purportedly provided by the Fraudulently Owned PCs as if they were legitimate professional corporations when, in fact, they were not.

241.    Defendants concealed the fact that the Controllers were the true owners of the Fraudulently Owned PCs in order to circumvent the B.C.L., which prohibits individuals who are not licensed to practice medicine from owning professional corporations in the medical field. Specifically, Section 1507 of the B.C.L. permits the ownership of a professional corporation by only those "individuals who are authorized by law to practice in this state [New York] a profession which such corporation is authorized to practice . . . ."

242.    By concealing the fact that the Controllers were the true owners of the Fraudulently Owned PCs, the Defendants circumvented the restrictions contained in Article 15 of the B.C.L., which are designed to "ensure that a professional service corporation renders professional services only through qualified members of the professions and are *in fact controlled only by qualified members*."  New York Legislative Annual 1970, p. 129 (emphasis added).

243.    On information and belief, the Fraudulently Owned PCs were interrelated and controlled by one or more of the Controllers as part of a centralized scheme to defraud. By way of example and not limitation:

- One or more of the Fraudulently Owned PCs operated out of the same location, 1786 Flatbush Avenue, Brooklyn, New York.

- One or more of the Fraudulently Owned PCs, including but not limited to ACH Chiropractic, P.C. and Energy Chiropractic, P.C.  used the same

phone number, (929) 333-9955 and/or the same fax number, (929) 333-9954.

- Covered Persons were routinely treated by doctors at professional corporations that were owned on paper by different doctors. By way of example, and not limitation, Claim No. 0374512275-02 submitted to Allstate contains bills reflecting that Parisien rendered services at Allay Medical Services, P.C., which was owned on paper by Pavlova. By way of further example, and not limitation, Claim No. 0431774421-02 submitted to Allstate contains bills reflecting that Parisien rendered services at KP Medical Care P.C., which was also owned on paper by Pavlova.

- The Fraudulently Owned PCs used initial examination and re-evaluation forms which were substantially similar, if not identical.

- The similar and/or identical initial examination and re-evaluation forms used by the Fraudulently Owned PCs contained sections titled "Disability and Prognosis" and/or very similar titles that used the same language: "It is my opinion, based on the history of the patient's symptoms, diagnosis and examination findings that the above noted injuries were sustained/aggravated in the accident that occurred on [date] and the disability resulting from it is/may be of a temporary/permanent nature. The prognosis for a complete recovery is presently (cautiously optimistic/guarded)."

- Numerous Fraudulently Owned PCs changed their names to defraud insurance carriers into believing that newly named clinics were independent of each other, billing for services under the different names and using different tax identification numbers to conceal their connections. By way of example, and not limitation, Dr. Francis J. Lacina was the Paper Owner of two professional corporations that bore his initials, FJL Medical Services P.C., and JFL Medical Care, P.C., in addition to RA Medical Services P.C., each of which has its own unique tax identification number.

- Patients were treated by many Fraudulently Owned PCs for the same purported injuries in a manner that appears calculated to maximize billings to insurance carriers without medical justification. By way of example, and not limitation, Claim No. 0374512275-02 submitted to Allstate contains bills from ACH Chiropractic, P.C., Allay Medical Services, P.C., Charles Deng, Darren T. Mollo, Energy Chiropractic, P.C., Island Life Chiropractic Pain Care, PLLC, JFL Medical Care P.C., Jules Francois Parisien, Ksenia Pavlova, and MSB Physical Therapy, P.C.

- Although JPF Medical Services, P.C., was purportedly owned by Parisien, and JFL Medical Care P.C. was purportedly owned by Dr. Lacina, both entities were formed on the same day, September 23, 2016.

- The corporate formation documents for JPF Medical Services, P.C., PFJ Medical Care P.C., FJL Medical Services P.C., JFL Medical Care P.C., RA Medical Services P.C., KP Medical Care P.C., and MSB Physical Therapy, P.C., were all filed with the New York Department of State by the same attorney, Alexander Almonte, Esq.

- Although JPF Medical Services, P.C., was purportedly owned by Parisien, and FJL Medical Services P.C. was purportedly owned by Dr. Lacina, the certificates of dissolution for those entities were both filed by the same accountant, Norman I. Weisman, CPA.

- The form documentation used by virtually all of the Defendant licensed healthcare professionals at 1786 Flatbush remained the same, except for the provider's name on the letterhead, and the treatment provided by the entities was virtually identical.

- On information and belief, and further demonstrative of how the Defendant PCs were used interchangeably as part of a centralized scheme to defraud, bank records reflect that the aforementioned nurse practitioner was paid for her work at 1786 Flatbush with checks drawn on the accounts of JPF Medical Services, P.C., and PFJ Medical Care P.C. (owned on paper by Defendant Parisien), Defendant Parisien personally, and by Allay Medical Services, P.C., and KP Medical Care P.C. (owned on paper by Defendant Pavlova). The nurse practitioner, however, stated that she did not believe she worked for these professional corporations and had never met or spoken to Parisien or Pavlova.

244.     From at least June 28, 2013 through January 30, 2020, the Paper Owners submitted bills to Allstate under the individual tax identification numbers, and on occasion social security numbers, of sole proprietorships of Defendant Doctors Parisien, Lacina, and Pavlova for services provided at 1786 Flatbush Avenue. Beginning in May 2015, however, the Paper Owners also began submitting claims for the same services to Allstate under a variety of entities operating out of the same location. For example, Parisien's services were billed (a) under his own taxpayer identification number as early as October 2013, (b) by PFJ Medical Care P.C. from April 2016

through October 2016, (c) by JPF Medical Services, P.C. from September 2016 through May 2017; (d) by Jules Medical PC from January 2020 through February 2020, and (e) by JP Medical Services, P.C. from November 2019 through the present. Lacina's services were billed (a) under his own taxpayer identification number beginning in January 2014, (b) by RA Medical Services, P.C. from May 2015 through June 2016, (c) by FJL Medical Services P.C. from July 2016 through October 2017, and (d) by JFL Medical Care P.C. from November 2016 through January 2018. Pavlova's services were billed (a) under her own taxpayer identification number beginning in June 2013, (b) by Allay Medical Services, P.C. from July 2015 through October 2016, and (c) by KP Medical Care P.C. from October 2016 through March 2017. In that regard, the Controllers used the Papers Owners' names and licenses interchangeably, submitting and/or causing to be submitted fraudulent claims under the Paper Owners individual names, as well as through the Fraudulently Owned PCs.

245. On information and belief, the Paper Owners did not exercise control or maintain the Fraudulently Owned PCs' books and records, including accounting, financial records, bank statements and reports relating to the Fraudulently Owned PCs, all of which were controlled and maintained by the Controllers and/or others acting under their direction and control.

246. On information and belief, in furtherance of the scheme to defraud, the Controllers also caused payments to be issued by the Fraudulently Owned PCs to pay personal expenses for T. Rybak, O. Rybak, John Doe Defendants 1 through 20, and/or others unknown to the Plaintiffs in order to further divert the profits of the Fraudulently Owned PCs to themselves, their co-conspirators, and others unknown to Allstate.

247. Bank records reflect that T. Rybak, O. Rybak, and others siphoned proceeds from the providers that operated at 1786 Flatbush:

- At least eleven providers that operated at 1786 Flatbush Avenue, including but not limited to Defendants Parisien, PFJ Medical Care P.C., Charles Deng Acupuncture, P.C., Pavlova, Allay Medical Services, P.C. and Island Life Chiropractic Pain Care, PLLC, wrote checks to an associate of T. Rybak named Clara Pantin totaling over $506,000. No check ever exceeded $10,000, and the checks were at times sequentially numbered or written on the same or consecutive days.

- At least eleven providers that operated at 1786 Flatbush Avenue, including but not limited to Defendants Parisien, PFJ Medical Care P.C., Pavlova, Allay Medical Services, P.C., and MSB Physical Therapy, P.C., purportedly issued at least 56 checks totaling more than $74,000 to Vasila Queen, an associate of T. Rybak.

- At least eight providers that operated at 1786 Flatbush Avenue, including but not limited to Defendants Parisien, JPF Medical Services, P.C., PFJ Medical Care P.C., Pavlova, Allay Medical Services, P.C., and MSB Physical Therapy, P.C., purportedly issued at least 54 checks totaling over $216,000 to Voldymyr Maistrenko, his wife Olga Maistrenko, and his business Art Glass International LLC, which is an interior design business located in North Miami, Florida near condominiums owned by T. Rybak and O. Rybak. No check ever exceeded $10,000, and the checks were sometimes sequentially numbered or written on the same or consecutive days, and on occasion multiple checks written on the same or consecutive days for less than $10,000 totaled $10,000 or more.

- At least eight providers that operated at 1786 Flatbush Avenue, including but not limited to Defendants Parisien, JPF Medical Services, P.C., PFJ Medical Care P.C., Pavlova, Allay Medical Services, P.C., KP Medical Care P.C., and MSB Physical Therapy, P.C., purportedly issued at least 150 checks to Les Levine totaling more than $221,000 between April 2016 and April 2018. Les Levine is a private investigator who was purportedly hired to help O. Rybak defend the lawsuit brought by Gutierrez in which Gutierrez alleged that T. Rybak and O. Rybak improperly controlled Gutierrez's medical practice at 1468 Flatbush Avenue.

- At least eight providers that operated at 1786 Flatbush Avenue, including but not limited to Defendants Parisien, JPF Medical Services, P.C., PFJ Medical Care P.C., Pavlova, Allay Medical Services, P.C., Charles Deng Acupuncture, P.C., Island Life Chiropractic Pain Care, PLLC, and MSB Physical Therapy, P.C. purportedly issued at least 59 checks totaling more than $425,000 to a real estate law firm that represented a real estate development firm owned by Sergey Rybak, the brother of O. Rybak. On some occasions, multiple checks were written on the same date or consecutive days, and the law firm often received checks from different Defendants dated on the same day or

consecutive days. According to a search of the New York Civil Supreme Court online docket, the law firm and one of its attorneys has represented T. Rybak's son and O. Rybak's brother, Sergey Rybak, or Rybak Development in three cases, filed in 2009, 2015, and 2017.

## THE MECHANICS OF THE SCHEME TO DEFRAUD

248.    In furtherance of Defendants' fraudulent billing scheme, individuals who were purportedly involved in automobile accidents in which they ostensibly sustained soft-tissue injuries would present to one of the Defendant PCs, where the Covered Person would be interviewed by the support staff employed by the Controllers. Upon satisfying the initial threshold inquiry for "treating" at one of the Defendant PCs, the Covered Person would be given various No-fault forms to complete upon entering a particular PC for the first time.  The No-fault forms set forth all the information necessary for the Defendant PCs to establish and prepare bills, including but not limited to the Covered Person's address, claim number, policy number, name of insured, name of No-fault carrier and assignment of benefits forms.

249.    Regardless of whether a Covered Person was seen by a doctor on the date of the initial office visit, the Defendant PCs would initiate a series of template reports and related medical documentation to justify the extensive and aggressive prescription of treatments and diagnostic testing that would immediately follow.

250.    As further part of the fraudulent billing scheme, a Covered Person's initial office consultation at any one of the Defendant PCs would automatically trigger the internal generation of bogus reports and billing practices and procedures in which Defendants would create bogus medical documentation and bill for services, including but not limited to initial and follow-up examinations, electrodiagnostic testing, Physical Capacity Testing, and V-sNCT testing, chiropractic services, physical therapy treatment, range of motion testing, acupuncture services,

muscle testing and pain injections, regardless of whether such treatments and tests were actually performed or medically necessary.

251.    Based on the results of purported examinations and testing, the Covered Persons were then referred for additional treatments and services, including but not limited to further follow-up examinations, chiropractic services, acupuncture services, physical therapy services, pain management services, orthopedic services, dry needling, trigger point injections, and other therapeutic services.

252.    Defendants failed to follow-up on the diagnoses and apparent medical conditions they had fabricated to justify the aggressive expensive treatment and testing for which they billed and for which they submitted fraudulent documentation, including material misrepresentations concerning the services rendered.

253.    The bills and documentation submitted by the Defendant PCs, in support of their claims, included fraudulent reports and records that intentionally misrepresented, exaggerated and falsified the condition and test results of Covered Persons.

254.    Defendants' billing documents also contained the implicit misrepresentation that the services were administered, and the bills were generated by lawful professional service corporations, operated by medical doctors. Instead, the Defendant PCs were operated and controlled by the Controllers.

255.    On information and belief, as part of the fraudulent billing scheme, the Controllers, their co-conspirators, and others, caused the signatures of doctors and other healthcare professionals to appear on medical reports and bills submitted to Allstate in the names of the Defendant PCs.

A. **The Fraudulent Treatment Protocol**

256.    In furtherance of the scheme to defraud alleged herein, individuals who were purportedly involved in automobile accidents in New York and purportedly sustained soft-tissue injuries would present to a multidisciplinary clinic located at 1786 Flatbush Avenue, Brooklyn New York (the "Flatbush Avenue Clinic"), which would automatically trigger a treatment protocol designed to fraudulently bill insurance companies, in general, and Allstate, in particular, for *inter alia,* medical evaluations, diagnostic tests, chiropractic treatment, acupuncture treatment, and physical therapy, irrespective of medical necessity.

257.    To the extent any Covered Person was examined at all at the providers operating out of the Flatbush Avenue Clinic, they were each diagnosed with conditions that varied little from Covered Person to Covered Person, allowing for the same predetermined protocol of treatment for each Covered Person.

258.    Notwithstanding that legitimate treatment plans for patients with non-specific neck and back pain, such as those purportedly treated at the Flatbush Avenue Clinic may be limited to rest, over-the-counter pain medications, and application of heat or cold packs, or involve no treatment at all, Covered Persons purportedly treated at the Flatbush Avenue Clinic were routinely assessed the same general diagnoses and subjected to the same pre-determined treatment protocol irrespective of medical necessity, including but not limited to pain management and diagnostic services purportedly provided by JPC Medical, P.C., JPF Medical Services, P.C., JFL Medical Care P.C., Allay Medical Services, P.C., FJL Medical Services P.C., PFJ Medical Care P.C., RA Medical Services P.C. and KP Medical Care P.C.; physical therapy services purportedly provided by MSB Physical Therapy, P.C.; chiropractic services purportedly provided by ACH Chiropractic,

P.C., Energy Chiropractic, P.C., and Island Life and Chiropractic Pain Care, PLLC; and acupuncture services purportedly provided by Charles Deng Acupuncture, P.C.

259.    The protocol of treatment by each of the providers operating out of the Flatbush Avenue Clinic involved virtually the same services purportedly performed for nearly every Covered Person on each visit and continued irrespective of any documented changes in the Covered Person's condition.

260.    The protocol of treatment by each of the providers operating out of the Flatbush Avenue Clinic failed to take into account the needs of any particular Covered Person, and rarely, if ever, varied based upon a Covered Person's age, medical history, circumstances of alleged accident, physical condition, symptoms, prior treatment or severity or location of alleged injury.

261.    Rather than taking into account the needs of individual Covered Persons, Defendants implemented and/or participated in a fraudulent treatment apparatus through which, they, as a matter of pattern, practice and protocol, provided Covered Persons with, and billed Allstate for, among other things, initial and follow-up examinations, electrodiagnostic testing, Physical Capacity Testing, and V-sNCT testing, chiropractic services, physical therapy treatment, range of motion testing, acupuncture services, muscle testing and pain injections irrespective of medical necessity (the "Fraudulent Treatment Protocol").

1.  **The Fraudulent Initial and Follow-Up Examinations by the Defendant Doctors**

262.    Pursuant to the Fraudulent Treatment Protocol, a Covered Person's initial visit to the Flatbush Avenue Clinic would involve a purported examination by a Defendant Doctor who would virtually always diagnose the Covered Person with soft tissue injuries, including but not limited to cervical and lower back strains, for no other purpose than to justify further treatment and testing by the providers operating out of the Flatbush Avenue Clinic.

263.    Pursuant to the Fraudulent Treatment Protocol, once the bogus diagnosis was made, Covered Persons would be referred for chiropractic services, acupuncture treatment, physical therapy, diagnostic testing and related services by the providers operating out of the Flatbush Avenue Clinic, who would then fraudulently bill Allstate for medically unnecessary treatment and testing.

264.    In furtherance of the scheme to defraud alleged herein and demonstrative of the lack of oversight and control over the treatment provided at the Fraudulently Owned PCs, the Defendant Doctors utilized the same or similar boilerplate, pre-printed initial evaluation forms, often containing numerous typographical errors, to document Covered Persons' initial evaluations (the "Initial Evaluation Forms").

265.    The Initial Evaluation Forms were utilized by the Defendant Doctors for no other purpose than to "document" the purported injuries of Covered Persons in a manner which would fraudulently induce payment from insurers in general, and Allstate in particular, as well as to feign the existence of injuries which could justify further testing and treatment by other providers operating out of the Flatbush Avenue Clinic.

266.    Rather than being utilized in a manner which could document specific findings relating to an individual Covered Person required by the level 4 and level 5 billing codes used by Defendants, the Initial Evaluation Forms contained pre-printed findings and narratives which the Defendant Doctors could check off, circle or underline, and the Defendant Doctors rarely, if ever, documented any substantive diagnosis which was specific to a particular Covered Person, resulting in fraudulently inflated evaluations billed under codes that do not correspond to the purported service provided.

267.    In furtherance of the scheme to defraud alleged herein, the Defendant Doctors would, as a matter of pattern, practice and protocol, routinely document the same or similar findings, patient complaints and diagnoses on virtually every Initial Evaluation Form, including but not limited to finding that a majority of Covered Persons (i) complained of neck pain; (ii) complained of lower back pain; and (iii) complained of pain on a frequent and/or daily basis; (iv) had abnormal range of motion; and (v) had a cervical sprain, strain cervicalgia, or myofascitis [sic] and/or lumbar sprain, strain, myofascitis [sic], or conditions in one or more other regions.

268.    Based upon the fraudulent diagnoses documented on the Initial Evaluation Forms, the Defendant Doctors virtually always recommended the Fraudulent Treatment Protocol for all Covered Persons, notwithstanding that the Defendant Doctors knew or should have known that such services were medically unnecessary and fraudulent.    A representative sample of the aforementioned Initial Evaluation Forms is annexed hereto as Exhibit "3."

269.    In addition to the fraudulent initial evaluations, the Defendant Doctors, through their respective Defendant PCs, and/or under their individual names, routinely billed Allstate for periodic level 4 or 5 re-evaluations, which like their initial examinations, involved, at most, cursory, exams of Covered Persons, consisting of boilerplate findings and no significant change in treatment plan as a result of the re-evaluation, to support the continuation of billing for medically unnecessary services purportedly provided to Covered Persons at the Flatbush Avenue Clinic.    A representative sample of re-evaluation reports is annexed hereto as Exhibit "4."

270.    On information and belief, as with the Defendant Doctors' fraudulent initial examinations, the Defendant Doctors similarly failed to tailor their re-evaluations to the unique circumstances of each Covered Person.

271. In addition to the fraudulent initial evaluations, the Defendant Doctors, as a matter of pattern, practice and protocol, routinely scheduled Covered Person follow-up examinations approximately four weeks after their initial examination.

272. Irrespective of whether a particular Covered Person's condition was documented to have improved, remained the same, or worsened, nearly every follow-up examination report recommends the same and/or continuation of treatment and testing from the various providers that operated from the Flatbush Avenue Clinic. *See* Exhibit 4.

### 2. **The Fraudulent Physical Therapy Services**

273. In furtherance of the Fraudulent Treatment Protocol, Defendant Buslon, through MSB Physical Therapy, and/or in her individual name, purportedly performed physical therapy on virtually all Covered Persons that were treated at the Flatbush Avenue Clinic irrespective of medical necessity.

274. In many instances, Covered Persons would receive physical therapy at the Flatbush Avenue Clinic either on the day of their first visit there, or shortly thereafter, irrespective of whether the Covered Person had first been seen by a Defendant Doctor and referred for physical therapy, as required by the No-fault law. *See*, N.Y. Ins. Law § 5102(a)(1)(ii).

275. On information and belief, in those instances where Defendant Bulson through MSB Physical Therapy, and/or in her individual name, provided physical therapy services for Covered Persons irrespective of whether there was a referral from a Defendant Doctor, they did so because it knew that as part of the Fraudulent Treatment Protocol established at the Flatbush Avenue Clinic, a Defendant Doctor would be referring virtually all Covered Persons for physical therapy services irrespective of medical necessity.

276. The physical therapy services purportedly performed by Defendant Buslon through MSB Physical Therapy, and/or in her individual name, rarely varied from patient to patient, nor did any particular Covered Person's physical therapy change based upon an alleged worsening or improving of the Covered Person's condition.

277. The physical therapy services purportedly performed by Defendant Buslon through MSB Physical Therapy, and/or in her individual name, virtually always, if not always, involved from three to five passive modalities, which would occur on every Covered Person of service, and were rarely identified or documented, to the extent that they were performed at all.

278. On information and belief, in order to support the phony physical therapy treatment, a boilerplate "Physical Therapy Examination Report" was prepared in connection with a Covered Person's first date of service.

279. The Physical Therapy Examination Reports were used by Defendants for no other purpose than to justify further unnecessary physical therapy services.

280. In addition, the Physical Therapy Examination Reports routinely concluded that Covered Persons should begin physical therapy to include: (i) the application of heat packs; (ii) therapeutic massage; (iii) therapeutic exercise; (iv) synaptic therapy; and (v) home exercise, though no details of the specific types of home exercise were ever detailed in the Reports. A representative sample of the aforementioned Physical Therapy Examination Reports is annexed hereto as Exhibit "5."

281. Once the bogus justification for the commencement of unnecessary physical therapy was documented in a Physical Therapy Examination Report, all Covered Persons would purportedly receive the same physical therapy services on virtually every visit, consisting of hot packs, therapeutic massage and exercise.

282.     In order to justify continued physical therapy services, as well as to substantiate the purported physical therapy services in claims for reimbursement submitted to Allstate, Defendant Buslon through MSB Physical Therapy, and/or in her individual name, documented the purported treatment of patients on boilerplate forms ("Daily Notes"), which consisted of nothing more than pre-printed check boxes, and rarely, if ever, documented any substantive description of the services purportedly performed.

283.     By way of example and not limitation, the Daily Notes rarely, if ever, documented the nature of therapeutic exercises performed, the duration of such exercises, or Covered Persons' responses to such exercises.  A representative sample of the aforementioned Daily Notes is annexed hereto as Exhibit "6."

### 3.  **The Fraudulent Chiropractic Services**

284.     In furtherance of the Fraudulent Treatment Protocol, Defendant Mollo, through ACH Chiropractic, P.C., Energy Chiropractic, P.C., Island Life Chiropractic Pain Care, PLLC (the "Chiropractic PCs") and/or under his individual name, submitted bills to Plaintiffs for chiropractic services purportedly performed on virtually all Covered Persons that were treated at the Flatbush Avenue Clinic irrespective of medical necessity, and despite chiropractic treatment rarely being medically necessary for motor vehicle accident patients with neck and back pain who are also undergoing physical therapy.

285.     As part of the fraudulent protocol established by the Defendants, Covered Persons that were purportedly given chiropractic examinations were practically always diagnosed with identical conditions that were documented in the same way on pre-printed initial reports prepared by the Defendant Mollo and/or one or more chiropractors in the Chiropractic PCs' employ (the Initial Chiropractic Reports").  In furtherance of the fraudulent protocol, Covered Persons received

chiropractic treatment at the same time they received physical therapy and regardless of the result or efficacy of the physical therapy treatment.

286.    On information and belief, the Initial Chiropractic Reports were utilized by the Defendant Mollo and/or one or more chiropractors in the Chiropractic PCs' employ for no other purpose than to "document" the purported injuries of Covered Persons in a manner which would fraudulently induce payment from insurers in general, and Allstate in particular, as well as to feign the existence of injuries which could justify further chiropractic treatment.

287.    The Initial Chiropractic Reports contained pre-printed text which could be circled or underlined, and rarely, if ever, were utilized by the Defendant Mollo and/or one or more chiropractors in the Chiropractic PCs' employ to document specific findings related to any individual Covered Person.

288.    In furtherance of the scheme to defraud, the Initial Chiropractic Reports, as a matter of pattern, practice and protocol, routinely:

- Reported a diagnosis of most, if not all Covered Persons with one or more generalized conditions of the spine, including but not limited to muscle spasms, sprains of one or more regions of the spine, and/or segmented joint dysfunction in one or more regions of the spine and hip;

- Identified the same treatment plan for most, if not all Covered Persons, which included (i) chiropractic manipulation three times a week for four to six weeks or six to eight weeks; (ii) referrals for x-rays and/or MRIs of the spine "to R/O [rule out] discogenic injury if symptoms persist for 3-4 weeks;" (iii) Voltage Actuated Sensory Nerve Conduction (VsNCT Testing), which is described by the Defendant Mollo and/or one or more chiropractors in the Chiropractic PCs' employ as "small pain fiber studies of the cervical/lumbar spine to evaluate pathology to the A-delta, A-Beta, and C sensory nerve fibers."

289.    In furtherance of the scheme to defraud alleged herein, the chiropractic examinations purportedly performed on Covered Persons nearly always resulted in the same common diagnoses and treatment plans which did not vary from patient to patient or amongst dates

of service. A representative sample of the aforementioned Initial Chiropractic Reports is annexed hereto as Exhibit "7."

290.     On information and belief, Initial Chiropractic Reports were used for no other purpose than as a vehicle through which the Defendant Mollo and/or one or more chiropractors in the Chiropractic PCs' employ could document fictitious Covered Person injuries in order to justify the purported performance of, and billing for, medically unnecessary chiropractic treatments.

291.     Once Covered Persons began their courses of additional chiropractic treatment, Covered Persons' purported progress was documented in Subjective, Objective, Assessment, and Plan notes (the ""Chiropractic SOAP Notes"), which as with the Initial Chiropractic Reports, contained pre-printed text which could be circled or underlined, and rarely, if ever, were utilized by the Defendant Mollo and/or one or more chiropractors in the Chiropractic PCs' employ to document specific findings related to any individual Covered Person. By way of example and not limitation, as a matter of pattern, practice and protocol, the Chiropractic SOAP Notes routinely:

- Documented most, if not all Covered Persons as having complaints of "NP" (neck pain), "MBP" (mid-back pain); and/or "LBP" (low-back pain);

- Documented most Covered Persons as having "No Change" in their condition;

- Documented that most Covered Persons' treatment plans should "Continue as Planned;"

- Documented that most Covered Persons had objective findings of "hypertonic" or "spasm" in the spine and/or joint dysfunction in multiple regions of the spine;

- Rarely documented any modification to the treatment plan, notwithstanding that the SOAP Notes contained a section to indicate such modification;

- Documented that irrespective of the outcome of a Covered Person's initial evaluation, most, if not all Covered Persons routinely received the same treatment, consisting of chiropractic manipulation of three to four regions of the spine; and

- Rarely, if ever, documented the written name of the chiropractor that purportedly provided the chiropractic treatment.

292. On information and belief, the Chiropractic SOAP Notes were used for no other purpose than as a vehicle through which the Defendant Mollo, and/or one or more chiropractors in the Chiropractic PCs' employ, could document medically unnecessary treatment in order to justify the purported performance of, and billing for, further chiropractic treatment which was rarely, if ever, effective in alleviating the purported injury for the Covered Persons or tailored to the needs of any individual Covered Person. A representative sample of the aforementioned Chiropractic SOAP Notes is annexed hereto as Exhibit "8."

293. By way of example and not limitation, as a matter of pattern, practice and protocol, the Defendant Mollo and/or one or more chiropractors in the Chiropractic PCs' employ routinely provided Covered Persons with chiropractic manipulations that did not change in type or frequency depending on whether the Covered Persons' purported injury improved or did not improve.

294. As part of the fraudulent protocol established by the Defendants, Covered Persons that began a course of chiropractic "treatment" with the Chiropractic PCs were routinely, if not always, referred for a follow-up examination following a course of chiropractic treatment at the Flatbush Avenue Clinic.

295. On information and belief, as a matter of pattern, practice and protocol, the follow-up examinations purportedly performed by Defendant Mollo and/or one or more chiropractors in the Chiropractic PCs' employ at the Flatbush Avenue Clinic were routinely performed for no other purpose than to justify the performance of, and billing for, additional and medically unnecessary chiropractic services in furtherance of the Fraudulent Treatment Protocol which was established at the Flatbush Avenue Clinic.

296. In particular, reports of follow-up examinations, which consist of single-page sheets with preprinted content, routinely indicate that, despite having undergone a course of purported chiropractic care, patients continue to complain of cervical and/or lower back pain. Even when patients purportedly have no range of motion deficits upon re-examination, the re-examination report recommends continuation of the same treatment plan and the patient thereafter continues the Predetermined Treatment Protocol, often including several more weeks of chiropractic manipulations. A representative sample of follow-up chiropractic examination reports is annexed hereto as Exhibit "9."

### 4. The Fraudulent Acupuncture Services

297. In furtherance of the scheme to defraud alleged herein, Deng, through Deng Acupuncture, P.C., and/or under his individual name, billed Allstate for acupuncture services pursuant to a fraudulent pre-determined treatment protocol irrespective of medical necessity, on virtually all, if not all, Covered Persons who were purportedly treated at the Flatbush Avenue Clinic during all times relevant to the Complaint.

298. Deng, through Deng Acupuncture, P.C., and/or under his individual name, purportedly performed acupuncture on Covered Persons on the same days that such Covered Persons purportedly received medical services from one or more additional providers at the Flatbush Avenue Clinic, including but not limited to physical therapy and chiropractic services.

299. On information and belief, acupuncture services are premised upon the theory that each individual has a unique life energy ("Qi") which flows along paths called meridians and impact an individual's mental and physical health. There are twelve main meridians ("the Meridians") in the human body through which Qi flows. When that Qi becomes disrupted or imbalanced for any reason (such as trauma), needles can be inserted or pressure can be applied to

very specific points ("Acupuncture Points") along the Meridians to remove the disruption or imbalance and restore the patient's Qi. There are three main steps in an acupuncture treatment regimen.

300. On information and belief, to the extent that acupuncture treatment is ever effective, a point which is widely debated, the first step in any legitimate acupuncture regimen is an examination of the patient, which includes an examination of the appearance of the patient's tongue's color, shape, and texture, and measurements of the rate, rhythm, and strength of the patient's pulse. Competently performing these components of the physical examination is necessary to accurately diagnose the patient and thereby determine an acupuncture treatment plan designed to benefit the patient by restoring their unique Qi.

301. On information and belief, the second step in any legitimate acupuncture regimen is the development of a specific acupuncture treatment plan, which requires the insertion of needles into particular Acupuncture Points along the Meridians, including local points at the injury sites, proximal Acupuncture Points (i.e., near the affected areas of the involved Meridian) and distal Acupuncture Points (i.e., distant from the affected areas of the involved Meridian).

302. On information and belief, the third step in any legitimate acupuncture regimen is the implementation of the acupuncture treatment plan. The acupuncturist inserts generally 10 but more typically 20 or more acupuncture needles, for a minimum of approximately twenty minutes into each of the selected Acupuncture Points, with the number and location of the Acupuncture Points varying based upon the individualized circumstances presented by each patient, and each patient's therapeutic response to each acupuncture treatment.

303. On information and belief, the greater the severity a patient's condition is, the greater frequency that patient is treated and at a greater number of Acupuncture Points. As patients improve, treatment frequency and the number of points used should decrease.

304. On information and belief, a meaningful assessment of each patient is required before a licensed acupuncturist begins treatment to ascertain the patient's condition and determine whether acupuncture treatment is necessary and will benefit the patient.

305. On information and belief, legitimate acupuncture protocols permit up to four treatment sessions during the first two weeks of treatment. Following the first two weeks of treatment, the frequency of sessions typically decreases, providing time to assess how long the patient remains pain free between treatments and/or how long the therapeutic effect of such treatments can be maintained between treatments.

306. On information and belief, as treatments progress, an acupuncturist evaluates whether and when treatments are no longer beneficial and/or necessary for each patient.

307. On information and belief, any legitimate acupuncture regimen requires meaningful documentation of the: (1) patient's medical history; (2) physical examination; (c) diagnosis; (d) treatment plan; (e) results of each treatment session; and (f) the patient's progress throughout the course of treatment.

308. On information and belief, legitimate acupuncture regimens require the continuous assessment of the patients' condition and energy flow as well as the therapeutic effect of previous treatments. Acupuncture treatment plans, like most treatments, are fluid and should evolve over time. Therefore, over the course of legitimate acupuncture treatment plans, the acupuncturist makes adjustments to improve the therapeutic effectiveness of each treatment and eventually return the patient to maximum health by restoring his or her unique Qi.

309.     On information and belief, because Deng's and Deng Acupuncture, P.C.'s purported services were provided pursuant to an illegal protocol of treatment irrespective of medical necessity, Deng's and Deng Acupuncture, P.C.'s evaluation and treatment of Covered Persons did not bear any of the hallmarks of a legitimate acupuncture regimen.

310.     On information and belief, rather than providing acupuncture services within the prevailing standard of care, and in furtherance of their scheme to defraud, to the extent any Covered Person received purported acupuncture treatment at all at Deng Acupuncture, P.C. and/or under Deng's individual name, such treatment was performed on every Covered Person the same way, consistent with providing purported acupuncture treatments pursuant to a pre-determined protocol, with no regard to any particular Covered Person's medical history, physical examination, diagnosis, treatment plan or progress throughout the course of treatment.

311.     Following the pre-determined treatment protocol, Deng, through Deng Acupuncture, P.C. and/or under his individual name, documented Covered Persons' purported initial acupuncture examinations on pre-printed boilerplate forms which indicated that virtually every Covered Person examined was:

- Reported to have "persistent" and/or "sharp" neck pain, notwithstanding that Deng Acupuncture's initial examination form allows for other pain description options to be indicated, including but not limited to "intermittent," "aggravated with sitting/ standing/ walking/ lying down," "dull," "stabbing," "shooting," "distending," "fixed," "heavy," and "aching;"

- Reported to have a tongue that was "light red" in color, "normal" in shape, and having a coating that was "thick white;"

- Reported to have injuries that had "a direct causal relationship between the accident described and the patient's current injuries;"

- Examined without having the "Prognosis" section of their initial evaluation forms completed;

- Diagnosed with the same two channels of (1) Chi-blood stagnation ("The Small Intestine Channel of Hand-Taiyang," and/or (2) "The Urinary Bladder Channel of Foot-Taiyang" ("UB Channel"), notwithstanding that Deng Acupuncture, P.C.'s initial evaluation form has more than 18 preprinted channel options that can be selected;

- Diagnosed with conditions in one or more regions of the spine, as well other conditions, including but not limited to those involving the knee, shoulder, or headaches;

- Prescribed an acupuncture treatment plan consisting of treatment two to three times per week for four weeks;

- Prescribed the same type and size of needles to be used in their acupuncture treatments, noted as "disposable and sterile, individually packed with guided PVC tube. Size 36# x 1.0 (0.20mm x 25mm) or 34# x 1.5 (.22mm x 40mm). 15 [minutes] for initial insertion or reinsertion;" and

- Found to require acupuncture services in order to (i) "provide symptomatic pain relief in acute and sub-acute stages of injury condition; (ii) assist to reduce inflammatory response to affected areas; and (iii) reflexively subside painful muscle contraction and reactive spasm of the injured joint's intrinsic musculature, thereby reversing the pain-spams-muscle cycle."

312. In furtherance of the scheme to defraud alleged herein, the acupuncture initial examinations purportedly performed on Covered Persons generally always resulted in the same common diagnoses and treatment plans which did not vary from patient to patient or amongst dates of service.

313. On information and belief, oftentimes the treatment did not vary despite the purported findings in the initial examination. By way of example and not limitation, despite the indication of abnormal findings, such as potential thrush in the medical records, the medical records do not indicate that Deng, nor anyone at Deng Acupuncture, P.C., took any additional steps to confirm or rule out any potential abnormal findings.

314. On information and belief, in furtherance of the scheme to defraud alleged herein, the initial acupuncture evaluations were used for no other purpose than as a vehicle through which

Deng, through Deng Acupuncture, P.C., and/or under his individual name could document fictitious Covered Person injuries in order to justify the purported performance of, and billing for, medically unnecessary acupuncture services. A representative sample of initial evaluation reports is annexed hereto as Exhibit "10."

315. Once Covered Persons began their courses of acupuncture based upon their fraudulent initial evaluations, Covered Persons' purported progress was documented in Subjective, Objective, Assessment, and Plan notes ("the "Acupuncture SOAP Notes"), which contained pre-printed text which could be circled or underlined, and rarely, if ever, were utilized by the Defendant Chiropractors to document specific findings related to any individual Covered Person. By way of example and not limitation, as a matter of pattern, practice and protocol, the Acupuncture SOAP Notes routinely:

- Documented that virtually every Covered Person presented with neck and/or low-back pain, as well as tenderness and spasms in their cervical and/or lumbar spine.

- Documented that needles were virtually always inserted at the same common Acupuncture Points, irrespective of any Covered Person's particular condition and which appear to be determined only for the sake of expediency. The forms do not identify the number of needles used.

- Failed to document the condition of Covered Persons' tongue or pulse, notwithstanding that such conditions are documented at Covered Persons' purported initial acupuncture evaluations, and that, on information and belief, the ongoing evaluation of such conditions is important for the evaluations of a Covered Person's condition and need for further acupuncture treatment.

- Documented treatment that continued without any change or improvement in Covered Persons' condition from a Covered Person's first treatment to their final treatment.

316. On information and belief, the Acupuncture SOAP Notes were used for no other purpose than as a vehicle through which Deng, through Deng Acupuncture, P.C. and/or under his individual name, could document medically unnecessary Covered Person acupuncture services in

order to justify the purported performance of, and billing for, further acupuncture services which were rarely, if ever, tailored to the needs of any individual Covered Person. A representative sample of the aforementioned Acupuncture SOAP Notes is annexed hereto as Exhibit "11."

317.    On information and belief, because the New York State Fee Schedule applicable to No-fault claims limits reimbursement of acupuncture services (the insertion of needles) to one billing unit for the first 15 minutes of treatment and a second billing unit for the next 15 minutes of treatment irrespective of the number of needles inserted, Defendants devised a scheme to maximize reimbursement through billing for Cupping, a treatment in which a local suction is created on the skin using a glass, ceramic, bamboo, or plastic cup, while negative pressure is created in the cup either by applying a flame to the cup to remove oxygen before placing it on the skin or by attaching a suction device to the cup after it is placed on the skin.

318.    On information and belief, Cupping is an unproven and often dangerous treatment that has never been scientifically proven to provide any significant health benefits.

319.    By way of example and not limitation, the United States Government's National Center for Complementary and Integrative Medicine (NCCIM), which is part of the National Institute of Health, has concluded that: (i) most research regarding the utility of Cupping in pain management is of low quality; (ii) evidence that Cupping can reduce pain is not strong; and that (iii) Cupping can cause side effects such as persistent skin discoloration, scars, burns, and infections, and may worsen eczema or psoriasis.

320.    Notwithstanding that Cupping is an unproven and often dangerous treatment, Deng, through Deng Acupuncture, P.C. and/or under his individual name, as a matter of pattern, practice and protocol, routinely billed Allstate for Cupping treatment purportedly performed on Covered

Persons, notwithstanding that Cupping is rarely, if ever, recommended as part of the treatment plan in Covered Persons' initial acupuncture evaluation reports.

321.     On information and belief, Cupping is not listed as a treatment modality pursuant to the Fee Schedule, and was therefore billed by Deng, through Deng Acupuncture, P.C. and/or under his individual name, pursuant to CPT Code 99199 as an "unlisted special service, procedure or report," which allowed Deng, through Deng Acupuncture, P.C. and/or under his individual name, to choose his own rate for reimbursement and circumvent the limit of the Fee Schedule that he would otherwise be allowed to bill for traditional acupuncture services.  A chart identifying a representative sample of claims billed under CPT Code 99199 is annexed hereto as Exhibit "12."

### 5.  **The Fraudulent Electrodiagnostic Testing**

322.     In furtherance of the scheme to defraud alleged herein, as a matter of practice, procedure and protocol, Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C. billed Allstate for nerve conduction velocity tests ("NCV") and electromyograms ("EMG") (the foregoing tests are generically and collectively referred to as "Electrodiagnostic Testing") when in fact such services were medically unnecessary and/or of no diagnostic or treatment value.

323.     The Electrodiagnostic Testing was purportedly performed, if at all, in a manner that Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC. and PFJ Medical Care P.C. knew or should have known was contrary to the prevailing standard of care and would produce invalid data, findings and diagnoses that endangered the welfare of the Covered Persons, putting them at risk of having undiagnosed medical conditions and diseases and/or the wrong diagnosis and wrong treatment. By submitting fictitious bills and reports for NCV and EMG testing to Allstate, Defendants Allay Medical

Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC, and PFJ Medical Care P.C. misrepresented the actual medical status of the Covered Persons and the services purportedly rendered, which were not provided as billed, if provided at all.

324.    The American Medical Association (AMA) is the publisher of the CPT Code Book, which is the definitive medical source used by licensed medical professionals to accurately describe, among other things, medical and diagnostic services performed and billed to third-party payors, such as insurance companies.

325.    Pursuant to Section 5108 of the Insurance Law, the Department of Insurance has adopted the Fee Schedule published by the Workers' Compensation Board, which sets forth the charges for professional health services that are reimbursable under the No-fault Law. The Fee Schedule incorporates the CPT codes published by the AMA, and the coding rules and regulations set forth by the AMA (collectively the "AMA Guidelines).

326.    At all relevant times mentioned herein, Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C. submitted bills to Allstate for Electrodiagnostic Tests, wherein using CPT codes that intentionally and materially misrepresented the services, if any, performed and for which they sought reimbursement and were paid.

327.    On information and belief, in furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C. routinely referred Covered Persons treated at one or more of the Fraudulently Owned PCs for evaluations billed through the Fraudulently Owned PCs that Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ

Medical Care P.C. knew or should have known were medically unnecessary and/or would produce medically invalid recommendations for Electrodiagnostic Testing, also billed through the Fraudulently Owned PCs, that were of no clinical or diagnostic value.

328.    In furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C. submitted boilerplate reports of purported evaluations to falsely justify Electrodiagnostic Testing which was not indicated by the Covered Persons' examination findings.

329.    The nervous system is divided into two major anatomical divisions: the central nervous system and the peripheral nervous system. The central nervous system includes the brain and the spinal cord, while the peripheral nervous system includes the peripheral nerves. The purpose of a neurological examination is to identify the presence of any abnormality in the nervous system. The standard neurological examination checks the function and integrity of each component of the nervous system, including examination for the presence of generalized diseases of the peripheral nerves, known as neuropathy. Neuropathy can result from many diseases such as diabetes, kidney failure, cancer, AIDs and from systemic inflammatory disease of the small arteries of the body. In accordance with accepted medical practice, when a physician conducts an examination of a patient where the complained of symptoms may affect the nervous system or where the examination shows findings suggestive of nervous system disease or injury, it is essential that the physician rule out the existence of neuropathy, which can, for most patients, be accomplished utilizing simple neurological tests including but not limited to testing the patient's reflexes, pinprick sensation, vibration sensation, proprioceptive sensation, and muscle strength, with the performance of an NCV needed in only a minority of cases.

330. Radiculopathy is defined as injury or dysfunction of spinal nerve roots, which may affect the nerve root of a sensory nerve, motor nerve or both. With respect to trauma cases, such as those suffered as a result of automobile accidents, for the few cases in which radiculopathy occurs, the usual cause of radiculopathy is direct pressure on the nerve root by a herniated intervertebral disc causing inflammation of the nerve root. In the context of Electrodiagnostic Testing, for most patients the presence or absence of radiculopathy can be determined by neurological examination, with EMG performed to find and confirm radiculopathy in the minority of cases in which the neurological examination is not definitive.

331. To confirm or rule out a diagnosis through an NCV and EMG, the data and results produced from the testing must be performed and interpreted in a medically valid manner according to the standard of practice. Similarly, it is impossible to correctly interpret an EMG unless the NCV is properly performed and interpreted in accordance with the prevailing standard of practice.

332. On information and belief, in numerous instances, the reported results associated with the Electrodiagnostic Testing were fictitious, meaning that Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C. routinely and as an integral element of their scheme to defraud submitted bogus reports, findings and data to insurance companies, in general, and Plaintiffs, in particular, to substantiate their fraudulent claims and induce payment.

a. **Protocol Approach to NCV and EMG Testing**

333. By way of example and not limitation, as a matter of practice and procedure, Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C. used what is known as the "protocol

approach" to perform NCVs and EMGs, when in fact accepted medical practice and the AMA requirement is that such tests be performed using what is known as a "dynamic" examination or approach as a prerequisite for billing under EMG and NCV CPT codes.

334.    Unlike the protocol approach utilized by Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C. that resulted in the same set of nerves and muscles purportedly being tested regardless of the Covered Persons' symptoms and findings, the dynamic approach (also known as a "progressive" examination) actually takes into account the individual symptoms and the results and findings of each nerve and muscle tested, resulting in a logical, coherent and constantly evolving electrodiagnostic evaluation, evidenced by variation of the nerves and muscles tested on a case-by-case basis.

335.    Even though NCVs and EMGs must be performed dynamically, Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C. used the protocol approach, which fails to recognize that the nerves and muscles studied should change from case to case and evolve within a case as the study proceeds.

336.    Use of the dynamic approach is a prerequisite for the use of the electrodiagnostic CPT codes and, in using the protocol approach as a matter of practice, procedure and protocol, Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C. submitted bills to Allstate for reimbursement of NCVs and EMGs wherein they represented the services were validly performed and reimbursable under the No-fault Law, when in fact they were not.

337.   Even though Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C.'s utilization of a protocol approach to the selection of NCVs and EMGs was violative of the requirements of the applicable CPT codes, Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C. sought reimbursement, and were paid by Allstate, for such services that they knew or should have known were not validly performed, were of no diagnostic value and were fraudulent and not reimbursable under the No-fault Law. By way of example and not limitation:

- Representative examples of claims wherein the Defendants purportedly sampled the same 10 nerves (Bilateral Motor Median and Ulnar, Bilateral Sensory Median, Radial and Ulnar, and Bilateral Median and Ulnar F-waves) in the upper limb nerve conduction tests include Covered Persons: E.F., claim number 374553048, B.S., claim number 0374512275; Z.S., claim number 0374512275, T.T., claim number 0380809228; I.L., claim number 0411304496; J.L., claim number. 0411304496; M.T., claim number 0431774421; S.B. claim number 0434546750; S.M., claim number 0436499486; I.G., claim number 0431259696; A.J., claim no. 0434552568; D.T., claim number 0434704607; M.K., claim number 0436367817; R.N. claim number 0436730963; , R.N., claim number 0439267394, L.W., claim number 0449854487, and M.T., claim number 0441705449;

- Representative examples of claims wherein the Defendants purportedly sampled the same 8 nerves (Bilateral Motor Peroneal and Tibial, Bilateral Sensory Superficial Peroneal and Sural, Bilateral Peroneal and Tibial F-waves, and Bilateral tibial H reflexes) in the lower limb nerve conduction tests include Covered Persons: B.S., claim number 0374512275, Z.S., claim number 0374512275, E.F., claim number 374553048, B.G., claim number 0380809228, T.T., claim number 0380809228; M.J., claim number 0431774421, M.T., claim number 0431774421; I.E., claim number 0434546750; S.B. claim number 0434546750; S.M., claim number 0436499486; I.G., claim number 0431259696; A.J., claim no. 0434552568; D.T., claim number 0434704607; M.K., claim number 0436367817; and R.N. claim number 0436730963; P.W. claim No. 0438641714; R.N., claim number 0439267394, M.T., claim number 0441705449, and L.W., 0449854487;

- Representative examples of claims wherein the Defendants purportedly sampled the same 14 muscles (Bilateral Deltoid, Bicep, Triceps, Brachioradialis, Pronator Teres, 1st Dorsal Interosseous, Adductor Pollicis) in the upper limb EMG tests include Covered Persons: B.G., claim number 0380809228; T.T., claim number 0380809228; I.L., claim number 0411304496; J.L., claim number. 0411304496;

E.I. 0434546750; D.T., claim number 0434704607; and E.F., claim number 0374553048; and

- Representative examples of claims wherein the Defendants purportedly sampled the same 12 muscles (Bilateral Vastus Medialis, Vastus Lateralis, Anterior Tibialis, Gastrocnemius, Extensor Digitorum Longus, Peroneus Longus) in the lower limb EMG tests include Covered Persons: B.G., claim number 0380809228; T.T., claim number 0380809228; I.L., claim number 0411304496; J.L., claim number. 0411304496; E.I. 0434546750; D.T., claim number 0434704607; and E.F., claim number 0374553048.

338. The use of the "protocol approach," which, if administered at all, was uniformly employed by Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C. increases the likelihood of invalid diagnoses and unreasonable and unnecessary testing.

339. The use of the "protocol approach," by Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C. virtually assured the likelihood of medically unreasonable and unnecessary Electrodiagnostic Testing.

340. Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C.'s purported use of the "protocol approach" (as opposed to utilizing the "progressive" or "dynamic" examination approach) in performing NCVs and EMGs is contrary to the well accepted practices of the medical community.

341. Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C.'s use of the "protocol approach" is contrary to the requirements for billing for electrodiagnostic services under the CPT codes used by the Defendants in seeking reimbursement from Allstate, and reflects a pattern and practice of billing for services that were bogus, medically necessary and/or of no diagnostic value.

342.     On information and belief, since the NCV and EMG testing was substantially or routinely performed in a manner that could not possibly produce medically valid results, none of the medically accepted electrodiagnostic procedures were followed, rendering the purported services billed by Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C. to Allstate of no diagnostic value and fraudulent.

343.     By submitting to Allstate fictitious bills and documentation for NCV and EMG testing, Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C. misrepresented the services purportedly rendered and billed for services which were not rendered, or services performed in an invalid manner, rendering the results of no diagnostic value.

344.     A protocol approach to electrodiagnostic studies is clinically unacceptable and does not meet the standard required for billing for services under the applicable CPT code, and therefore bills submitted by Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C. to Allstate in connection therewith were fraudulent and potentially exposed the Covered Persons to an incorrect diagnosis and treatment plan.

**b.   Overutilization of F-wave Tests**

345.     On information and belief, the F-wave is a late combined motor action potential resulting from the backfiring of antidromically activated motor neurons by a supramaximal stimulus.

346.     On information and belief, Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C.

as a matter of pattern and practice, routinely over-utilized F-wave tests to fraudulently bill Allstate for services that were performed, if at all, solely to maximize reimbursement to Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C.

347.  On information and belief, in numerous instances, Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C. submitted Electrodiagnostic Testing reports to Allstate in support of claims for reimbursement, which demonstrated that Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C. purportedly performed four (4) F-wave tests in each upper and lower limb NCV of the Covered Persons.

348.  On information and belief, performing four (4) F-waves tests in all NCV studies of Covered Persons who have been involved in automobile accidents, or even Covered Persons with suspected radiculopathy, is contrary to accepted medical practice, which dictates the use of an EMG to diagnose radiculopathy, as opposed to the F-wave tests that were purportedly performed by Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C.

349.  On information and belief, the over-utilization of F-wave tests by Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C. was intentionally designed to fraudulently increase reimbursement from Allstate through Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C.'s purported routine performance of unnecessary, excessive testing. Assuming that Defendants Allay

Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C. actually performed the billed for tests, the over utilization of F-wave tests served no purpose other than to enrich Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C. through higher reimbursement, while needlessly exposing Covered Persons to increased pain associated with a minimum of forty uncomfortable electrical stimulations required by the testing.

350.     Billing for the F-wave tests was a misrepresentation by Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C. that the tests were medically indicated or within the standard of care for proper treatment, when in fact they were not, and knowingly administering this unnecessary testing to Covered Persons evidenced a wanton disregard by Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C. for their welfare.

**c.   Improper Performance of F-wave Tests and Misrepresented Findings**

351.     In addition to the intentional and fraudulent over utilization of F-wave tests, on information and belief, in numerous instances, Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C. knowingly failed to administer F-wave testing in accordance with the prevailing standard of care and the requirements of the applicable CPT code, rendering the F-wave test results invalid and unusable for clinical purposes.

352.     In that regard, Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C. through

the Fraudulently Owned PCs, routinely, intentionally and fraudulently billed Allstate for F-wave tests that were not medically necessary, purportedly to diagnose radiculopathy (the ostensible justification for the test in the first place), despite F-wave tests lacking proven medical efficacy for such diagnoses, and then, in performing this wholly unnecessary test, routinely failed to conduct a sufficient number of stimulations per each nerve tested in order to observe the required number of ten (10) F-wave responses per test.

353.    According to the AMA, who owns and defines the meaning of the CPT codes under which Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C. billed for nerve conduction studies, at least ten (10) F-waves should be assessed to arrive at a reasonably accurate F-wave latency. Performing enough stimulations to observe a minimum of ten (10) F-waves is also a requirement of the CPT code.

354.    Many of the F-wave waveforms submitted by Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C. to Allstate in support of claims for reimbursement fail to reflect the performance of a sufficient number of stimulations to produce the required ten (10) F-waves and fail to identify ten (10) visible F-waves in each nerve tested.

355.    By way of example and not limitation, representative claims submitted by Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C. to Allstate for reimbursement which fail to identify ten (10) visible F-waves in each nerve tested include Covered Persons: R.N., claim number 0439267394; J.C., claim number 0431774421; M.J.F., claim number 0431774421; L.W., claim number 0449854487; B.S., claim number 0374512275;  Z.S., claim number 0374512275,

T.T., claim number 0380809228; I.L., claim number 0411304496; J.L., claim number 0411304496; M.T., claim number 0431774421; S.B. claim number 0434546750; S.M., claim number 0436499486; I.G., claim number 0431259696; A.J., claim no. 0434552568; D.T., claim number 0434704607; M.K., claim number 0436367817; R.N., claim number 0436730963; and P.W., claim number 0438641714.

356. By failing to perform the F-wave testing within the requirements of the CPT code and the prevailing standard of care, Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C. failed to provide the fundamental professional medical services for which they fraudulently submitted and/or conspired to submit bills related thereto, to Allstate for reimbursement under the No-fault Law.

357. Additionally, notwithstanding that Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C. knew or should have known that the F-wave tests were invalid, on information and belief, Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C. knowingly submitted NCV studies to Allstate in which the data and findings related to the F-wave tests were, in part or wholly, fictitious and contrived, meaning that Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C. routinely submitted to Allstate F-wave findings that contained material misrepresentations to substantiate their fraudulent claims and induce payment.

358. By way of example and not limitation, in numerous instances, Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain

Care, PLLC and PFJ Medical Care P.C. submitted Electrodiagnostic Testing reports to Allstate which contained findings falsely representing that there were normal F-wave latencies of all nerves tested, when in fact the number of F-wave responses was insufficient to measure latency. Representative examples of these claims include Covered Persons: R.N., claim number 0439267394; L.W., claim number 0449854487; B.S., claim number 0374512275; Z.S., claim number 0374512275, T.T., claim number 0380809228; I.L., claim number 0411304496; J.L., claim number 0411304496; M.T., claim number 0431774421; S.B. claim number 0434546750; S.M., claim number 0436499486; I.G., claim number 0431259696; A.J., claim no. 0434552568; D.T., claim number 0434704607; M.K., claim number 0436367817; R.N., claim number 0436730963; and P.W. Claim No. 0438641714.

359.   In other instances, Defendant JPC Medical P.C. submitted electrodiagnostic test reports to Allstate which contained findings falsely representing that "F-wave latencies were prolonged," when in fact the number of F-wave responses was insufficient to accurately assess the latency. Representative examples of these claims include Covered Persons: M.T., claim number 0441705449; and L.W., claim number 0449854487.

360.   By misrepresenting the F-wave findings, Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and PFJ Medical Care P.C. knowingly endangered the welfare of the Covered Persons, putting them at risk of having undiagnosed medical conditions and diseases, and/or the wrong diagnosis and wrong treatment, as well as billed Allstate for services that were not rendered as billed and were of no diagnostic value.

361.   In other instances, Defendants Allay Medical Services, P.C., JPC Medical P.C., KP Medical Care P.C., Island Life Chiropractic Pain Care, PLLC and/or PFJ Medical Care P.C.

performed NCV tests without performing EMG tests contrary to the standard of care. The American Association of Neuromuscular and Electrodiagnostic Medicine (AANEM) states unequivocally that, in accordance with the prevailing standard of practice, the performance of an NCV should be accompanied with the performance of an EMG test. By way of example and not limitation, in a representative sample of twenty-two (22) electrodiagnostic tests reviewed, Defendants conducted an NCV test without performing an EMG. A table identifying the Covered Persons in which and NCV was performed without and EMG is annexed hereto as Exhibit "13."

### d. **Unreported Conduction Block Falsely Interpreted as Normal**

362. By way of further example of Defendants Allay Medical Services, P.C., KP Medical Care P.C. and PFJ Medical Care P.C's NCV fraud, on information and belief, in numerous instances Defendants Allay Medical Services, P.C., KP Medical Care P.C. and PFJ Medical Care P.C. submitted electrodiagnostic testing reports in support of claims for reimbursement that included NCV data and waveforms which demonstrated a significant drop in proximally evoked motor nerve amplitude responses as compared to distal, indicative of conduction block, an electrodiagnostic finding suggestive of a serious medical problem, which Defendants Allay Medical Services, P.C., KP Medical Care P.C. and PFJ Medical Care P.C. failed to report was present, and failed to incorporate in the diagnosis of each NCV study in which the conduction block occurred.

363. According to the AMA, conduction block is an important pathologic finding. NCV studies are performed to assess the integrity of and diagnose diseases of the peripheral nervous system and an NCV report should document the nerves evaluated, the distance between the stimulation and recording sites, conduction velocity, latency values, and amplitude, and include a final diagnosis.

364. On information and belief, by failing to indicate that a conduction block was present in the studies in which it occurred, Defendants Allay Medical Services, P.C., KP Medical Care P.C. and PFJ Medical Care P.C.'s reports failed to meet the basic criteria of the CPT code, and thereby such services were not rendered as billed and in accordance with the applicable CPT code.

365. On information and belief, in addition to failing to report and/or diagnose the presence of conduction block, in numerous instances, the NCV studies submitted by Defendants Allay Medical Services, P.C., KP Medical Care P.C. and PFJ Medical Care P.C. were falsely interpreted by them to be within normal limits, when in fact, the data they submitted, upon which these interpretations were purportedly based, contained data values and abnormal electrodiagnostic findings indicative of conduction block, that if taken at face value are suggestive or diagnostic of an underlying neuropathy that were entirely ignored. By ignoring these obvious abnormalities, Defendants Allay Medical Services, P.C., KP Medical Care P.C. and PFJ Medical Care P.C. failed to provide the fundamental professional medical services for which they fraudulently submitted and/or conspired to submit bills to Allstate for reimbursement under the No-fault Law.

366. Representative examples of claims in which conduction block was present but failed to be noted and properly interpreted include Covered Persons: B.S., claim number 0374512275, Z.S., claim number 0374512275, J.C., claim number 0431774421; M.F.J., claim number 0431774421; I.L., claim number 0411304496; M.T., claim number 0431774421; and E.I., claim number 0434546750.

367. On information and belief, were the reported abnormal data values submitted by Defendants Allay Medical Services, P.C., KP Medical Care P.C. and PFJ Medical Care P.C. to Allstate true and the cause of the apparent neuropathy not diagnosed and treated, the patients would be placed at risk for progressive neurological disorders and/or underlying disease.

368. On information and belief, were the reported abnormal data values submitted by Defendants Allay Medical Services, P.C., KP Medical Care P.C. and PFJ Medical Care P.C. to Allstate true, emergent diagnostic workups were required to identify the cause of said neuropathy or other nerve injury. In each instance, Defendants Allay Medical Services, P.C., KP Medical Care P.C. and PFJ Medical Care P.C. failed to perform the required follow-up or diagnostic testing consistent with the abnormal findings. Rather, the abnormal findings were often reported as being within "normal" variance or were otherwise ignored.

369. On information and belief, the abnormal data values were ignored because they were known to be fictitious and therefore not indicative of any underlying condition warranting additional examination or diagnostic testing.

370. On information and belief, if the abnormal data values reported by Defendants Allay Medical Services, P.C., KP Medical Care P.C. and PFJ Medical Care P.C. were true and went untreated, the "Covered Persons" would have been left to suffer from various neuropathies, including potentially grave neuropathies and undiagnosed systemic diseases, such as Guillain-Barre syndrome (GBS), chronic inflammatory demyelinating polyneuropathy (CIDP) and multifocal motor neuropathy with persistent conduction block (MMN).

371. Defendants Allay Medical Services, P.C., KP Medical Care P.C. and PFJ Medical Care P.C. did not either rule out conduction blocks or diagnose the potentially serious conditions that cause conduction blocks in the aforementioned studies because they knew that the studies were bogus, fictitious, and therefore not indicative of any underlying condition warranting additional examination or diagnostic testing.

372. In addition to committing many acts of mail fraud by the submission of fraudulent NCV data to Allstate in connection with claims for reimbursement, Defendants Allay Medical

Services, P.C., KP Medical Care P.C. and PFJ Medical Care P.C., as a matter of procedure, practice and protocol, routinely submitted, through the Fraudulently Owned PCs, bills for reimbursement to Allstate for EMG tests that reflected services that were invalid, materially misrepresented, fabricated, of no diagnostic value, and/or never performed as billed.

   **e.   <u>Over-Diagnosis of Radiculopathy</u>**

373.   Accepted medical literature and published studies have determined that the rate of radiculopathy confirmed by Electrodiagnostic Testing typically seen in patients who have been involved in motor vehicular accidents, such as those purportedly treated by Defendants Allay Medical Services, P.C., KP Medical Care P.C. and PFJ Medical Care P.C., is in the range of 8% for cervical radiculopathy, 12% for lumbar radiculopathy, and 19% for either cervical or lumbar radiculopathy. *See, e.g.,* Braddom RL, Spitz L and Rivner MH. Frequency of Radiculopathies in Motor Vehicle Accidents. *Muscle & Nerve,* 39: 545-547, 2009.

374.   Contrary to published reports and medically accepted rates concerning patients diagnosed with radiculopathy post motor vehicle accident, a representative review of 9 patient files submitted by Defendants to Plaintiffs for reimbursement of Electrodiagnostic Testing, reveals that Defendants diagnosed cervical radiculopathy and/or lumbosacral radiculopathy in each patient. By way of example and not limitation, a table identifying the patients with radiculopathy diagnoses in the sampled claim files is annexed hereto as Exhibit "14."

375.   On information and belief, the difference in the frequency of radiculopathy diagnoses between what is typically found in ambulatory post-motor vehicle accident patients and the radiculopathy rate purportedly found by Defendants is strongly indicative of fraud and an intentional misrepresentation of the Electrodiagnostic Testing for which Defendants billed Plaintiffs. This consistent over-diagnosis of cervical and lumbar radiculopathy demonstrates that

the Electrodiagnostic Testing was either not performed as billed, was fabricated, and/or was of no diagnostic value. Moreover, the false diagnosis of radiculopathy by Defendants reflects a disregard for the welfare of the patients, since the wrong diagnosis could result in selection of the wrong treatment plan.

**f.  Over-Diagnosis of Multi-Level Radiculopathy**

376.  Accepted medical literature and published studies have determined that the majority of radiculopathies occur at only one level, and that single root level involvement can be diagnosed by clinical means 75%-80% of the time. *See, e.g.*, Dumitru, *Electrodiagnostic Medicine.* (1st Ed., Hanley and Belfus, Philadelphia, 1995, p. 557).

377.  Contrary to the medically accepted literature regarding single root level radiculopathy, a review of  sample studies for 9 patients submitted by Defendants to Plaintiffs for reimbursement of Electrodiagnostic Testing, where Covered Persons purportedly underwent EMG testing, Defendants diagnosed multi-level radiculopathy in 9 (100%) out of 9 patients. By way of example and not limitation, a table identifying diagnoses of multi-level radiculopathy in the sampled claim files is annexed hereto as Exhibit "15."

378.  On information and belief, the consistent over-diagnosis of multi-level radiculopathy, finding multi-level radiculopathy in every single study despite the medically accepted standard that the vast majority of those studies should have yielded a single-root diagnosis, demonstrates  that the Electrodiagnostic Testing was either not performed as billed, was fabricated, and/or was of no diagnostic value.

379.  On information and belief, the consistent over-diagnosis of multi-level radiculopathy, finding multi-level radiculopathy in every single study despite the medically accepted standard that the vast majority of those studies should have yielded a single-root

diagnosis, demonstrates Defendants' disregard for the welfare of the patients and could result in the subsequent selection of improper and unnecessary invasive treatments by other providers that might rely on these diagnoses.

**g.   Over-Diagnosis of Bilateral Radiculopathy**

380.    On information and belief, accepted medical literature and published studies have determined that only about 1%-6% of patients diagnosed with either cervical or lumbar radiculopathy suffer from bilateral radiculopathy.

381.    On information and belief, accepted medical literature and published studies advise that bilateral radiculopathy is rarely caused by compressive injuries such as those experienced in motor vehicle accidents, but rather, indicates other conditions, including osteomyelitis, tuberculous meningitis, vertebrae metastasis, lymphoma, leptomeningeal carcinomatosis, sarcoidosis, spinal cord ischemia, and multiple sclerosis, and represents a need for further exploration by the treating physician in order to rule out more serious conditions.

382.    Contrary to the medically accepted literature regarding the infrequency of bilateral radiculopathy, a review of 9 sample studies submitted by Defendants to Plaintiffs for reimbursement of Electrodiagnostic Testing, where Covered Persons purportedly underwent EMG testing, Defendants diagnosed bilateral radiculopathy in each patient. By way of example and not limitation, a table identifying sample claim files where Defendants diagnosed bilateral radiculopathy is annexed hereto as Exhibit "16."

383.    Defendants' over-diagnosis of bilateral radiculopathy, combined with their failure to follow-up and rule out more serious conditions, demonstrates that the Electrodiagnostic Testing was either not performed as billed, was fabricated, and/or was of no diagnostic value.

384. On information and belief, Defendants' disregard for patient health in failing to investigate serious conditions could have resulted in the patients suffering permanent nerve or muscle damage or unchecked progression of the underlying disease with potentially serious or life-threatening consequences.

385. On information and belief, Defendants did not investigate the potential existence of more serious medical and life-threatening conditions because they knew the results were the product of fraudulent Electrodiagnostic Testing and therefore it was unnecessary to rule out a serious underlying condition or they willfully ignore such results, exhibiting a gross reckless indifference to the care and wellbeing of their patients.

### h. Improper Performance of EMG Studies

386. Separate and apart from the foregoing, on information and belief, Defendants routinely failed to perform EMG studies at the standard of care and reported final diagnoses that could not be justified based on Defendants' failure to perform the EMG in a valid manner.

387. The standard practice in electromyography is to sample a minimum of five muscles per limb to screen for the presence or absence of radiculopathy. By way of example and not limitation, in numerous instances, Defendants submitted Electrodiagnostic Testing reports to Allstate which contained diagnoses of radiculopathy in the upper and/or lower limb studies that could not be justified because an insufficient number of muscles were tested per limb.

388. Defendants' failure to test a sufficient number of limb muscles required for a screening EMG renders the EMG studies invalid and of no diagnostic value and does not adequately support the given diagnoses. Representative examples of these claims include Covered Persons: I.G., claim number 0431259696, A.J., claim number 0434552568, M.K., claim number

0436367817, N.R., claim number 0436730963, P.W., claim number 0438641714, L.W., claim number 0449854487, and M.T., claim number 0441705449.

389.    In addition, despite their failure to test a sufficient number of limb muscles, Defendants fraudulently billed for a full limb of EMG in order to maximize their reimbursement. According to the AMA, who owned and defines the meaning of the CPT codes under which Defendants billed for EMG studies, in order to bill for EMG studies under CPT Codes 95860-95866 (the CPT codes used by Defendants), at least 5 limb muscles or 4 limb muscles plus paraspinal muscles must be studied per limb.

390.    On information and belief, many of the EMG reports submitted by Defendants to Allstate failed to reflect the performance of the required number of limb muscles to constitute a full limb of EMG for which Defendants billed and constitute a willful misrepresentation of the services provided.

### i.    Failure to Extend EMG from a Screening to Diagnostic Study

391.    By way of further example of Defendant JPC Medical P.C.'s EMG fraud, on information and belief, in numerous instances Defendant JPC Medical P.C. submitted electrodiagnostic testing reports in support of claims for reimbursement which demonstrated that Defendant JPC Medical P.C. failed to extend the EMG studies from screening to diagnostic EMGs when radiculopathy was detected.

392.    As alleged above, the standard practice in electromyography is to sample a minimum of five muscles per limb to screen for the presence or absence of radiculopathy. However, if abnormalities suggestive of radiculopathy are found, the EMG study is extended, and additional muscles are tested in order to establish an accurate diagnosis by defining the radiculopathy to the correct root level.

393. On information and belief, Defendant JPC Medical P.C.'s failure to extend the EMG from screening to diagnostic studies renders the EMG studies invalid and of no diagnostic value and was a material misrepresentation of the services provided.

394. By way of example and not limitation, representative examples of claims where Defendant JPC Medical P.C. failed to extend the EMG from screening to diagnostic studies include Covered Person: P.W., claim number 0438641714.

### 6. **The Fraudulent VsNCT Testing**

395. In furtherance of the scheme to defraud alleged herein, Defendants purportedly performed pf-NCS Testing to diagnose abnormalities in the Covered Persons' peripheral nerves. Peripheral nerves consist of bundles of fibers which are capable of detecting sensation, with the largest and fastest fibers known as A-Alpha and A-Beta fibers, and the smaller and slower conducting fibers that transmit feelings of pain known as C-fibers and A-Delta fibers.

396. On information and belief, at all relevant times mentioned herein, the Defendants purported to selectively stimulate a Covered Person's nerve's A-Delta fibers through pf-NCS Testing in order to diagnose abnormalities within the nerves.

397. The speed, or velocity, with which a nerve fires is proportional to its diameter and the nature of its myelin covering. Conversely, the intensity of an electrical stimulus required to cause a fiber to activate is inversely proportional to its diameter. Thus, the intensity of electrical shock required to excite the C or A-Delta pain fibers is at least four times that required to stimulate the significantly larger A-Beta fibers.

398. The amount of external stimulus (amplitude) that must be applied to a nerve before it fires is different than the amplitude of the nerve's resulting compound action potential. The stimulus threshold is the amount of external electricity that must be delivered to a nerve fiber

before it fires. In contrast, the amplitude of the nerve's compound action potential represents the strength of the nerve's response to that external shock.

399.    The other factor determining the susceptibility of a nerve fiber to fire, aside from the intensity of an external shock, is the distance of the fiber from the source of the shock. Fibers closer to the source of the shock receive more current, and therefore reach their stimulus threshold (i.e., the amplitude required to generate a response) sooner than the fibers on the opposite side of the nerve. As the amplitude of the stimulus is gradually increased, more of the fibers begin to activate until all of the fibers capable of activation, are activated.

400.    At the lowest amplitude level, the only fibers that activate are the large-diameter A-Alpha fibers. As the intensity of the stimulus increases, more A-Alpha, and some A-Beta (touch/pressure) fibers begin to activate.

401.    The point at which all the fibers including the smallest A-Delta and C-fibers are eventually activated is referred to as "maximal stimulation," meaning the point at which all functioning fibers within a nerve are being simultaneously activated.

402.    On information and belief, activation of the A-Delta fibers requires a level of stimulus that will be perceived by the subject as painful as opposed to the "slight tickle" called for in the pf-NCS testing protocol.

403.    On information and belief, in furtherance of the scheme to defraud alleged herein, the Defendant Chiropractors purportedly performed pf-NCS Testing on the Covered Persons in order to diagnose nerve abnormalities.

404.    Abnormalities in the peripheral nerves are known as neuropathies. There are several methods for diagnosing the existence, nature, extent, and specific location of these abnormalities,

including but not limited to standard Nerve Conduction Studies ("NCS") and Quantitative Sensory Testing ("QST").

405.    NCS are the standard and most widely accepted methods for testing the health and integrity of the peripheral nerves; that is, for recording the compound action potential resulting from an external stimulus.

406.    Separate and apart from NCS, Quantitative Sensory Testing ("QST"), also known as Sensory Nerve Conduction Testing ("sNCT"), is a form of testing which purports to diagnose sensory peripheral neuropathies by identifying areas of relative numbness by stimulating the skin with different intensities of stimulus and asking the subject to indicate when they feel the stimulus (a psychophysical response from the person being tested). QST is entirely dependent upon the subject's subjective, psychophysical recognition of a stimulus applied to a physical area.  When QST is performed with an electric device, it is often referred to as "Sensory Nerve Conduction Threshold Testing" ("sNCT Testing").

407.    Current Perception Threshold Testing ("CPT Testing") and pf-NCS Testing are both forms of sNCT Testing which are performed by administering an electrical current to specific sites through electrodes placed on the surface of the skin, and identifying the minimum electrical stimulus necessary for the subject to perceive the stimulus and indicate that they feel the stimulus. These tests serve only to confirm the patient's subjective complaints of numbness and are not capable of providing any diagnostic information concerning the nature of the abnormalities in the nerves. They can be useful in the clinical setting to track the progression and severity of the patient's numbness in progressive conditions such as diabetic peripheral neuropathy.

408.     pf-NCS Testing purports to measure the voltage intensity entering the body from the testing device, and consequently, the intensity of the stimulus necessary to elicit a discernable nerve impulse in order to purportedly diagnose peripheral neuropathies.

409.     On information and belief, effective July 1, 2005, the AMA assigned CPT Category III Code 0110T to pf-NCS Testing.  Category III codes are a set of temporary codes that allow for data collection on emerging technology, services and procedures.  These codes are intended to be used for data collection to substantiate widespread usage or to provide documentation for the FDA approval process.

410.     On information and belief, the assignment of a Category III Code to a procedure does not imply or endorse clinical efficacy of that procedure, and the Fee Schedule provides that all Category III Codes are "By Report" (BR) procedures, meaning that to the extent that a Category III procedure is reimbursable, an "operative report" of the procedure is required.

411.     The Fee Schedule mandates that bills for Category III procedures not accompanied by the required operative report are to be deemed not properly submitted, unless and until an operative report is received by the payer.

412.     On or about January 7, 2008, CMS reiterated and clarified that pf-NCS Testing must be billed using CPT Category III 0110T.

413.     Defendants, including but not limited to ACH Chiropractic, P.C., Energy Chiropractic, P.C. and Island Life Chiropractic Pain Care, PLLC, routinely billed Plaintiffs under CPT Codes 95904 which, during the relevant dates of service was reserved for "Nerve conduction, amplitude latency/velocity study, each nerve; sensory" and/or 95999, which is reserved for "unlisted neurological or neuromuscular diagnostic procedures," when in fact, such services, if reimbursable at all, were required to be billed pursuant to CPT Category III Code 0110T.

414. The billing of pf-NCS Testing pursuant to CPT Codes 95904 and/or 95999 was a knowing misrepresentation of the facts. A chart identifying a representative sample of claims billing under CPT Codes 95904 and/or 95999 is annexed hereto as Exhibit "17."

415. On information and belief, pf-NCS Testing is not required for the diagnosis or treatment of injuries caused by motor vehicle accidents, such as radiculopathy, plexopathy and nerve entrapment, all which can be diagnosed with the standard methods of neurological examination and/or standard EMG/NCV testing.

416. Defendants sought reimbursement of No-fault benefits from Allstate through the submission of medical records, reports and bills which contained false and material misrepresentations as to the medical necessity of the pf-NCS Testing and the actual services rendered.

417. On information and belief, in order to obfuscate the fact that the billed for pf-NCS Testing was medically unnecessary, not rendered as billed and/or of no diagnostic value, Defendants made material misrepresentations in documentation submitted in support of their claims for reimbursement.

418. On information and belief, demonstrative of the fact that the pf-NCS purportedly performed by Defendants was fraudulent, the clinical presentation of Covered Persons, as documented in Defendants' own medical records, was routinely inconsistent with the reported results of the pf-NCS Testing. By way of example and not limitation, in numerous instances, Covered Persons reported that they were not having any pain, while the related pf-NCS Testing reports purport to identify evidence of radiculopathy at multiple levels.

### a.    __Presumptive Diagnosis__

419.    On information and belief, Defendants, including but not limited to ACH Chiropractic, P.C., Energy Chiropractic, P.C. and Island Life Chiropractic Pain Care, PLLC routinely misrepresented in bogus medical reports submitted to Allstate in support of claims for reimbursement that Covered Persons had a "Presumptive Diagnosis" (or reason why the pf-NCS Testing was being performed) of "sensory cervical plexus disorder without symptoms/signs of motor deficit," and/or "sensory lumbar plexus disorder without symptoms/signs of motor deficit," or substantially similar language.

420.    On information and belief, plexus disorder is an injured or disordered condition of a plexus and especially a nerve plexus.

421.    On information and belief, Defendants, including but not limited to ACH Chiropractic, P.C., Energy Chiropractic, P.C. and Island Life Chiropractic Pain Care, PLLC included "sensory cervical plexus disorder without symptoms/signs of motor deficit," and/or "sensory lumbar plexus disorder without symptoms/signs of motor deficit," or substantially similar language as a presumptive diagnosis in their medical reports to indicate that pf-NCS Testing was being performed in order to evaluate for the possibility of a cervical or lumbosacral plexus disorder that has resulted in injury or damage to the sensory fibers, but not to the motor fibers.

422.    On information and belief, rarely if ever does a plexus disorder involve exclusively sensory fibers, without motor deficit.

423.    On information and belief, cervical plexus and lumbosacral plexus disorders involve injury to major peripheral nerves, which carry both motor and sensory nerve fibers of all types and sizes.

424.     On information and belief, it would be extremely unlikely for any patient, anatomically   and/or physiologically, to injure only the sensory nerve fibers of a plexus without injuring the motor nerves.

425.     Defendants' representations that pf-NCS Testing is useful for evaluating a presumptive diagnosis of "Sensory cervical" or "plexus disorder without symptoms/signs of motor deficit" were knowing and willful misrepresentations of the facts designed to induce Plaintiffs into paying for pf-NCS Testing that was not performed as billed, was medically unnecessary and/or was of no diagnostic value.

**b.      pf-NCS Graphs Misrepresented as Showing Nerve Conduction Velocity**

426.     Defendants, including but not limited ACH Chiropractic, P.C., Energy Chiropractic P.C. and Island Life Chiropractic Pain Care, PLLC included printed graphs with their reports submitted to Plaintiffs in support of reimbursement which misrepresented that the pf-NCS Testing measured nerve conduction velocity/latency (Vel./Lat.), when in fact, it did not.

427.     On information and belief, velocity, or speed, is a measure of distance over time.

428.     In electrodiagnostic medicine, velocity is measured as meters per second (m/s), and to measure the conduction velocity of a nerve, one must know the time and distance it takes for a nerve impulse to travel from one point in a nerve to another point.

429.     In electrodiagnostic medicine, distal peak or onset latency can also be a measure of conduction speed, or velocity, but only because certain studies are performed at standard distances,  so the distances are already known. By way of example and not limitation, when performing a standard antidromic median sensory nerve conduction study at the wrist, the stimulus point is typically 14 cm proximal to the recording over the nerve at the finger. Because the distance is fixed, the time it takes to get from point A to point B (distal latency) is a useful

and valid measure of conduction speed. Therefore, a distal latency is only valid if the standard distance is used (and recorded on the report). Notwithstanding the foregoing, in the graphs submitted by Defendants in connection with their claims for reimbursement, which are clearly labeled as measuring velocity and/or latency, there are no measurements of distance, making it impossible to measure velocity, or speed.

430.    Therefore, these graphs misrepresent that they are measuring the nerve conduction velocity/latency.

### 7. <u>The Fraudulent Computerized Range of Motion and Manual Muscle Testing</u>

431.    On information and belief, in furtherance of the scheme to defraud alleged herein, and as a matter of practice, procedure and protocol, numerous patients treated at 1786 Flatbush were subjected to medically unnecessary computerized Range of Motion and Muscle Tests that Defendants knew, or should have known, were medically unnecessary and/or of no clinical or diagnostic value, often performed on multiple occasions three to four weeks apart, and billed for through Allay Medical Services, P.C., KP Medical Care P.C., PFJ Medical Care P.C. and/or the Defendant Doctors in their individual names.

432.    On information and belief, the measurement of the ability for each joint to fully perform its anatomical function is a patient's range of motion for each joint.

433.    On information and belief, traditional, or manual range of motion testing consists of the non-electronic measurement of a joint's ability to move through various angles within its arc of motion with a manual inclinometer or goniometer, compared to the generally agreed upon values for the full ranges of motion of the unimpaired or ideal joint, as published in standard texts.

434.     On information and belief, active range of motion testing refers to range of motion testing where the clinician directs the patient to move a joint to the full extent the patient is capable.

435.     On information and belief, active range of motion testing can be inaccurate if the patient does not provide full effort.

436.     On information and belief, passive range of motion testing refers to range of motion testing where the clinician moves a patient's joints to identify restrictions of movement, pain caused by movement, and whether grating sound or sensation is produced with the joint's movement, and is only performed when the patient is unable to actively perform an active range of motion exam or if there is obvious pain with active motion of the joint.

437.     On information and belief, manual muscle strength test consists of a non-electronic measurement of muscle strength, by having the patient move a joint against resistance applied by the clinician, and grading the patient's tolerance to the resistance according what is known as the Oxford Scale or Medical Research Council Manual Muscle Testing Scale, which rates the patient's tolerance on a scale of 0 to 5. For example, if a physician were to measure a person's knee flexion strength, he or she would first determine whether the patient could flex their knee against the force of gravity without additional resistance, and if the patient is capable, apply resistance against the person's posterior foreleg while having them flex their knee.

438.     On information and belief, a physical examination performed on a person to diagnose a patient presenting with soft-tissue injuries will typically require manual range of motion testing and muscle strength testing to assess injury and develop a treatment plan. These documented range of motion and strength impairment measurements provide an objective frame of reference as it pertains to functional tasks, which allows the doctor to monitor progress.

439. On information and belief, manual range of motion and strength tests are regularly performed on patients as part of their initial evaluation and any follow-up examination, and, accordingly are billed as part of the charge, and under the CPT code for the initial or follow-up evaluation.

440. On information and belief, computerized range of motion testing is purportedly performed by the placement of a digital inclinometer on various parts of a patient's body while the patient is asked to move the related joint through its available motion. Computerized range of motion testing is nearly identical to the traditional or manual range of motion testing except that a digital reading is gained rather than a manual one. To the extent a clinician performs active computerized range of motion testing, this test is dependent upon patient cooperation and effort, and whether active or passive, is likewise dependent on the skill of the examiner.

441. On information and belief, computerized muscle testing is purportedly performed through the placement of a digital device against a limb to be tested while the patient attempts to flex the muscle against resistance applied by the clinician, and is nearly identical to the traditional or manual muscle strength testing performed by clinicians during an initial and/or follow-up examination, except that a digital reading is gained identifying the pounds of pressure that the patient exerts as opposed to a 0 to 5 scale.

442. On information and belief, the digital recordings do not take into account whether the patient is applying full effort, and thus, the accuracy of computerized muscle testing is dependent upon patient cooperation, effort, and the skill of the examiner.

443. On information and belief, when the computerized range of motion and muscle tests are performed, the decision of which joints to test for range of motion and which muscles to test in the computerized muscle test should be tailored to the unique clinical findings of that individual

patient., and accordingly, the particular joints and muscles tested should be individualized for each patient.

444. On information and belief, while the computerized range of motion and muscle testing performed separately from traditional or manual testing as part of initial and follow-up exams may be useful tools in assessing spinal cord injuries, neurological conditions, movement disorders, or as part of medical research studies, under the circumstances employed at 1786 Flatbush, they were medically unnecessary and, to the extent they were performed at all, were performed and billed for pursuant to a pre-determined treatment protocol irrespective of medical necessity, designed solely to maximize profits.

445. In particular, most patients at 1786 Flatbush Avenue purportedly underwent traditional, manual range of motion testing and muscle strength testing as part of their initial and/or follow-up examinations with the medical, chiropractic, and physical therapy practices at 1786 Flatbush Avenue.

446. Each form filled out in connection with each initial examination billed for by the medical practices at 1786 Flatbush Avenue, which contain the recorded results of the manual range of motion and manual muscle testing purportedly conducted during these examinations, also contains the option to include "computerized ROM/MMT" within each patient's treatment plan.

447. On each form, the space to check to include "computerized ROM/MMT" within each patient's treatment plan was nearly always left unselected, yet defendants regularly submitted bills to Allstate for reimbursement for such services.

448. Defendants regularly submitted bills to Allstate for reimbursement for medically unnecessary computerized range of motion and muscle tests purportedly performed on Covered Persons.

449.    On information and belief, the computerized range of motion and muscle tests were not tailored to each Covered Person's individual needs, did not provide any additional actionable data over the manual range of motion and muscle strength tests that were allegedly performed, and were irrelevant to the monitoring of the restoration of function for purposes of treatment.

450.    On information and belief, in the relatively minor soft-tissue injuries allegedly sustained by the patients, the difference of a few degrees in the patients' range of motion reading or pounds of resistance in the patients' muscle strength testing is unimportant to the diagnosis or treatment of such patients.

451.    Even if there was a reason to perform computerized range of motion and muscle tests, on information and belief, the methods in which the tests are performed were not tailored to the individual Covered Persons, are not intended to identify or diagnose particular conditions, and do not facilitate treatment or result in change in a treatment program.

452.    On information and belief, while a clinician can take measurements of a variety of limb movements in each test, Defendants' tests never tested many joints in the body, while other joints in the body are tested repeatedly irrespective of the Covered Person's specific complaints or conditions, and irrespective of whether or not the joints were previously diagnosed with any pain, deformity, or functional deficit.

453.    Moreover, irrespective of whether Defendants' computerized range of motion and muscle testing was conducted in a diagnostically useful manner, or was medically necessary, Defendants fraudulently unbundled charges for such services.

454.    In that regard, many bills for computerized muscle testing submitted by the Defendants listed multiple charges under CPT Code 95831 to represent that as many as seven separate measurements had been performed on each patient, as well as a separate charge for CPT

Code 95833 designated for "Muscle testing, manual (separate procedure) with report; total evaluation of body, excluding hands."

455.    According to the applicable fee schedule, however, a healthcare provider seeking reimbursement for Muscle Tests may only bill under CPT Code 95831 for a maximum of 5.16 relative units—or $43.60—for each individual "extremity" or "trunk section" which is tested, **but** should bill under CPT Code 95833 for a maximum of 13.55 relative units—or $114.32—if the entire body is tested.

456.    However, by billing for each measurement separately, as well as billing for a total evaluation of the body, Defendants instead misrepresented to Allstate that they were entitled to bill for between three and seven measurements separate and independent of each other, resulting in charges ranging from $245.12 to $492.52 per patient per test, rather than the maximum allowable charge of $114.32 for a full body evaluation excluding hands. A chart identifying a representative sample of claims billing under CPT Codes 95831 and/or 95833 is annexed hereto as Exhibit "18."

457.    As a result of the misrepresentations, even if the computerized muscle testing had diagnostic value and were properly reimbursable—which they were not—by submitting bills seeking payment for the testing of three or more separate muscles in addition to separately billing for a full body evaluation, Defendants defrauded Allstate into paying more than Defendants were entitled to be paid.

458.    Nonetheless, on information and belief, the test results and supporting documentation submitted in connection with Defendants' claims for reimbursement for computerized range of motion and muscle testing reflected services that, if performed at all, were

medically unnecessary and performed pursuant to a pre-determined treatment protocol irrespective of medical necessity.

**8.  <u>The Fraudulent Physical Capacity Testing</u>**

459.     Pursuant to the Fraudulent Treatment Protocol and in furtherance of the scheme to defraud, one or more of the Defendant Doctors, through Allay Medical Services, P.C., JPF Medical Services, P.C., KP Medical Care P.C., PFJ Medical Care P.C., and/or the Defendant Doctors in their individual names, purportedly performed medically unnecessary Physical Capacity Testing on Covered Persons.

460.     On information and belief, the Physical Capacity Testing purportedly performed by one or more of the Defendant Doctors, through Allay Medical Services, P.C., JPF Medical Services, P.C., KP Medical Care P.C., PFJ Medical Care P.C. and/or the Defendant Doctors in their individual names, required Covered Persons to perform six types of lifts, wherein the pounds of force exerted by the Covered Persons were recorded on a handwritten form.

461.     On information and belief, once the pounds of force exerted by the Covered Persons were recorded on a handwritten form, the results were imported by Defendants into a software program which generated Physical Capacity Testing reports with bar graphs and purportedly reflecting the Covered Persons' ratings as compared to a normative average.

462.     On information and belief, the Physical Capacity Testing purportedly performed by one or more of the Defendant Doctors, through Allay Medical Services, P.C., JPF Medical Services, P.C., KP Medical Care P.C., PFJ Medical Care P.C. and/or the Defendant Doctors in their individual names, at the Flatbush Avenue Clinic was medically unnecessary, was not individually tailored to Covered Persons and was given in a formulaic fashion, and involved the

same sets of tasks for almost every Covered Person regardless of their unique complaints and/or response to treatment.

463.    On information and belief, demonstrative of the fact that the Physical Capacity Testing purportedly performed by Defendants was not medically necessary, Defendants' testing reports contained results for NIOSH lift tests which are intended to help determine is the patient can return to work, and what type of work they can return to, yet Defendants' records submitted to Allstate provide no connection between these tests and any plan for the Covered Persons to return to work.

464.    On information and belief, demonstrative of the fact that the Physical Capacity Testing purportedly performed by Defendants was fraudulent, Defendants diagnosed virtually all Covered Persons as falling within the lowest 10th percentile, indicating a level of impairment that would be unusual in one Covered Person with the types of injuries purportedly documented, let alone for a large number of Covered Persons.

465.    On information and belief, further demonstrative of the fact that the Physical Capacity Testing purportedly performed by Defendants was fraudulent, in many instances, Covered Persons performed the same or worse on subsequent re-evaluation tests without any documentation as to why Covered Persons purportedly undergoing treatment were not getting better.

466.    On information and belief, in addition to performing Physical Capacity Testing that was not individually tailored to any Covered Person and involved the same sets of tasks by almost every individual regardless of their unique complaints and/or response to treatment, Defendants, as a matter of pattern, practice and protocol, routinely billed Allstate for such testing using CPT

code 97750, fraudulently representing that the Physical Capacity Testing which they purportedly performed met the requirements for that CPT code, when it fact, it did not.

467. According to the AMA Guidelines, CPT Code 97750 should be used when seeking reimbursement for "Physical performance test or measurement (e.g., musculoskeletal, functional capacity), with written report, each 15 minutes" and describes tests and measurements performed by a physician or other qualified health care professional.

468. On information and belief, some examples of physical testing or measurement that are typically reported with CPT code 97750 include: isokinetic testing for assessing the combination of strength, endurance, and power while performing certain movements with the trunk or extremities; functional capacity testing; and specific tests and measures related to balance such as the timed up-and-go test.

469. According to the Fee Schedule and the AMA Guidelines, reimbursement for physical testing or measurement billed under CPT Code 97750 includes the test or measurement procedure itself and the time required to analyze and interpret the resulting data while the individual is present.

470. To be eligible for reimbursement under CPT Code 97750, a medical provider must both perform testing applicable to that code, and prepare an identifiable signed report that interprets the test results, sets forth the medical necessity for the billed for service and includes the following: (a) a description of the test and measure protocol, (b) the data collected, and (c) the impact of the outcome of the test and measure on the individual's plan for care (i.e., need for continuing treatment, discharge from treatment, or referral to other providers).

471. Any written report submitted in support of billing for services rendered under CPT Code 97750 must include: Total time spent with the individual in providing the test and

measurement, including the time spent preparing the individual for the test and measurement procedure; the time spent performing the selected protocol; and the time spent with the individual in providing any post-testing instructions.

472.    One or more of the Defendant Doctors, through Allay Medical Services, P.C., JPF Medical Services, P.C., KP Medical Care P.C., PFJ Medical Care P.C. and/or the Defendant Doctors in their individual names, submitted Physical Capacity Test reports that routinely failed to include: (i) total time spent with the patient in providing the test and measurement, including the time spent preparing the patient for the test and the measurement procedure; (ii) the time spent performing the selected protocol; (iii) the time spent with the patient in providing any post-testing instructions; (iv) the testing elements and/or protocols; (v) interpretation of the data collected; and/or (vi) the impact on the patient's plan of care such as return to sport or activities of daily living, and/or modification of treatment.

473.    In every instance where one or more of the Defendant Doctors, through Allay Medical Services, P.C., JPF Medical Services, P.C., KP Medical Care P.C., PFJ Medical Care P.C. and/or the Defendant Doctors in their individual names, billed Allstate for Physical Capacity Testing using CPT Code 97750, which is a time-based code, the bills submitted reflected billings for six units of time at $41.66 each, resulting in uniform invoices for $249.96, which is implausible given that the one-on-one time spent with Covered Persons in providing the test, preparing Covered Persons for the test, performing the selected protocol, and providing any post-testing instructions would normally be different for each Covered Person's appointment.  A chart identifying a representative sample of claims billing under CPT code 97750 is annexed hereto as Exhibit "19."

474.     On information and belief, in addition to purportedly performing Physical Capacity Testing that was medically unnecessary and fraudulently representing that such testing met the requirements for CPT code 97750, Defendants, as a matter of pattern, practice and protocol, and in an effort to maximize their reimbursement, routinely billed Allstate for billed-for Physical Capacity Testing performed on Covered Persons pursuant to CPT codes 95831-95834 or 95851-95852, which are reserved for standardized testing batteries, evaluation or re-evaluation services, and which may not be separately billed in addition to CPT Code 97750.

475.     By way of example and not limitation, within thirty days of fraudulently billing Allstate for Physical Capacity tests for Covered Persons, one or more of the Paper Owners, through Allay Medical Services, P.C., KP Medical Care P.C., PFJ Medical Care P.C., MSB Physical Therapy, P.C. and/or in their individual names, routinely submitted bills to Allstate for the "performance" of the same tests using one or more of CPT codes 95831, 95833, and/or 95851, which are codes reserved for muscle testing and range of motion, when in fact services reimbursable pursuant to those codes were not performed. A chart identifying a representative sample of claims billing under CPT codes 95831, 95833, and/or 95851 is annexed hereto as Exhibit "20."

476.     By way of further example and not limitation, within thirty days of fraudulently billing Allstate for Physical Capacity Testing, one or more of the Paper Owners, through Allay Medical Services, P.C., KP Medical Care P.C., PFJ Medical Care P.C., MSB Physical Therapy, P.C., and/or in their individual names, routinely submitted bills to Allstate for physical therapy evaluation and/or re-evaluation of the same patients using CPT codes 97001 and/or 97002, when in fact services reimbursable pursuant to those codes were not performed, and physical testing or measurement services billed using CPT code 97750 are not to be used in lieu of evaluation or re-

evaluation services. A chart identifying a representative sample of claims billing under CPT codes 97001 and/or 97002 is annexed hereto as Exhibit "21."

**9.  The Fraudulent Somatosensory Evoked Potentials**

477.  In furtherance of the scheme to defraud alleged herein, as a matter of practice, procedure and protocol, Defendants Parisien, Lacina, Pavlova, Smith, Allay Medical Services, P.C., PFJ Medical Care P.C., KP Medical Care P.C., and Island Life Chiropractic Pain Care, PLLC billed Allstate for Somatosensory Evoked Potentials (SSEP) when in fact such services were medically unnecessary and/or of no diagnostic or treatment value.

478.  On information and belief, the SSEP were purportedly performed, if at all, in a manner that Defendants Parisien, Lacina, Pavlova, Smith, Allay Medical Services, P.C., PFJ Medical Care P.C., KP Medical Care P.C., and Island Life Chiropractic Pain Care, PLLC knew or should have known was contrary to the prevailing standard of care and would produce invalid data, findings and diagnoses that endangered the welfare of the Covered Persons, putting them at risk of having undiagnosed medical conditions and diseases and/or the wrong diagnosis and wrong treatment.

479.  SSEP are non-invasive tests which stimulate peripheral nerves in the arms and/or legs using electrical currents and recording the potentials which are evoked by using electrodes affixed to the patient's scalp.

480.  On information and belief, SSEP may be useful in studying disorders of the brain and brainstem, spinal cord, dorsal roots, and peripheral nerves and the exact sites of stimulation, and the number of nerves/roots tested is dependent upon the clinical problem presented by the patient and the clinic information which is needed.

481.     On information and belief, SSEP may be useful in studying disorders of the brain and brainstem, spinal cord, dorsal roots, and peripheral nerves, as well as in identifying clinically inapparent abnormalities and lesions causing only vague or equivocal signs or symptoms, and in certain conditions in which the diagnosis is uncertain, by indicating involvement of central somatosensory pathways, as well as suggesting the type of involvement (e.g., demyelination).

482.     On information and belief, SSEP is now done in relatively rare circumstances and not appropriate in diagnosing injuries sustained in motor vehicle accidents.

483.     The American Association of Neuromuscular and Electrodiagnostic Medicine (AANEM) has issued guidelines for the use of SSEP in which the AANEM concluded that SSEP are "generally not useful in the evaluation of acute radiculopathies, and offer no more information than can be obtained by a careful clinical and needle electromyographic evaluation," and that the yield gained from such testing is "low compared to information obtained from the neurological examinations, needle electromyography (EMG), and H-Reflex studies."

484.     On information and belief, SSEP have virtually no clinical value in the diagnosis or treatment of radiculopathy, such as that purportedly suffered by the No-fault Covered Persons on which Defendants purportedly performed SSEP.

485.     On information and belief, SSEP tests stimulate mixed nerves (nerves that contain nerve fibers that travel to more than one nerve root) at the wrist (median nerve) and ankle (tibial nerve). Accordingly, because the testing involves more than one nerve, an abnormal SSEP result renders impossible to know which nerve root is an issue. Moreover, since SSEP signals travel along the peripheral nerves and the spinal cord to the brain, an abnormal SSEP result may be caused by an issue at any one of those points, making the test virtually useless in the diagnosis of radiculopathy.

486. On information and belief, SSEPs were purportedly performed by Defendants Parisien, Lacina, Pavlova, Smith, Allay Medical Services, P.C., PFJ Medical Care P.C., KP Medical Care P.C., and Island Life Chiropractic Pain Care, PLLC in order to diagnose radiculopathy, notwithstanding that SEPs are effectively useless in the diagnosis of radiculopathy.

487. On information and belief, as a matter of pattern, practice and protocol, Defendants Parisien, Lacina, Pavlova, Smith, Allay Medical Services, P.C., PFJ Medical Care P.C., KP Medical Care P.C., and Island Life Chiropractic Pain Care, PLLC routinely performed SEPs on both the upper and lower limbs of Covered Persons.

488. On information and belief, as a matter of pattern, practice and protocol, Defendants Parisien, Lacina, Pavlova, Smith, Allay Medical Services, P.C., PFJ Medical Care P.C., KP Medical Care P.C., and Island Life Chiropractic Pain Care, PLLC routinely failed to document in Covered Persons' medical records why SEPSs were performed or how SSEP results effected Covered Persons' treatment.

489. On information and belief, the SEP reports of Defendants Parisien, Lacina, Pavlova, Smith, Allay Medical Services, P.C., PFJ Medical Care P.C., KP Medical Care P.C., and Island Life Chiropractic Pain Care, PLLC virtually always conclude with the same sentence indicating a normal SSEP result: "The above electrodiagnostic study revealed no evidence of delayed nerve conduction throughout the spinal nerve roots, spinal cord or brain stem." A chart identifying a representative sample of fraudulent claims for SSEP testing billed under CPT codes 95925 and/or 95926 is annexed hereto as Exhibit "22."

**10. The Fraudulent Trigger Point Injections and Dry Needling**

490. In furtherance of the scheme to defraud alleged herein, as a matter of practice, procedure and protocol, Defendant Doctors Parisien, Lacina and Pavlova routinely billed Allstate

for trigger point injections and dry needling procedures, as well as ultrasonic guidance in connection with those procedures, when in fact such services were medically unnecessary and/or of no diagnostic or treatment value.

491.     On information and belief, trigger points are small, discrete tender points or muscle knots (usually between 2-5 millimeters in diameter) located in a tight band of skeletal muscle which cause localized and referred pain, and limited range of motion. Trigger points can be identified by palpation (i.e., hand or finger pressure), which will elicit either direct localized pain and/or radiating referred pain and a local twitch.

492.     On information and belief, in order to establish a diagnosis for a major trigger point, there must be complaints of regional pain, pain or altered sensation in the expected distribution of referred pain from the trigger point, a palpable taut band in an accessible muscle with exquisite tenderness at one point along the length of the muscle and some degree of restricted range of motion.

493.     On information and belief, a diagnosis for a minor trigger point can be established by either a reproduction of a referred pain pattern by stimulating the trigger point, altered sensation by pressure on the tender spot, a local response elicited by snapping palpation at, or needle insertion into, the tender spot or pain alleviated by stretching or injecting the tender spot.

494.     On information and belief, once a diagnosis is made, various treatment modalities can be used to inactivate trigger points including consultation with a pain management physician, use of analgesics and adjunctive medications, passive or active physical therapy, manipulation therapy, dry needling and trigger point injections.

### a. Trigger Point Injections/Dry Needling

495. On information and belief, dry needling and trigger point injections involve the insertion of a thin needle into a trigger point in order to stimulate the tissue and increase range of motion.

496. On information and belief, trigger point injections also involve the administration of a small amount of medication, typically a local anesthetic, into the affected area, with the goal of reducing localized pain by relaxing the affected muscles and/or reducing referred pain by interrupting the nerve signaling pathways that cause referred pain.

497. On information and belief, dry needling insertions differ from trigger point injections insofar as they do not involve injecting of any medication.

498. On information and belief, dry needling for trigger points is unproven, experimental and investigational.

499. On information and belief, there is also no generally accepted evidence that injecting medication into trigger points improves patients' results.

500. On information and belief, because dry needling and trigger point injections represent alternative options for treating the same conditions, it is rarely deemed appropriate to perform dry needling at the same time as trigger point injections when used to treat the same condition.

501. On information and belief, potential side effects from trigger point injections involving the use of local anesthetics include blood disorders, paralysis, lung failure, seizures, major cardiac and central nervous system effects, and local anesthetic systemic toxicity.

502. On information and belief, in addition to potential side effects and/or complications resulting from injecting local anesthetics, risks involved from the trigger point injection and dry

Case 1:22-cv-00441-SBB-MDB Document 80-2 Filed 07/28/22 USDC Page 133 of 222 PageID #: 2232
Case 1:22-cv-00441-SBB-MDB Document 80-2 Filed 07/28/22 USDC Page 133 of 222 PageID #: 2232
PageID #: 1694

needling insertion procedures themselves include serious bacterial skin infection, soreness, bruising, hemorrhages, fainting, fatigue, damage to the central nervous system and major organ puncture.

503.    On information and belief, trigger point injections and/or dry needling are considered medically necessary only when the trigger point is presently causing tenderness and/or weakness, restricting motion, and/or causing referred pain when compressed.

504.    On information and belief, trigger point injections and/or dry needling should not be used for acute spinal pain.

505.    On information and belief, trigger point injections and/or dry needling should not be performed during an initial examination, absent exigent circumstances.

506.    On information and belief, trigger point injections and/or dry needling should only be utilized either as a second or third options for non-acute pain that is not resolving with more conservative means (*e.g.*, NSAIDs, exercises) within a six-week time frame.

507.    On information and belief, administering trigger point injections and/or dry needling before the patient has completed a minimum of six weeks (and, generally, at least three months) of conservative therapy is excessive and medically unnecessary.

508.    On information and belief, patients should be reassessed two weeks after each set trigger point injection and/or dry needling session in order to assess any improvement in function, temporary and sustained pain relief, and/or a reduction in the use of a prescribed analgesic medication.

509.    On information and belief, no more than four insertions should be administered during each trigger point injection and/or dry needling session.

510.    On information and belief, patients should not undergo more than four trigger point injections and/or dry needling sessions during a 12-month period.

511.    On information and belief, patients should wait at least three to four weeks after a trigger point injection and/or dry needling session before undergoing any subsequent trigger point injections and/or dry needling sessions.

512.    On information and belief, trigger point injections and/or dry needling should be limited to the least number necessary, and the need for repeated injections/insertions should be supported by documentation indicating a benefit from earlier procedures.

513.    On information and belief, repeated trigger point injections and/or dry needling sessions are not recommended unless there is both subjective and objective evidence of improvement resulting from the prior trigger point injections and/or dry needling injection treatment session.

514.    On information and belief, absent exigent circumstances, trigger point injections and/or dry needling should only be repeated if there is evidence of persistent significant pain, even with partial improvements in range of motion, absent exigent circumstances.

515.    On information and belief, a second set of trigger point injections and/or dry needling may be deemed reasonable only if there is at least a partial demonstrated improvement after the first set of injections/insertions.

516.    On information and belief, the medical record must clearly reflect the medical necessity for any repeated trigger point injections and/or dry needling.

517.    On information and belief, the use of ultrasound or other imaging studies for trigger point injections and/or dry needling is not recommended.

**b. Defendants' Trigger Points and Dry Needling**

518.     On information and belief, in furtherance of the scheme to defraud alleged herein, as a matter of practice, procedure and protocol, one or more of the Defendant Doctors, including but not limited to Defendant Doctors Parisien, Lacina and Pavlova, routinely performed excessive and medically unnecessary trigger point injections on Covered Persons, virtually always combining them with dry needling during the same treatment sessions.

519.     In furtherance of their fraudulent scheme, Defendants documented purported trigger point injections and dry needling procedures on pre-printed forms (the "Trigger Point/Dry Needling Forms") that purport to reflect diagnoses supporting trigger point injections and/or dry needling.

520.     On information and belief, while the Trigger Point/Dry Needling Forms include pre-printed checkboxes for five different injection options (e.g., nerve block, facet, intra-articular, platelet-rich plasma), Defendant Doctors, including but not limited to Defendant Doctors Parisien, Lacina and Pavlova, virtually always select only trigger point injections.

521.     On information and belief, while Defendant Doctors, including but not limited to Defendant Doctors Parisien, Lacina and Pavlova, purportedly treated different Covered Persons at different times at the Flatbush Avenue Clinic, they administered trigger point injections and dry needling procedures in the same fraudulent manner, routinely recommending both procedures during Covered Persons' initial examinations or during follow-up examinations early in the course of treatment.

522.     By way of example and not limitation, based on a representative sample of 338 Covered Persons who purportedly treated at the Flatbush Avenue Clinic with the Defendant Doctors, including but not limited to Defendant Doctors Parisien, Lacina and Pavlova, nearly half

of all Covered Persons who purportedly received trigger point injections received them within six-weeks of their purported accident, and more than 70 percent received them within 90-days of their purported accident.

523.    On information and belief, the Defendant Doctors, including but not limited to Defendant Doctors Parisien, Lacina and Pavlova, selected trigger point injections for more than 90 percent of the Covered Persons who purportedly received any of the five types of injections in the pre-printed checklist on the Trigger Point/Dry Needling Forms.

524.    On information and belief, Defendants purportedly combined trigger point injections with dry needling in nearly all instances (more than 95 percent of instances where trigger point injections were purportedly administered), billing under CPT codes 20552 or 20553 (for trigger point injections) and additionally under CPT code 20999 (for dry needling) for the same dates of services, which is prohibited pursuant to the Fee Schedule. A chart identifying a representative sample of billing under CPT codes 20552, 20553 and 20999 is annexed hereto as Exhibit "23."

525.    On information and belief, Defendant Doctors, including but not limited to Defendant Doctors Parisien, Lacina and Pavlova, also often conflated dry needling with trigger point injections on the Trigger Point/Dry Needling Forms, indicating that dry needling was being performed when, in fact, Defendants were billing Allstate for trigger point injections, and vice versa.

526.    Notwithstanding that no more than four insertions should be administered during any trigger point injection or dry needling session, and that trigger point injections and/or dry needling should be limited to the least number necessary, the Defendant Doctors, including but not limited to Defendant Doctors Parisien, Lacina and Pavlova, in order to maximize

reimbursement, routinely billed Allstate for excessive trigger point injections and dry needling insertions, with some Covered Persons purportedly receiving as many as 96 dry needling insertions and 16 trigger point injections during single visits. By way of example and not limitation:

- Covered Person A.B, (claim number 0457649770) purportedly received 96 dry needle insertions during a single treatment session and an additional 32 dry needle insertions at a subsequent treatment session;

- Covered Person M.J. (claim number 0344451562) purportedly received 16 trigger point injections during a single treatment session in August 2016 and 16 additional trigger point injections the following month;

- Covered Person R.G. (claim number 0376459327) purportedly received 7 trigger point injections during three separate treatment sessions (totaling 21 separate trigger point injections) during a three-and-a-half-month period;

- Covered Person A.F. (claim number 0391142502) purportedly received 16 trigger point injections during a single treatment session on November 9, 2015 and then received an additional 8 trigger point injections at a subsequent treatment session just six days later;

- Covered Person R.B. (claim number 0422002691) purportedly received 8 trigger point injections during a single treatment session and 7 additional trigger point injections at a subsequent treatment session (totaling 15 trigger point injections) during a one-month period;

- Covered Person L.C. (claim number 0400879102) purportedly received 8 trigger point injections during a single treatment session and 7 additional trigger point injections at a subsequent treatment session (totaling 15 trigger point injections) during a two-month period;

- Covered Persons E.J. (claim number 0368003091), T.U. (claim number 0386951981) and M.M. (claim number 0391594314) each purportedly received 16 trigger point injections during single treatment sessions; and

- Covered Persons M.R. (claim number 0375170644), M.C. (claim number 0388149213), D.D. (claim number 0387559552), B.C. (claim number 0391445368), D.L. (claim number 0391698619), A.F. (claim number 0391674355), J.P. (claim number 0393526215), A.C. (claim number 0393819305), M.L. (claim number 0393580955), Y.E. (claim number 0415767268), H.R. (claim number 0405632076), W.W. (claim number 0406090035) and A.H. (claim number 0408989390) each purportedly received between 7 and 14 trigger point injections during separate, individual treatment sessions.

527.     On information and belief, further demonstrative of the fact that the trigger point injections and dry needling procedures were medically unnecessary and performed, if at all, pursuant to a scheme to defraud, Defendant Doctors, including but not limited to Defendant Doctors Parisien, Lacina and Pavlova, routinely failed to document Covered Persons' responses to the procedures in their medical records, including whether Covered Persons had positive or negative responses, thereby leaving patients at risk of adverse reactions to future treatments.

528.     On information and belief, Defendant Doctors, including but not limited to Defendant Doctors Parisien, Lacina and Pavlova, also routinely failed to adequately document Covered Persons' informed consent when purportedly performing trigger point injections and/or dry needling procedures, only noting that their patients are "advised to start on a course of Therapeutic Injections," without any further elucidation.

529.     On information and belief, Defendant Doctors, including but not limited to Defendant Doctors Parisien, Lacina and Pavlova, also routinely failed to identify which, if any, alternative and/or additional procedures could benefit Covered Persons.

530.     On information and belief Defendant Doctors, including but not limited to Defendant Doctors Parisien, Lacina and Pavlova, failed to document medically sufficient rationales to justify the risks to the Covered Persons when purportedly performing trigger point injections and/or dry needling procedures.

531.     On information and belief, in most instances, Defendant Doctors, including but not limited to Defendant Doctors Parisien, Lacina and Pavlova, also failed to sufficiently document ultrasonic guidance in their medical records when used as a part of trigger point injection and/or dry needling procedures.

532. On information and belief, Defendant Doctors, including but not limited to Defendant Doctors Parisien, Lacina and Pavlova, also purportedly administered dry needling and/or trigger point injections to treat diagnoses of acute back pain.

533. On information and belief, doctors should allow adequate time between injection sessions to assess if the injection is providing long-lasting (as opposed to short-term) relief. However, patients at the Flatbush Avenue Clinic were often injected on multiple occasions with little to no documentation that they experienced **any** relief from the prior set of injections that they had already received, let alone long-lasting relief.

534. On information and belief, documenting a patient's responses to injections is imperative for anyone involved in a patient's care, including the licensed professionals administering the injections, other licensed professionals who may treat the patient contemporaneously or subsequently, the patients, and the insurers/payers; it is particularly critical for licensed professionals to have this information in order to decide whether to subject a patient to the risks of subsequent procedures.

535. On information and belief, notwithstanding the importance of documenting patients' responses to injections, the Defendant Doctors routinely only recorded Covered Persons' responses to an injection procedure with one or two check marks in a pre-printed box on the Trigger Point/Dry Needling Forms indicating that the "[p]atient tolerated the procedure well," without complication or complaint, and without any further elucidation of the patient's response to the procedure.

536. On information and belief, the Defendant Doctors, including but not limited to Defendant Doctors Parisien, Lacina and Pavlova, routinely failed to adequately document Covered

Persons' self-reported pain levels, rendering it impossible to determine whether the injections benefitted the Covered Persons.

537. On information and belief, the Defendant Doctors, including but not limited to Defendant Doctors Parisien, Lacina and Pavlova, also routinely failed to document the number and/or location of trigger point injections and/or dry needling insertions that were purportedly administered.

538. On information and belief, the risks to Covered Persons that Defendants took, and continue to take, by administering unnecessary trigger point injections are exacerbated by the fact that the Defendant Doctors, including but not limited to Defendant Doctors Parisien, Lacina and Pavlova, failed to sufficiently document the type(s) and/or amount(s) of medication(s) injected (via trigger point injections) into Covered Persons.

539. By way of example and not limitation, notwithstanding that the Trigger Point/Dry Needling Forms include a pre-printed section stating that "each area/trigger point was injected with 0.5cc of 0.5% Marcaine ….," the Defendant Doctors, including but not limited to Defendant Doctors Parisien, Lacina and Pavlova, routinely indicate on a separate section of the same form that they are administering an entirely separate type and/or amount of medication, making it impossible to determine the type or amount of medication injected in each Covered Person.

540. On information and belief, comprehending, and fully and accurately documenting, the type, dose and frequency of administered medications is critical for patients' safety, particularly considering potentially dangerous dose-related side effects.

541. On information and belief, without an accurate record of the type(s) and/or dose(s) of medications administered, patients are unable to make medically informed decisions, including about the type or dose administered and any subsequent changes.

542.    On information and belief, full and accurate documentation is also necessary in order to track patients' responses to past treatment, evaluate and address any adverse and/or potentially life-threatening reactions, and monitor the total amount of medication administered over time.

543.    On information and belief, Defendant Doctors, including but not limited to Defendant Doctors Parisien, Lacina and Pavlova, subjected virtually all of the Covered Persons that they treated at the Flatbush Avenue Clinic to dry needling during the same treatment session in which trigger point injections were purportedly administered.

544.    On information and belief, the combined dry needling and trigger point injection treatment sessions performed by the Defendant Doctors, including but not limited to Defendant Doctors Parisien, Lacina and Pavlova, are excessive, medically unnecessary and potentially harmful because: (i) dry needling is experimental, and it is unproven whether it can provide any benefit; (ii) is also unproven whether there is any benefit from injecting medication, including local anesthetics, into trigger points; and (iii) dry needling and trigger point injections typically treat the same conditions, thus, representing alternative treatment options which are supported by the same clinical rationales.

545.    On information and belief, Defendant Doctors, including but not limited to Defendant Doctors Parisien, Lacina and Pavlova, often purportedly administered several separate trigger point injection and/or dry needling insertions during a single treatment session, with some Covered Persons receiving as many as 96 separate insertions during the same session.

546.    On information and belief, based upon a representative sample of claim files for 338 Covered Persons at the Flatbush Avenue Clinic, Covered Persons, on average, received 32 dry

needling insertions (nearly always combined with trigger point injections) during a single treatment session.

547.     On information and belief, Covered Persons at the Flatbush Avenue Clinic purportedly and routinely underwent multiple trigger point and/or dry needling sessions without any indication that they experienced any improvement from the prior session(s).

548.     On information and belief, other than pre-printed boilerplate language, the Trigger Point/Dry Needling Forms do not indicate the type or gauge of the needles used on each particular Covered Person; nor do they indicate how the trigger point injections or dry needling insertions are performed other than to identify the muscle group(s) where it was administered.

549.     On information and belief Defendant Doctors, including but not limited to Defendant Doctors Parisien, Lacina and Pavlova, billed for dry needling procedures at the Flatbush Avenue Clinic using CPT code 20999, which is described as: "unlisted procedure, musculoskeletal system, general."  A chart identifying a representative sample of billing under CPT code 20999 is annexed hereto as Exhibit "24."

550.     While the CPT codes used for trigger point injections (20552 and 20553) are limited to a single billing unit regardless of the number of actual injections, there are no such limitations for billing under CPT code 20999.

551.     On information and belief,  as a part of their scheme to defraud, Defendant Doctors, including but not limited to Defendant Doctors Parisien, Lacina and Pavlova, subjected Covered Persons to excessive dry needling insertions not because the procedures were medically necessary, but, rather, in order to submit multiple charges for excessive amounts.

552.     By way of example and not limitation, in connection with claim number 0457649770, Covered Person A.B. purportedly received 96 dry needle insertions from Lacina

during a single treatment session, for which Lacina submitted charges to Allstate totaling $7,600 (excluding additional charges on the same date of service for a purported office visit, trigger point injections and ultrasonic guidance). At a subsequent visit, despite that A.B. had "no improvement" and the "same" pain, patient A.B. purportedly received an additional 32 dry needle insertions, for which Lacina submitted charges to Allstate totaling $2,550 (excluding additional charges on the same date of service for a purported office visit, trigger point injections and ultrasonic guidance).

553. In furtherance of their scheme to defraud, Defendant Doctors, including but not limited to Defendant Doctors Parisien, Lacina and Pavlova, also frequently inflated their charges for trigger point injections and dry needling insertions by representing that these procedures are performed using ultrasonic guidance, thereby providing Defendant Doctors, including but not limited to Defendant Doctors Parisien, Lacina and Pavlova, with the option of submitting an additional charge under CPT code 76942.

554. On information and belief, however, determining the proper needle placement for trigger point injections is routine and simple; it is extremely rare that ultrasonic guidance would be necessary; it is even more rare that ultrasonic guidance would be necessary for dry needling insertions, which do not involve injecting any medication.

555. On information and belief, even assuming that ultrasonic guidance was medically necessary in these instances, which it was not, in order to properly bill CPT Code 76942, the clinical need for ultrasonic guidance must be clearly supported in the medical record and an interpretation of the ultrasonic guidance must be documented in the patient's medical record.

556. On information and belief, Defendant Doctors, including but not limited to Defendant Doctors Parisien, Lacina and Pavlova, routinely: (i) failed either to create and/or submit this necessary documentation when billing under CPT code 76942; (ii) failed to document why

ultrasonic guidance was necessary when it was purportedly used; and (iii) failed to document interpretations of ultrasonic guidance when it was purportedly used. A chart identifying a representative sample of billing under CPT code 76942 is annexed hereto as Exhibit "25."

## DISCOVERY OF THE FRAUD

557.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud, described above, Plaintiffs did not discover and should not have reasonably discovered that their damages were attributable to fraud until shortly before they filed their complaint.

## FIRST CLAIM FOR RELIEF

## AGAINST ALL DEFENDANTS

## [RICO, pursuant to 18 U.S.C. § 1962(c)]

558.    The allegations of paragraphs 1 through 557 are hereby repeated and realleged as though fully set forth herein.

## THE RICO ENTERPRISE

559.    The Flatbush Avenue Clinic Enterprise (consisting of T. Rybak, O. Rybak, Pernier, Parisien, Lacina, Pavlova, Smith, Mollo, Deng, Buslon, JPC Medical, JPF Medical Services, Jules Medical, JP Medical Services, JFL Medical Care, Allay Medical Services, FJL Medical Services, PFJ Medical Care, RA Medical Services, KP Medical Care, Alford A. Smith MD, P.C., Strategic Medical Initiatives, ACH Chiropractic, Energy Chiropractic, Island Life Chiropractic Pain Care, Charles Deng Acupuncture, MSB Physical Therapy, John Does 1 Through 20, and ABC Corporations 1 Through 20) is an association-in-fact Enterprise as that term is defined by 18 U.S.C § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).  The Flatbush Avenue Clinic Enterprise engaged in activities, including defrauding insurers that are based outside of New York, that affect interstate commerce.

560.    From in or about 2013 through the present, Defendants T. Rybak, O. Rybak, Pernier Parisien, Lacina, Pavlova, Smith, Mollo, Deng, Buslon, JPC Medical, JPF Medical Services, Jules Medical, JP Medical Services, JFL Medical Care, Allay Medical Services, FJL Medical Services, PFJ Medical Care, RA Medical Services, KP Medical Care, Alford A. Smith MD, P.C., Strategic Medical Initiatives, ACH Chiropractic, Energy Chiropractic, Island Life Chiropractic Pain Care, Charles Deng Acupuncture, MSB Physical Therapy, John Does 1 Through 20, and ABC Corporations 1 Through 20 knowingly conducted and participated in the affairs of the Flatbush Avenue Clinic Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference.  Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

561.    The component parts of the Flatbush Avenue Clinic Enterprise are and have been joined in a common purpose, namely to defraud Allstate, and other insurance companies by submitting, and causing to be submitted, bills and supporting documentation that are fraudulent for services that were not provided, were not medically necessary, and/or were not legitimately entitled to reimbursement for patients treated purportedly treated at 1786 Flatbush Avenue, Brooklyn, New York, or the Enterprises' prior location at 1468 Flatbush Avenue, Brooklyn, New York. Although different component parts have performed different roles at different times, they have operated as a continuing unit with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose — to defraud Allstate through fraudulent insurance claims — with sufficient longevity to accomplish that common purpose.

562.    Defendants T. Rybak, O. Rybak, and one or more of the John Doe Defendants, at all relevant times, were the Controllers of, exerted control over, and directed the operations of the

Flatbush Avenue Clinic Enterprise and each of its component parts, and utilized that to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted fraudulent bills and supporting documents to Plaintiffs seeking payments that the Flatbush Avenue Clinic's component Fraudulently Owned PCs and Paper Owners were ineligible to receive because (a) the Fraudulently Owned PCs were fraudulently incorporated and/or owned and controlled by unlicensed laypersons; (b) the Controllers submitted and/or cause to be submitted claims in the names of the Paper Owners and/or through the Fraudulently Owned PCs for medically unnecessary services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) the Controllers submitted and/or cause to be submitted claims for reimbursement in the names of the Paper Owners and/or through the Fraudulently Owned PCs pursuant to unlawful referral and/or financial arrangement(s) between the Defendants without regard to medical necessity; and (d) the Controllers submitted and/or cause to be submitted claims for reimbursement in the names of the Paper Owners and/or through the Fraudulently Owned PCs under billing codes that misrepresent and/or exaggerate the services purportedly provided Claimants. In addition to participating in the control over the Fraudulently Owned PCs' and the submission of fraudulent bills and supporting documents to Plaintiffs, O. Rybak participated, facilitated promoted and profited from the scheme through serving as the Fraudulently Owned PCs' and Paper Owners' No-Fault collections counsel through which he, *inter alia*, funneled the proceeds of the scheme to defraud.

563. Defendants Pernier, Parisien, Lacina, Pavlova, Smith, Mollo, Deng, and Buslon were employed by or associated with the Flatbush Avenue Clinic Enterprise and its component parts, and participated in the conduct of its affairs through a pattern of racketeering activity. In addition, Defendants Pernier, Parisien, Lacina, Pavlova, Smith, Mollo, Deng, and Buslon furnished

their names and professional licenses to the Flatbush Avenue Clinic Enterprise and provided the essential means for the Enterprise to (a) fraudulently incorporate and/or operate a bogus professional service corporations and (b) submit bills in Defendants Pernier's, Parisien's, Lacina's, Pavlova's, Smith's, Mollo's, Deng's, and Buslon's individual capacities, to allow the lay person Controllers to fraudulently bill insurance companies for bogus services, including but not limited to, diagnostic testing, chiropractic, acupuncture, and physical therapy services performed pursuant to a predetermined treatment protocol irrespective of medical necessity.

564.    Defendants JPC Medical, JPF Medical Services, Jules Medical, JP Medical Services, JFL Medical Care, Allay Medical Services, FJL Medical Services, PFJ Medical Care, RA Medical Services, KP Medical Care, Alford A. Smith MD, P.C., Strategic Medical Initiatives, ACH Chiropractic, Energy Chiropractic, Island Life Chiropractic Pain Care, Charles Deng Acupuncture, and MSB Physical Therapy were associated with the Flatbush Avenue Clinic Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity. Each of the professional corporations furnished the Flatbush Avenue Clinic Enterprise with the identities of patients for the purpose of generating fraudulent claims, and with facilities that were essential prerequisites to an insurance fraud scheme. Moreover, the control of each professional corporation was ceded to Defendants T. Rybak, O. Rybak, and one or more of the John Doe Defendants, permitting such un-licensed lay persons to use the professional corporations to fraudulently bill for bogus services, including but not limited to diagnostic testing, chiropractic, acupuncture, and physical therapy services purportedly performed pursuant to a predetermined treatment protocol irrespective of medical necessity.

565.     On information and belief, one or more of John Does 1 through 20 were associated with the Flatbush Avenue Clinic Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

566.     On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the Flatbush Avenue Clinic Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

567.     As a whole, Defendants acted hand-in-hand, with well-defined ongoing roles in the organization, to achieve the common goal of defrauding Plaintiffs into paying bills for medical services and other healthcare services that were not supplied at all, or, if supplied, were provided by fraudulently incorporated health care practices, were of no diagnostic and/or treatment value, and/or provided pursuant to a predetermined treatment protocol irrespective of medical necessity.

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

568.     The racketeering acts set forth herein were carried out over a four-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of Flatbush Avenue Clinic Enterprise to defraud insurers.

569.     On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as the component parts of the Flatbush Avenue Clinic Enterprise continue to pursue collection on the fraudulent bills to the present day.

570.     As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue

checks to the component parts of the Flatbush Avenue Clinic Enterprise based upon materially false and misleading information.

571.    Through the Flatbush Avenue Clinic Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to No-fault Claimants. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

572.    A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

573.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

574.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## **DAMAGES**

575.    By reason of Defendants' violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have been injured in its business or property, and have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $1,800,000, the exact amount to be determined at trial.

576.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF

### AGAINST DEFENDANTS O. RYBAK, T. RYBAK, PERNIER, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

577.   The allegations of paragraphs 1 through 557 are hereby repeated and realleged as though fully set forth herein.

### THE RICO ENTERPRISE

578.   At all times relevant herein, JPC Medical was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

579.   From in or about 2016 through the present, Defendants O. Rybak, T. Rybak, Pernier, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 knowingly conducted and participated in the affairs of the JPC Medical Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference.  Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

580.   At all relevant times mentioned herein, Defendants O. Rybak, T. Rybak, and John Doe Defendants 1 through 20 were the Controllers of, exerted control over, and directed the operations of the JPC Medical Services Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs seeking payments that JPC Medical was ineligible to receive because it (a) is fraudulently incorporated and/or owned and controlled by unlicensed laypersons; (b) submitted claims for medically unnecessary services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c)

submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants without regard to medical necessity; and (d) submitted claims for reimbursement under billing codes that misrepresent and/or exaggerate the services purportedly provided Claimants. In addition to controlling the submission of bills to Plaintiffs, O. Rybak controlled the JPC Medical Enterprise's collection of fraudulent No-Fault Claims by serving as its No-Fault collections counsel.

581.     At all relevant times mentioned herein, Defendant Pernier was employed by or associated with the JPC Medical Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.   In addition, Defendant Pernier furnished his name and professional license to the JPC Medical Enterprise and provided the essential means for the Enterprise to fraudulently incorporate and/or operate a bogus professional service corporation and fraudulently bill insurance companies.

582.     On information and belief, one or more of John Does 1 through 20 were associated with the JPC Medical Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

583.     On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the JPC Medical Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY
### (RACKETEERING ACTS)

584.     The racketeering acts set forth herein were carried out over a four-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of JPC Medical to defraud insurers.

585.     On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as JPC Medical continues to pursue collection on the fraudulent bills to the present day.

586.     As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the JPC Medical Enterprise based upon materially false and misleading information.

587.     Through the JPC Medical Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to No-fault Claimants. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

588.     A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

589.     Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

590.     Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

591.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Indemnity Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $34,000, the exact amount to be determined at trial.

592.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants O. Rybak, T. Rybak, John Does 1 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

### THIRD CLAIM FOR RELIEF

### AGAINST DEFENDANTS O. RYBAK, T. RYBAK, PARISIEN, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

593.    The allegations of paragraphs 1 through 557 are hereby repeated and realleged as though fully set forth herein.

### THE RICO ENTERPRISE

594.    At all times relevant herein, JPF Medical Services was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

595.    From in or about 2016 through the present, Defendants O. Rybak, T. Rybak, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 knowingly conducted and participated in the affairs of the JPF Medical Services Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of

predicate acts set forth in the accompanying Appendix, which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

596.    At all relevant times mentioned herein, O. Rybak, T. Rybak, and John Doe Defendants 1 through 20, were the Controllers of, exerted control over, and directed the operations of the JPF Medical Services Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs seeking payments that JPF Medical Services was ineligible to receive because it (a) is fraudulently incorporated and/or owned and controlled by unlicensed laypersons; (b) submitted claims for medically unnecessary services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants without regard to medical necessity; and (d) submitted claims for reimbursement under billing codes that misrepresent and/or exaggerate the services purportedly provided Claimants. In addition to controlling the submission of bills to Plaintiffs, O. Rybak controlled the JPF Medical Services Enterprise's collection of fraudulent No-Fault Claims by serving as its No-Fault collections counsel.

597.    At all relevant times mentioned herein, Defendant Parisien was employed by or associated with the JPF Medical Services Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.  In addition, Defendant Parisien furnished his name and professional license to the JPF Medical Services Enterprise and provided the essential means for the Enterprise to fraudulently incorporate and/or operate a bogus professional service corporation and fraudulently bill insurance companies.

598.    On information and belief, one or more of John Does 1 through 20 were associated with the JPF Medical Services Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

599.    On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the JPF Medical Services Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY
### (RACKETEERING ACTS)

600.    The racketeering acts set forth herein were carried out over a five-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of JPF Medical Services to defraud insurers.

601.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as JPF Medical Services continues to pursue collection on the fraudulent bills to the present day.

602.    As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the JPF Medical Services Enterprise based upon materially false and misleading information.

603.    Through the JPF Medical Services, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to No-fault Claimants. The bills and supporting documents that were sent by Defendants, as well as the payments that

Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

604.     A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

605.     Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

606.     Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

607.     By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $146,000, the exact amount to be determined at trial.

608.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants O. Rybak, T. Rybak, Parisien, John Does 1 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## FOURTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS O. RYBAK, T. RYBAK, PARISIEN, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

609.     The allegations of paragraphs 1 through 557 are hereby repeated and realleged as though fully set forth herein.

## THE RICO ENTERPRISE

610.     At all times relevant herein, Jules Medical was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

611.     From in or about 2018 through the present, Defendants O. Rybak, T. Rybak, Parisien, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 knowingly conducted and participated in the affairs of the Jules Medical Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference.  Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

612.     At all relevant times mentioned herein, Defendants O. Rybak, T. Rybak, and John Doe Defendants 1 through 20, were the Controllers of, exerted control over, and directed the operations of the Jules Medical Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiff Allstate Fire and Casualty Insurance Company seeking payments that Jules Medical was ineligible to receive because it (a) is fraudulently incorporated and/or owned and controlled by unlicensed laypersons; (b) submitted claims for medically unnecessary services performed pursuant to a predetermined course of

treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants without regard to medical necessity; and (d) submitted claims for reimbursement under billing codes that misrepresent and/or exaggerate the services purportedly provided Claimants. In addition to controlling the submission of bills to Plaintiffs, O. Rybak controlled the Jules Medical Enterprise's collection of fraudulent No-Fault Claims by serving as its No-Fault collections counsel.

613.    At all relevant times mentioned herein, Defendant Parisien was employed by or associated with the Jules Medical Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.   In addition, Defendant Parisien furnished his name and professional license to the Jules Medical Enterprise and provided the essential means for the Enterprise to fraudulently incorporate and/or operate a bogus professional service corporation and fraudulently bill insurance companies.

614.    On information and belief, one or more of John Does 1 through 20 were associated with the Jules Medical Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

615.    On information and belief, one or more of the Jules Medical 1 through 20 were associated with the Jules Medical Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY
### (RACKETEERING ACTS)

616.    The racketeering acts set forth herein were carried out over a two-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of Jules Medical to defraud insurers.

617. On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Jules Medical continues to pursue collection on the fraudulent bills to the present day.

618. As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiff Allstate Fire and Casualty Insurance Company  and to induce Plaintiff Allstate Fire and Casualty Insurance Company to issue checks to the Jules Medical Enterprise based upon materially false and misleading information.

619. Through the Jules Medical Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to No-fault Claimants. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

620. A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

621. Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

622. Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

623.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiff Allstate Fire and Casualty Insurance Company has been injured in its business and property and has been damaged in the aggregate amount presently in excess of $16,000, the exact amount to be determined at trial.

624.    Pursuant to 18 U.S.C. § 1964(c), Allstate Fire and Casualty Insurance Company is entitled to recover from Defendants O. Rybak, T. Rybak, Parisien, John Does 1 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## FIFTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS O. RYBAK, T. RYBAK, PARISIEN, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

625.    The allegations of paragraphs 1 through 557 are hereby repeated and realleged as though fully set forth herein.

## THE RICO ENTERPRISE

626.    At all times relevant herein, JP Medical Services was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

627.    From in or about 2018 through the present, Defendants O. Rybak, T. Rybak, Parisien, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 knowingly conducted and participated in the affairs of the JP Medical Services Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the

representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference.  Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

628.    At all relevant times mentioned herein, O. Rybak, T. Rybak, and John Doe Defendants 1 through 20 were the Controllers of, exerted control over, and directed the operations of the JP Medical Services Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs seeking payments that JP Medical Services was ineligible to receive because it (a) is fraudulently incorporated and/or owned and controlled by unlicensed laypersons; (b) submitted claims for medically unnecessary services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants without regard to medical necessity; and (d) submitted claims for reimbursement under billing codes that misrepresent and/or exaggerate the services purportedly provided Claimants. In addition to controlling the submission of bills to Plaintiffs, O. Rybak controlled the JP Medical Services Enterprise's collection of fraudulent No-Fault Claims by serving as its No-Fault collections counsel.

629.    At all relevant times mentioned herein, Defendant Parisien was employed by or associated with the JP Medical Services Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.  In addition, Defendant Parisien furnished his name and professional license to the JP Medical Services Enterprise and provided the essential means for the Enterprise to fraudulently incorporate and/or operate a bogus professional service corporation and fraudulently bill insurance companies.

630.    On information and belief, one or more of John Does 1 through 20 were associated with the JP Medical Services Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

631.    On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the JP Medical Services Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

632.    The racketeering acts set forth herein were carried out over a three-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of JP Medical Services to defraud insurers.

633.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as JP Medical Services continues to pursue collection on the fraudulent bills to the present day.

634.    As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the JP Medical Services Enterprise based upon materially false and misleading information.

635.    Through the JP Medical Services Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to No-fault Claimants. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal

Service.  By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

636.    A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

637.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

638.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

639.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $24,000, the exact amount to be determined at trial.

640.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants O. Rybak, T. Rybak, Parisien, John Does 1 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

### SIXTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS O. RYBAK, T. RYBAK, PARISIEN, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

641.    The allegations of paragraphs 1 through 557 are hereby repeated and realleged as though fully set forth herein.

## THE RICO ENTERPRISE

642.     At all times relevant herein, PFJ Medical Care was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

643.     From in or about 2015 through the present, Defendants O. Rybak, T. Rybak, Parisien, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 knowingly conducted and participated in the affairs of the PFJ Medical Care Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference.  Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

644.     At all relevant times mentioned herein, O. Rybak, T. Rybak, and John Doe Defendants 1 through 20 were the Controllers of, exerted control over, and directed the operations of the PFJ Medical Care Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs seeking payments that PFJ Medical Care was ineligible to receive because it (a) is fraudulently incorporated and/or owned and controlled by unlicensed laypersons; (b) submitted claims for medically unnecessary services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants without regard to medical necessity; and (d) submitted claims for reimbursement under billing codes that misrepresent and/or exaggerate the services purportedly provided Claimants. In addition to controlling the submission of bills to Plaintiffs, O. Rybak controlled the

PFJ Medical Care Enterprise's collection of fraudulent No-Fault Claims by serving as its No-Fault collections counsel.

645.    At all relevant times mentioned herein, Defendant Parisien was employed by or associated with the PFJ Medical Care Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.  In addition, Defendant Parisien furnished his name and professional license to the PFJ Medical Care Enterprise and provided the essential means for the Enterprise to fraudulently incorporate and/or operate a bogus professional service corporation and fraudulently bill insurance companies.

646.    On information and belief, one or more of John Does 1 through 20 were associated with the PFJ Medical Care Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

647.    On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the PFJ Medical Care Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

648.    The racketeering acts set forth herein were carried out over a six-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of PFJ Medical Care to defraud insurers.

649.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as PFJ Medical Care continues to pursue collection on the fraudulent bills to the present day.

650.    As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made

through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the PFJ Medical Care Enterprise based upon materially false and misleading information.

651.    Through the PFJ Medical Care Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to No-fault Claimants. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

652.    A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

653.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

654.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

655.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $19,000, the exact amount to be determined at trial.

656.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants O. Rybak, T. Rybak, Parisien, John Does 1 through 20 and ABC Corporations 1 through 20, jointly

and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## SEVENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS O. RYBAK, T. RYBAK, LACINA, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

657.     The allegations of paragraphs 1 through 557 are hereby repeated and realleged as though fully set forth herein.

### THE RICO ENTERPRISE

658.     At all times relevant herein, JFL Medical Care was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

659.     From in or about 2016 through the present, Defendants O. Rybak, T. Rybak, Lacina, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 knowingly conducted and participated in the affairs of the JFL Medical Care Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

660.     At all relevant times mentioned herein, O. Rybak, T. Rybak, Lacina, and John Doe Defendants 1 through 20 were the Controllers of, exerted control over, and directed the operations of the JFL Medical Care Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs seeking payments that JFL Medical Care was ineligible to receive because it (a) is fraudulently incorporated and/or owned and controlled by unlicensed

laypersons; (b) submitted claims for medically unnecessary services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants without regard to medical necessity; and (d) submitted claims for reimbursement under billing codes that misrepresent and/or exaggerate the services purportedly provided Claimants. In addition to controlling the submission of bills to Plaintiffs, O. Rybak controlled the JFL Medical Care Enterprise's collection of fraudulent No-Fault Claims by serving as its No-Fault collections counsel.

661.     At all relevant times mentioned herein, Defendant Lacina was employed by or associated with the JFL Medical Care Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.  In addition, Defendant Lacina furnished his name and professional license to the JFL Medical Care Enterprise and provided the essential means for the Enterprise to fraudulently incorporate and/or operate a bogus professional service corporation and fraudulently bill insurance companies.

662.     On information and belief, one or more of John Does 1 through 20 were associated with the JFL Medical Care Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

663.     On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the JFL Medical Care Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

664.    The racketeering acts set forth herein were carried out over a four-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of JFL Medical Care to defraud insurers.

665.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as JFL Medical Care continues to pursue collection on the fraudulent bills to the present day.

666.    As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the JFL Medical Care based upon materially false and misleading information.

667.    Through the JFL Medical Care, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to No-fault Claimants. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

668.    A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

669.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

670.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

671.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $46,700, the exact amount to be determined at trial.

672.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants O. Rybak, T. Rybak, Lacina, John Does 1 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## EIGHTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS O. RYBAK, T. RYBAK, LACINA, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

673.    The allegations of paragraphs 1 through 557 are hereby repeated and realleged as though fully set forth herein.

## THE RICO ENTERPRISE

674.    At all times relevant herein, FJL Medical Services was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

675.    From in or about 2016 through the present, Defendants O. Rybak, T. Rybak, Lacina, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 knowingly conducted and participated in the affairs of the FJL Medical Services Enterprise through a pattern of racketeering

activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

676. At all relevant times mentioned herein, O. Rybak, T. Rybak, and John Doe Defendants 1 through 20 were the Controllers of, exerted control over, and directed the operations of the FJL Medical Services Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs seeking payments that FJL Medical Services was ineligible to receive because it (a) is fraudulently incorporated and/or owned and controlled by unlicensed laypersons; (b) submitted claims for medically unnecessary services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants without regard to medical necessity; and (d) submitted claims for reimbursement under billing codes that misrepresent and/or exaggerate the services purportedly provided Claimants. In addition to controlling the submission of bills to Plaintiffs, O. Rybak controlled the FJL Medical Services Enterprise's collection of fraudulent No-Fault Claims by serving as its No-Fault collections counsel.

677. At all relevant times mentioned herein, Defendant Lacina was employed by or associated with the FJL Medical Services Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity. In addition, Defendant Lacina furnished his name and professional license to the FJL Medical Services Enterprise and provided the essential means for the Enterprise to fraudulently incorporate and/or operate a bogus professional service corporation and fraudulently bill insurance companies.

678.    On information and belief, one or more of John Does 1 through 20 were associated with the FJL Medical Services Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

679.    On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the FJL Medical Services Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY
### (RACKETEERING ACTS)

680.    The racketeering acts set forth herein were carried out over a five-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of FJL Medical Services to defraud insurers.

681.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as FJL Medical Services continues to pursue collection on the fraudulent bills to the present day.

682.    As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the FJL Medical Services Enterprise based upon materially false and misleading information.

683.    Through the FJL Medical Services Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to No-fault Claimants. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal

Service.  By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

684.    A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

685.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

686.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

687.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $30,000, the exact amount to be determined at trial.

688.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants O. Rybak, T. Rybak, Lacina, John Does 1 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## NINTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS O. RYBAK, T. RYBAK, LACINA, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

689.    The allegations of paragraphs 1 through 557 are hereby repeated and realleged as though fully set forth herein.

## THE RICO ENTERPRISE

690.    At all times relevant herein, RA Medical Services was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

691.    From in or about 2015 through the present, Defendants O. Rybak, T. Rybak, Lacina, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 knowingly conducted and participated in the affairs of the RA Medical Services Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

692.    At all relevant times mentioned herein, O. Rybak, T. Rybak, and John Doe Defendants 1 through 20 were the Controllers of, exerted control over, and directed the operations of the RA Medical Services Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs seeking payments that RA Medical Services was ineligible to receive because it (a) is fraudulently incorporated and/or owned and controlled by unlicensed laypersons; (b) submitted claims for medically unnecessary services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants without regard to medical necessity; and (d) submitted claims for reimbursement under billing codes that misrepresent and/or exaggerate the services purportedly provided Claimants. In addition to controlling the submission of bills to

Plaintiffs, O. Rybak controlled the RA Medical Services Enterprise's collection of fraudulent No-Fault Claims by serving as its No-Fault collections counsel.

693.    At all relevant times mentioned herein, Defendant Lacina was employed by or associated with the RA Medical Services Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.  In addition, Defendant Lacina furnished his name and professional license to the RA Medical Services Enterprise and provided the essential means for the Enterprise to fraudulently incorporate and/or operate a bogus professional service corporation and fraudulently bill insurance companies.

694.    On information and belief, one or more of John Does 1 through 20 were associated with the RA Medical Services Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

695.    On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the RA Medical Services Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

696.    The racketeering acts set forth herein were carried out over a five-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of RA Medical Services to defraud insurers.

697.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as RA Medical Services continues to pursue collection on the fraudulent bills to the present day.

698.    As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made

through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the RA Medical Services Enterprise based upon materially false and misleading information.

699.     Through the RA Medical Services Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to No-fault Claimants. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

700.     A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

701.     Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

702.     Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

703.     By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $113,800, the exact amount to be determined at trial.

704. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants O. Rybak, T. Rybak, Lacina, John Does 1 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## TENTH CLAIM FOR RELIEF

## <u>AGAINST DEFENDANTS O. RYBAK, T. RYBAK, PAVLOVA, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20</u>

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

705. The allegations of paragraphs 1 through 557 are hereby repeated and realleged as though fully set forth herein.

### <u>THE RICO ENTERPRISE</u>

706. At all times relevant herein, Allay Medical Services was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

707. From in or about 2015 through the present, Defendants O. Rybak, T. Rybak, Pavlova, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 knowingly conducted and participated in the affairs of the Allay Medical Services Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

708. At all relevant times mentioned herein, O. Rybak, T. Rybak, and John Doe Defendants 1 through 20 were the Controllers of, exerted control over, and directed the operations of the Allay Medical Services Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the

fraudulent bills and supporting documents to Plaintiffs seeking payments that Allay Medical Services was ineligible to receive because it (a) is fraudulently incorporated and/or owned and controlled by unlicensed laypersons; (b) submitted claims for medically unnecessary services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants without regard to medical necessity; and (d) submitted claims for reimbursement under billing codes that misrepresent and/or exaggerate the services purportedly provided Claimants. In addition to controlling the submission of bills to Plaintiffs, O. Rybak controlled the Allay Medical Services Enterprise's collection of fraudulent No-Fault Claims by serving as its No-Fault collections counsel.

709. At all relevant times mentioned herein, Defendant Pavlova was employed by or associated with the Allay Medical Services Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity. In addition, Defendant Pavlova furnished his name and professional license to the Allay Medical Services Enterprise and provided the essential means for the Enterprise to fraudulently incorporate and/or operate a bogus professional service corporation and fraudulently bill insurance companies.

710. On information and belief, one or more of John Does 1 through 20 were associated with the Allay Medical Services Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

711. On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the Allay Medical Services Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

712.    The racketeering acts set forth herein were carried out over a six-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of Allay Medical Services to defraud insurers.

713.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Allay Medical Services continues to pursue collection on the fraudulent bills to the present day.

714.    As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Allay Medical Services Enterprise based upon materially false and misleading information.

715.    Through the Allay Medical Services Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to No-fault Claimants. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

716.    A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

717. Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

718. Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

719. By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company  Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $154,000, the exact amount to be determined at trial.

720. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants O. Rybak, T. Rybak, Pavlova, John Does 1 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

### ELEVENTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS O. RYBAK, T. RYBAK, PAVLOVA, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

721. The allegations of paragraphs 1 through 557 are hereby repeated and realleged as though fully set forth herein.

### THE RICO ENTERPRISE

722. At all times relevant herein, KP Medical Care P.C. was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

723.    From in or about 2016 through the present, Defendants O. Rybak, T. Rybak, Pavlova, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 knowingly conducted and participated in the affairs of the KP Medical Care Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference.  Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

724.    At all relevant times mentioned herein, O. Rybak, T. Rybak, and John Doe Defendants 1 through 20 were the Controllers of, exerted control over, and directed the operations of the KP Medical Care Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiff Allstate Fire and Casualty Insurance Company seeking payments that KP Medical Care was ineligible to receive because it (a) is fraudulently incorporated and/or owned and controlled by unlicensed laypersons; (b) submitted claims for medically unnecessary services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants without regard to medical necessity; and (d) submitted claims for reimbursement under billing codes that misrepresent and/or exaggerate the services purportedly provided Claimants. In addition to controlling the submission of bills to Plaintiffs, O. Rybak controlled the KP Medical Care Enterprise's collection of fraudulent No-Fault Claims by serving as its No-Fault collections counsel.

725.    At all relevant times mentioned herein, Defendant Pavlova was employed by or associated with the KP Medical Care Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.  In addition, Defendant Pavlova furnished his name and

180

professional license to the KP Medical Care Enterprise and provided the essential means for the

Enterprise to fraudulently incorporate and/or operate a bogus professional service corporation and

fraudulently bill insurance companies.

726.    On information and belief, one or more of John Does 1 through 20 were associated

with the KP Medical Care Enterprise and participated in the conduct of its affairs through a pattern

of racketeering activity.

727.    On information and belief, one or more of the ABC Corporations 1 through 20 were

associated with the KP Medical Care Enterprise and participated in the conduct of its affairs

through a pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

728.    The racketeering acts set forth herein were carried out over a four-year period, were

related and similar, and were committed as part of Defendants' scheme to use their control of KP

Medical Care to defraud insurers.

729.    On information and belief, this pattern of racketeering activity poses a specific

threat of repetition extending indefinitely into the future, inasmuch as KP Medical Care continues

to pursue collection on the fraudulent bills to the present day.

730.    As a part of the pattern of racketeering activity, and for the purpose of executing

the scheme and artifice to defraud as described above, Defendants caused mailings to be made

through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were

made in furtherance of a scheme or artifice to defraud Plaintiff Allstate Fire and Casualty Insurance

Company and to induce Plaintiff Allstate Fire and Casualty Insurance Company to issue checks to

the KP Medical Care Enterprise based upon materially false and misleading information.

731.    Through the KP Medical Care Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to No-fault Claimants. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

732.    A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

733.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

734.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

735.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiff Allstate Fire and Casualty Insurance Company has been injured in its business and property and has been damaged in the aggregate amount presently in excess of $18,000, the exact amount to be determined at trial.

736.    Pursuant to 18 U.S.C. § 1964(c), Plaintiff Allstate Fire and Casualty Insurance Company is entitled to recover from Defendants O. Rybak, T. Rybak, Pavlova, John Does 1 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## TWELFTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS O. RYBAK, T. RYBAK, SMITH, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

737.    The allegations of paragraphs 1 through 557 are hereby repeated and realleged as though fully set forth herein.

### THE RICO ENTERPRISE

738.    At all times relevant herein, Alford A. Smith MD, P.C. was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

739.    From in or about 2018 through the present, Defendants O. Rybak, T. Rybak, Smith, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 knowingly conducted and participated in the affairs of the Alford A. Smith MD, P.C. Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference.  Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

740.    At all relevant times mentioned herein, O. Rybak, T. Rybak, and John Doe Defendants 1 through 20 were the Controllers of, exerted control over, and directed the operations of the Alford A. Smith MD, P.C. Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiff Allstate Fire and Casualty Insurance Company seeking payments that Alford A. Smith MD, P.C. was ineligible to receive because it (a) is fraudulently incorporated and/or owned and controlled by unlicensed laypersons; (b) submitted claims for medically unnecessary services performed pursuant to a predetermined course of

treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants without regard to medical necessity; and (d) submitted claims for reimbursement under billing codes that misrepresent and/or exaggerate the services purportedly provided Claimants. In addition to controlling the submission of bills to Plaintiffs, O. Rybak controlled the Alford A. Smith MD, P.C. Enterprise's collection of fraudulent No-Fault Claims by serving as its No-Fault collections counsel.

741.    At all relevant times mentioned herein, Defendant Smith was employed by or associated with the Alford A. Smith MD, P.C. Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.  In addition, Defendant Smith furnished his name and professional license to the Alford A. Smith MD, P.C. Enterprise and provided the essential means for the Enterprise to fraudulently incorporate and/or operate a bogus professional service corporation and fraudulently bill insurance companies.

742.    On information and belief, one or more of John Does 1 through 20 were associated with the Alford A. Smith MD, P.C. Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

743.    On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the Alford A. Smith MD, P.C. Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

### THE PATTERN OF RACKETEERING ACTIVITY
### (RACKETEERING ACTS)

744.    The racketeering acts set forth herein were carried out over a three-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of Alford A. Smith MD, P.C. to defraud insurers.

745. On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Alford A. Smith MD, P.C. continues to pursue collection on the fraudulent bills to the present day.

746. As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiff Allstate Fire and Casualty Insurance Company and to induce Plaintiff Allstate Fire and Casualty Insurance Company to issue checks to the Alford A. Smith MD, P.C. Enterprise based upon materially false and misleading information.

747. Through the Alford A. Smith MD, P.C. Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to No-fault Claimants. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

748. A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

749. Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

750. Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

751.     By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiff Allstate Fire and Casualty Insurance Company has been injured in its business and property and has been damaged in the aggregate amount presently in excess of $10,000, the exact amount to be determined at trial.

752.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants O. Rybak, T. Rybak, Smith, John Does 1 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## THIRTEENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS O. RYBAK, T. RYBAK, SMITH, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

753.     The allegations of paragraphs 1 through 557 are hereby repeated and realleged as though fully set forth herein.

## THE RICO ENTERPRISE

754.     At all times relevant herein, Strategic Medical Initiatives was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

755.     From in or about 2018 through the present, Defendants O. Rybak, T. Rybak, Smith, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 knowingly conducted and participated in the affairs of the Strategic Medical Initiatives Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the

representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

756. At all relevant times mentioned herein, O. Rybak, T. Rybak, and John Doe Defendants 1 through 20 were the Controllers of, exerted control over, and directed the operations of the Strategic Medical Initiatives Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs seeking payments that Strategic Medical Initiatives was ineligible to receive because it (a) is fraudulently incorporated and/or owned and controlled by unlicensed laypersons; (b) submitted claims for medically unnecessary services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants without regard to medical necessity; and (d) submitted claims for reimbursement under billing codes that misrepresent and/or exaggerate the services purportedly provided Claimants. In addition to controlling the submission of bills to Plaintiffs, O. Rybak controlled the Strategic Medical Initiatives Enterprise's collection of fraudulent No-Fault Claims by serving as its No-Fault collections counsel.

757. At all relevant times mentioned herein, Defendant Smith was employed by or associated with the Strategic Medical Initiatives Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity. In addition, Defendant Smith furnished his name and professional license to the Strategic Medical Initiatives Enterprise and provided the essential means for the Enterprise to fraudulently incorporate and/or operate a bogus professional service corporation and fraudulently bill insurance companies.

758.    On information and belief, one or more of John Does 1 through 20 were associated with the Strategic Medical Initiatives Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

759.    On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the Strategic Medical Initiatives Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

### THE PATTERN OF RACKETEERING ACTIVITY
### (RACKETEERING ACTS)

760.    The racketeering acts set forth herein were carried out over a three-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of Strategic Medical Initiatives to defraud insurers.

761.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Strategic Medical Initiatives continues to pursue collection on the fraudulent bills to the present day.

762.    As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Strategic Medical Initiatives Enterprise based upon materially false and misleading information.

763.    Through the Strategic Medical Initiatives Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to No-fault Claimants. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States

Postal Service. By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

764. A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

765. Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

766. Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

767. By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Fire and Casualty Insurance Company and Allstate Property and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $2,000, the exact amount to be determined at trial.

768. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants O. Rybak, T. Rybak, Smith, John Does 1 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

### FOURTEENTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS O. RYBAK, T. RYBAK, MOLLO, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

769. The allegations of paragraphs 1 through 557 are hereby repeated and realleged as though fully set forth herein.

## THE RICO ENTERPRISE

770. At all times relevant herein, ACH Chiropractic was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

771. From in or about 2015 through the present, Defendants O. Rybak, T. Rybak, Mollo, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 knowingly conducted and participated in the affairs of the ACH Chiropractic Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

772. At all relevant times mentioned herein, O. Rybak, T. Rybak, and John Doe Defendants 1 through 20 were the Controllers of, exerted control over, and directed the operations of the ACH Chiropractic Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs seeking payments that ACH Chiropractic was ineligible to receive because it (a) is fraudulently incorporated and/or owned and controlled by unlicensed laypersons; (b) submitted claims for medically unnecessary services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants without regard to medical necessity; and (d) submitted claims for reimbursement under billing codes that misrepresent and/or exaggerate the services purportedly provided Claimants. In addition to controlling the submission of bills to Plaintiffs, O. Rybak controlled the

ACH Chiropractic Enterprise's collection of fraudulent No-Fault Claims by serving as its No-Fault collections counsel.

773.    At all relevant times mentioned herein, Defendant Mollo was employed by or associated with the ACH Chiropractic Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.  In addition, Defendant Mollo furnished his name and professional license to the ACH Chiropractic Enterprise and provided the essential means for the Enterprise to fraudulently incorporate and/or operate a bogus professional service corporation and fraudulently bill insurance companies.

774.    On information and belief, one or more of John Does 1 through 20 were associated with the ACH Chiropractic Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

775.    On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the ACH Chiropractic Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

776.    The racketeering acts set forth herein were carried out over a five-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of ACH Chiropractic to defraud insurers.

777.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as ACH Chiropractic continues to pursue collection on the fraudulent bills to the present day.

778.    As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made

through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the ACH Chiropractic Enterprise based upon materially false and misleading information.

779.     Through the ACH Chiropractic Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to No-fault Claimants. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

780.     A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

781.     Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

782.     Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

783.     By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $22,000, the exact amount to be determined at trial.

784.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants O. Rybak, T. Rybak, Mollo, John Does 1 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## FIFTEENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS O. RYBAK, T. RYBAK, MOLLO, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

785.     The allegations of paragraphs 1 through 557 are hereby repeated and realleged as though fully set forth herein.

## THE RICO ENTERPRISE

786.     At all times relevant herein, Energy Chiropractic was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

787.     From in or about 2016 through the present, Defendants O. Rybak, T. Rybak, Mollo, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 knowingly conducted and participated in the affairs of the Energy Chiropractic Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

788.     At all relevant times mentioned herein, O. Rybak, T. Rybak, and John Doe Defendants 1 through 20 were the Controllers of, exerted control over, and directed the operations of the Energy Chiropractic Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the

fraudulent bills and supporting documents to Plaintiffs seeking payments that Energy Chiropractic was ineligible to receive because it (a) is fraudulently incorporated and/or owned and controlled by unlicensed laypersons; (b) submitted claims for medically unnecessary services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants without regard to medical necessity; and (d) submitted claims for reimbursement under billing codes that misrepresent and/or exaggerate the services purportedly provided Claimants. In addition to controlling the submission of bills to Plaintiffs, O. Rybak controlled the Energy Chiropractic Enterprise's collection of fraudulent No-Fault Claims by serving as its No-Fault collections counsel.

789.    At all relevant times mentioned herein, Defendant Mollo was employed by or associated with the Energy Chiropractic Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.  In addition, Defendant Mollo furnished his name and professional license to the Energy Chiropractic Enterprise and provided the essential means for the Enterprise to fraudulently incorporate and/or operate a bogus professional service corporation and fraudulently bill insurance companies.

790.    On information and belief, one or more of John Does 1 through 20 were associated with the Energy Chiropractic Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

791.    On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the Energy Chiropractic Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

792. The racketeering acts set forth herein were carried out over a four-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of Energy Chiropractic to defraud insurers.

793. On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Energy Chiropractic continues to pursue collection on the fraudulent bills to the present day.

794. As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Energy Chiropractic Enterprise based upon materially false and misleading information.

795. Through the Energy Chiropractic Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to No-fault Claimants. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

796. A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

797.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

798.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### DAMAGES

799.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company and Allstate Property and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $16,000, the exact amount to be determined at trial.

800.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants O. Rybak, T. Rybak, Mollo, John Does 1 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

### SIXTEENTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS O. RYBAK, T. RYBAK, MOLLO, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

801.    The allegations of paragraphs 1 through 557 are hereby repeated and realleged as though fully set forth herein.

### THE RICO ENTERPRISE

802.    At all times relevant herein, Island Life Chiropractic Pain Care was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

803.    From in or about 2010 through the present, Defendants O. Rybak, T. Rybak, Mollo, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 knowingly conducted and participated in the affairs of the Island Life Chiropractic Pain Care Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference.  Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

804.    At all relevant times mentioned herein, O. Rybak, T. Rybak, and John Doe Defendants 1 through 20 were the Controllers of, exerted control over, and directed the operations of the Island Life Chiropractic Pain Care Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs seeking payments that Island Life Chiropractic Pain Care was ineligible to receive because it (a) is fraudulently incorporated and/or owned and controlled by unlicensed laypersons; (b) submitted claims for medically unnecessary services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants without regard to medical necessity; and (d) submitted claims for reimbursement under billing codes that misrepresent and/or exaggerate the services purportedly provided Claimants. In addition to controlling the submission of bills to Plaintiffs, O. Rybak controlled the Island Life Chiropractic Pain Care Enterprise's collection of fraudulent No-Fault Claims by serving as its No-Fault collections counsel.

805.    At all relevant times mentioned herein, Defendant Mollo was employed by or associated with the Island Life Chiropractic Pain Care Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.  In addition, Defendant Mollo furnished his

name and professional license to the Island Life Chiropractic Pain Care Enterprise and provided the essential means for the Enterprise to fraudulently incorporate and/or operate a bogus professional service corporation and fraudulently bill insurance companies.

806.     On information and belief, one or more of John Does 1 through 20 were associated with the Island Life Chiropractic Pain Care Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

807.     On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the Island Life Chiropractic Pain Care Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

808.     The racketeering acts set forth herein were carried out over a ten-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of Island Life Chiropractic Pain Care to defraud insurers.

809.     On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Island Life Chiropractic Pain Care continues to pursue collection on the fraudulent bills to the present day.

810.     As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Island Life Chiropractic Pain Care Enterprise based upon materially false and misleading information.

811. Through the Island Life Chiropractic Pain Care Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to No-fault Claimants. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

812. A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

813. Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

814. Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## **DAMAGES**

815. By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $113,000, the exact amount to be determined at trial.

816. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants O. Rybak, T. Rybak, Mollo, John Does 1 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## SEVENTEENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS O. RYBAK, T. RYBAK, BUSLON, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

817.    The allegations of paragraphs 1 through 557 are hereby repeated and realleged as though fully set forth herein.

### THE RICO ENTERPRISE

818.    At all times relevant herein, MSB Physical Therapy was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

819.    From in or about 2016 through the present, Defendants O. Rybak, T. Rybak, Buslon, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 knowingly conducted and participated in the affairs of the MSB Physical Therapy Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference.  Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

820.    At all relevant times mentioned herein, O. Rybak, T. Rybak, and John Doe Defendants 1 through 20 were the Controllers of, exerted control over, and directed the operations of the MSB Physical Therapy and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs seeking payments that MSB Physical Therapy was ineligible to receive because it (a) is fraudulently incorporated and/or owned and controlled by unlicensed laypersons; (b) submitted claims for medically unnecessary services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c)

submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants without regard to medical necessity; and (d) submitted claims for reimbursement under billing codes that misrepresent and/or exaggerate the services purportedly provided Claimants. In addition to controlling the submission of bills to Plaintiffs, O. Rybak controlled the MSB Physical Therapy Enterprise's collection of fraudulent No-Fault Claims by serving as its No-Fault collections counsel.

821.    At all relevant times mentioned herein, Defendant Buslon was employed by or associated with the MSB Physical Therapy Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.  In addition, Defendant Buslon furnished his name and professional license to the MSB Physical Therapy Enterprise and provided the essential means for the Enterprise to fraudulently incorporate and/or operate a bogus professional service corporation and fraudulently bill insurance companies.

822.    On information and belief, one or more of John Does 1 through 20 were associated with the MSB Physical Therapy Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

823.    On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the MSB Physical Therapy Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

### THE PATTERN OF RACKETEERING ACTIVITY
### (RACKETEERING ACTS)

824.    The racketeering acts set forth herein were carried out over a five-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of MSB Physical Therapy to defraud insurers.

825.     On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as MSB Physical Therapy continues to pursue collection on the fraudulent bills to the present day.

826.     As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the MSB Physical Therapy Enterprise based upon materially false and misleading information.

827.     Through the MSB Physical Therapy Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to No-fault Claimants. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

828.     A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

829.     Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

830.     Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

831.     By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $38,700, the exact amount to be determined at trial.

832.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants O. Rybak, T. Rybak, Buslon, John Does 1 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## EIGHTEENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS O. RYBAK, T. RYBAK, DENG, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

833.     The allegations of paragraphs 1 through 557 are hereby repeated and realleged as though fully set forth herein.

## THE RICO ENTERPRISE

834.     At all times relevant herein, Charles Deng Acupuncture was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

835.     From in or about 2011 through the present, Defendants O. Rybak, T. Rybak, Deng, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 knowingly conducted and participated in the affairs of the Charles Deng Acupuncture Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the

representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

836. At all relevant times mentioned herein, O. Rybak, T. Rybak, and John Doe Defendants 1 through 20 were the Controllers of, exerted control over, and directed the operations of the Charles Deng Acupuncture and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs seeking payments that Charles Deng Acupuncture was ineligible to receive because it (a) is fraudulently incorporated and/or owned and controlled by unlicensed laypersons; (b) submitted claims for medically unnecessary services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants without regard to medical necessity; and (d) submitted claims for reimbursement under billing codes that misrepresent and/or exaggerate the services purportedly provided Claimants. In addition to controlling the submission of bills to Plaintiffs, O. Rybak controlled the Charles Deng Acupuncture Enterprise's collection of fraudulent No-Fault Claims by serving as its No-Fault collections counsel.

837. At all relevant times mentioned herein, Defendant Deng was employed by or associated with the Charles Deng Acupuncture Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity. In addition, Defendant Deng furnished his name and professional license to the Charles Deng Acupuncture Enterprise and provided the essential means for the Enterprise to fraudulently incorporate and/or operate a bogus professional service corporation and fraudulently bill insurance companies.

838. On information and belief, one or more of John Does 1 through 20 were associated with the Charles Deng Acupuncture Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

839. On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the Charles Deng Acupuncture Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY
### (RACKETEERING ACTS)

840. The racketeering acts set forth herein were carried out over at least a ten-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of Charles Deng Acupuncture to defraud insurers.

841. On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Charles Deng Acupuncture continues to pursue collection on the fraudulent bills to the present day.

842. As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Charles Deng Acupuncture Enterprise based upon materially false and misleading information.

843. Through the Charles Deng Acupuncture Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to No-fault Claimants. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States

Postal Service. By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

844. A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

845. Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

846. Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

847. By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $277,000, the exact amount to be determined at trial.

848. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants O. Rybak, T. Rybak, Deng, John Does 1 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## NINETEENTH CLAIM FOR RELIEF

### AGAINST ALL DEFENDANTS

### (Common Law Fraud)
### (Fraudulent Incorporation)

849. The allegations of paragraphs 1 through 557 are hereby repeated and realleged as though fully set forth herein.

850. Defendants O. Rybak, T. Rybak, Pernier, Parisien, Lacina, Pavlova, Smith, Mollo, Deng, Buslon, JPC Medical, JPF Medical Services, Jules Medical, JP Medical Services, JFL Medical Care, Allay Medical Services, FJL Medical Services, PFJ Medical Care, RA Medical Services, KP Medical Care, Alford A. Smith MD, Strategic Medical Initiatives, ACH Chiropractic, Energy Chiropractic, Island Life Chiropractic Pain Care, Charles Deng Acupuncture, MSB Physical Therapy, John Does 1 through 20 and ABC Corporations 1 through 20 intentionally, knowingly, fraudulently and with an intent to deceive Plaintiffs, made various misleading statements intended to hold out the Fraudulently Owned PCs as legal professional service corporations in compliance with core licensing requirements when, in fact, they were not, thereby inducing Plaintiffs to make payments that Defendants were not entitled to because of their fraudulent incorporation and/or illegal corporate structure that rendered the Fraudulently Owned PCs not licensed in accordance with applicable New York state law. As part of the fraudulent scheme implemented by Defendants, the Fraudulently Owned PCs, with the assistance and knowledge of Defendants the O. Rybak, T. Rybak, Pernier, Parisien, Lacina, Pavlova, Smith, Mollo, Deng, Buslon, and one or more of the John Doe Defendants 1 through 20, made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs for payment.

851.    Defendants O. Rybak, T. Rybak, Pernier, Parisien, Lacina, Pavlova, Smith, Mollo, Deng, Buslon, JPC Medical, JPF Medical Services, Jules Medical, JP Medical Services, JFL Medical Care, Allay Medical Services, FJL Medical Services, PFJ Medical Care, RA Medical Services, KP Medical Care, Alford A. Smith MD, Strategic Medical Initiatives, ACH Chiropractic, Energy Chiropractic, Island Life Chiropractic Pain Care, Charles Deng Acupuncture, MSB Physical Therapy, John Does 1 through 20 and ABC Corporations 1 through 20 intentionally, knowingly, fraudulently and with an intent to deceive Plaintiffs, concealed the fact that O. Rybak, T. Rybak, and one or more John Doe Defendants, not Defendants Pernier, Parisien, Lacina, Pavlova, Smith, Mollo, Deng, Buslon, were the true owners of the Fraudulently Owned PCs, by making false representations of material facts, including but not limited to the following fraudulent misrepresentations:

a.    Each and every bill and report set forth the name of the Fraudulently Owned PCs as professional corporations owned by Defendants Pernier, Parisien, Lacina, Pavlova, Smith, Mollo, Deng, Buslon, licensed healthcare providers, when, in fact, they were not. The submission of bills and reports containing the signatures of Defendants Pernier, Parisien, Lacina, Pavlova, Smith, Mollo, Deng, Buslon, was a fraudulent misrepresentation, intended to deceive and mislead the Plaintiffs into believing that the Fraudulently Owned PCs were legal professional corporations when, in fact, they were not;

b.    False and misleading statements and information regarding who owned, controlled and operated the Fraudulently Owned PCs;

c.    False and misleading statements and information intended to mislead Plaintiffs into believing that the Fraudulently Owned PCs were being operated by Defendants Pernier, Parisien, Lacina, Pavlova, Smith, Mollo, Deng, Buslon, as indicated in their respective certificates of incorporation when, in fact, they were not;

d.    False and misleading statements intended to mislead Plaintiffs into believing that the Fraudulently Owned PCs were licensed in accordance with applicable New York state law when, in fact, they were not;

e.    False and misleading statements that the Fraudulently Owned PCs were properly licensed and therefore eligible to recover No-fault benefits

pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR 65-3.16(a)(12) when, in fact, they were not;

f.    False and misleading statements and information intended to circumvent Article 15 of the B.C.L., which prohibits ownership by individuals not licensed to practice the profession for which a professional corporation was incorporated;

g.    False and misleading statements and information, as contained in the signed medical reports and NF-3s, that were intended to deceive and conceal the facts that the Fraudulently Owned PCs were engaged in the illegal corporate practice of medicine, in contravention of New York state law and that the Controllers, and/or others unknown to Plaintiffs, were billing for medical and/or other healthcare services through Fraudulently Owned PCs;

h.    False and misleading statements and information set forth in NF-3 forms and medical reports indicating that Defendants Pernier, Parisien, Lacina, Pavlova, Smith, Mollo, Deng, Buslon were actively involved in the operations of the Fraudulently Owned PCs when, in fact, they were not; and

i.    False and misleading statements contained in each separate bill, medical record and report submitted by Defendants to Plaintiffs regarding the relationships between Defendants Pernier, Parisien, Lacina, Pavlova, Smith, Mollo, Deng, Buslon, and the Fraudulently Owned PCs and Defendants O. Rybak and T. Rybak, which concealed or failed to disclose the actual relationships between said parties and the existence of fraudulent corporate structures.

852.    Defendants knew the foregoing material misrepresentations to be false when made, particularly that the Fraudulently Owned PCs were properly licensed in accordance with New York state law and eligible to recover No-fault benefits, and made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

853.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and/or omissions and upon a state of facts that Plaintiffs were led to believe existed as a result of Defendants' acts of fraud and deception, and which led to Plaintiffs making substantial payments to the Fraudulently Owned PCs.

854.    Had Plaintiffs known of the Fraudulently Owned PCs' illegal corporate structure, which were contrary to all indications reflected in the medical reports, treatment verifications, bills

for medical and/or other healthcare services and other documents they submitted in support of payment, Plaintiffs would not have paid the Fraudulently Owned PCs' claims for No-fault insurance benefits submitted in connection therewith.

855.    Plaintiffs were thus injured as a proximate result and are entitled to recover and recoup from the Defendants payments they made to the Fraudulently Owned PCs, in accordance with the Court of Appeals' decision in *State Farm v. Mallela*. *See* 4 N.Y.3d 313, 827 N.E.2d 758 (2005).

856.    Furthermore, Defendants' far-reaching pattern of fraudulent conduct evinces a high degree of moral turpitude and wanton dishonesty which, as alleged above, has harmed, and will continue to harm, the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

857.    By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $1,100,000, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## TWENTIETH CLAIM FOR RELIEF

## AGAINST ALL DEFENDANTS

### (Common Law Fraud-Billing Fraud)

858.    The allegations of paragraphs 1 through 557 are hereby repeated and realleged as though fully set forth herein.

859.    Defendants O. Rybak, T. Rybak, Pernier, Parisien, Lacina, Pavlova, Mollo, Deng, Buslon, JPC Medical, JPF Medical Services, JFL Medical Care, Allay Medical Services, FJL Medical Services, PFJ Medical Care, RA Medical Services, KP Medical Care, ACH Chiropractic,

Energy Chiropractic, Island Life Chiropractic Pain Care, Charles Deng Acupuncture, MSB Physical Therapy, John Does 1 through 20 and ABC Corporations 1 through 20, intentionally, knowingly, fraudulently, and with an intent to deceive Plaintiffs, made numerous false and misleading statements of material fact as to the necessity of the medical services purportedly rendered and that the medical services were provided when in fact they were not provided as billed and exaggerated the level of service, if any, purportedly provided, thereby inducing Plaintiffs to make payments to Defendants that Defendants were not entitled to because of their fraudulent nature. As part of the fraudulent scheme, Defendants O. Rybak, T. Rybak, Pernier, Parisien, Lacina, Pavlova, Mollo, Deng, Buslon, JPC Medical, JPF Medical Services, JFL Medical Care, Allay Medical Services, FJL Medical Services, PFJ Medical Care, RA Medical Services, KP Medical Care, ACH Chiropractic, Energy Chiropractic, Island Life Chiropractic Pain Care, Charles Deng Acupuncture, MSB Physical Therapy, John Does 1 through 20 and ABC Corporations 1 through 20 made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs for payment.

860. Defendants O. Rybak, T. Rybak, Pernier, Parisien, Lacina, Pavlova, Mollo, Deng, Buslon, JPC Medical, JPF Medical Services, JFL Medical Care, Allay Medical Services, FJL Medical Services, PFJ Medical Care, RA Medical Services, KP Medical Care, ACH Chiropractic, Energy Chiropractic, Island Life Chiropractic Pain Care, Charles Deng Acupuncture, MSB Physical Therapy, John Does 1 through 20 and ABC Corporations 1 through 20 intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs, concealed the fact that the bills submitted to Plaintiffs for reimbursement of No-fault benefits the Fraudulent Services were materially misrepresented.

861.     Defendants O. Rybak, T. Rybak, Pernier, Parisien, Lacina, Pavlova, Smith, Mollo, Deng, Buslon, JPC Medical, JPF Medical Services, JFL Medical Care, Allay Medical Services, FJL Medical Services, PFJ Medical Care, RA Medical Services, KP Medical Care, ACH Chiropractic, Energy Chiropractic, Island Life Chiropractic Pain Care, Charles Deng Acupuncture, MSB Physical Therapy, John Does 1 through 20 and ABC Corporations 1 through 20 intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs, concealed the fact that, in many instances, the services relating to Fraudulent Services were provided pursuant to a pre-determined protocol that was intended to maximize Defendants' profit and reimbursement of payments from the Plaintiffs, as opposed to medical necessity.

862.     Defendants intentionally, knowingly, fraudulently, and with the intent to deceive, submitted patient medical records, reports, treatment verifications and bills for medical treatment which contained false representations of material facts, including but not limited to one or more of the following fraudulent material misrepresentations:

a) False and misleading statements and information designed to conceal the fact that Defendants provided services according to a treatment protocol intended to fraudulently bill Plaintiffs for *inter alia,* medical evaluations, diagnostic tests, pain management procedures, chiropractic treatment, acupuncture treatment, and physical therapy, irrespective of medical necessity;

b) False and misleading statements and information designed to conceal the fact that the Fraudulent Services were provided pursuant to an illegal referral and/or financial arrangement between and among the Defendants;

c) False and misleading statements and information designed to conceal the fact that the Fraudulent Services were provided pursuant to an unlawful fee splitting arrangement between the Paper Owner Defendants through the Fraudulently Owned PCs and the Defendant Controllers;

d) False and misleading statements and information in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement for services that were never rendered, not rendered as billed, not of any diagnostic or treatment value and/or reflected a pattern of billing for services that were medically unnecessary;

e) False and misleading statements made by one or more Defendants in which Defendants recorded incomplete and/or fabricated Claimant complaints and medical histories to support pre-determined diagnoses to justify the billing for initial and follow-up examinations and outcome assessment testing irrespective of medical necessity, and to justify referrals for diagnostic tests, pain management procedures, acupuncture, physical therapy and chiropractic services with the intent to defraud Plaintiffs;

f) False and misleading statements made by one or more Defendants concerning Claimants conditions in order to justify the billing almost identical physical therapy treatments to virtually every Claimant irrespective of medical necessity;

g) False and misleading statements made by one or more Defendants regarding Claimants' conditions in order to justify the provision of physical therapy services which were provided, if at all, pursuant to an illegal treatment protocol irrespective of medical necessity;

h) False and misleading statements made by one or more Defendants through which they fraudulently diagnosed every Claimant with sprains and strains in the cervical, thoracic, and lumbar regions of the back in order to justify the provision of chiropractic services which were provided, if at all, pursuant to an illegal treatment protocol irrespective of medical necessity;

i) False and misleading statements regarding the severity of Claimants' conditions in order to justify the provision of acupuncture services which were provided, if at all, pursuant to an illegal treatment protocol irrespective of medical necessity;

j) False and misleading statements made by one or more Defendants in order to justify the billing for Electrodiagnostic Testing under CPT codes 95903, 95904, 95934, 95861 and/or 95886 when in fact such services were never provided, not provided as billed, medically unnecessary and/or of no diagnostic or treatment value;

k) False and misleading statements made by one or more Defendants in order to justify the billing for VsNCT under CPT codes 95904 and/or 95999 when in fact such services were never provided, not provided as billed, medically unnecessary and/or of no diagnostic or treatment value;

l) False and misleading statements made by one or more Defendants in order to justify the billing for Computerized Range of Motion and Manual Muscle Testing under CPT Codes 95831, 95833, and/or 95851 when in fact such services were never provided, not provided as billed, medically unnecessary and/or of no diagnostic or treatment value;

m) False and misleading statements made by one or more Defendants in order to justify the billing for Somatosensory Evoked Potentials under CPT Codes 95925 and/or 95926, when in fact such services were never provided, not provided as billed, medically unnecessary and/or of no diagnostic or treatment value;

n) False and misleading statements made by one or more Defendants in order to justify the billing for Trigger Point Injections and related ultrasonic guidance under CPT Codes 20552, 20553, and/or 76942 when in fact such services were never provided, not provided as billed, medically unnecessary and/or of no diagnostic or treatment value;

o) False and misleading statements made by one or more Defendants in order to justify the billing for Dry Needling under CPT Code 20999 when in fact such services were never provided, not provided as billed, medically unnecessary and/or of no diagnostic or treatment value;

p) False and misleading statements made by one or more Defendants in order to justify the billing for Physical Capacity Testing under CPT Code 97750 when in fact such services were never provided, not provided as billed, medically unnecessary and/or of no diagnostic or treatment value;

q) False and misleading statements contained in the initial and follow-up reports of one or more the Defendants concerning each patient's condition and/or diagnosis to justify the continued necessity of the Fraudulent Services irrespective of improvements in a Claimant's condition; and

r) Other misrepresentations, including but not limited to those contained in paragraphs a through r above.

863. On information and belief, in numerous instances, the medical records, reports and bills submitted by Defendants to Plaintiffs in connection with the Fraudulent Services set forth fictional representations of each Claimant's condition and services provided. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the Claimants and the consumer public, particularly if the sham and fictional diagnoses were to be relied upon by any subsequent healthcare provider.

864. The foregoing was intended to deceive and mislead the Plaintiffs into believing that Defendants were providing medically valid services when, in fact, they were not.

865. Defendants knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

866.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations, which Plaintiffs were led to believe existed as a result of Defendants' acts of fraud and deception.

867.    Had Plaintiffs known of the fraudulent content of, and misrepresentations in, the medical records, reports, treatment verifications, and bills for medical treatment, they would not have paid Defendant's claims for No-fault insurance benefits submitted in connection therewith.

868.    Furthermore, Defendants' far reaching pattern of fraudulent conduct evinces a high degree of moral turpitude and wanton dishonesty which, as alleged above, has harmed, and will continue to harm, the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

869.    By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $1,800,000, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## TWENTY-FIRST CLAIM FOR RELIEF

## AGAINST ALL DEFENDANTS

### (Unjust Enrichment/Restitution)

870.    The allegations of paragraphs 1 through 557 are hereby repeated and realleged as though fully set forth herein.

871.    By reason of their wrongdoing, Defendants have been unjustly enriched, in that they have, directly and/or indirectly, received substantial moneys from Plaintiffs that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

872.    Plaintiffs are entitled to recover restitution for the amount that Defendants were unjustly enriched as a result of payments made by Plaintiffs to said Defendants.

873.    By reason of the foregoing, Plaintiffs have sustained compensatory damages and have been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $1,800,000 the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## TWENTY-SECOND CLAIM FOR RELIEF

## <u>AGAINST ALL DEFENDANTS</u>

### (Declaratory Judgment)
### (Corporate Practice of Medicine
### New York State Business Corporation Law §§ 1501, *et seq.*)

874.    The allegations of paragraphs 1 through 557 are hereby repeated and realleged as though fully set forth herein.

875.    During the relevant time period of  the Complaint, the Controllers have used the names of Defendants Pernier, Parisien, Lacina, Pavlova, Smith, Mollo, Deng, and Buslon, to circumvent the strict tenets of Article 15 of the Business Corporation Law and incorporate the Fraudulently Owned PCs and submit bills to insurers thereunder.

876.    Under New York law, a professional corporation is not eligible to recover No-fault benefits if it is not licensed in accordance with applicable New York State Law and any such entity does not have standing to seek reimbursement under the No-fault Law.  As a matter of eligibility and standing, the New York Court of Appeals held in *State Farm Mut. Auto. Ins. Co. v. Mallela*, 4 N.Y.3d 313, 827 N.E.2d 758, 794 N.Y.S.2d 700 (2005), that a fraudulently incorporated and/or professional corporation not licensed in accordance with New York State Law, such as the Fraudulently Owned PCs, not formed and/or operated in accordance with Article 15 of the Business Corporation Law, is not entitled to recover No-fault benefits.

877. As the Fraudulently Owned PCs are fraudulently incorporated and/or are not licensed and/or operated in accordance with applicable New York State Law, with a nominal owner listed on each certificate of incorporation filed with the Department of State, concealing the true owners, it is respectfully requested that this Court issue an order declaring that Allstate is under no obligation to pay any of Fraudulently Owned PCs' No-fault claims because the Fraudulently Owned PCs are not properly licensed in accordance with New York State Law.

878. As the Fraudulently Owned PCs are fraudulently incorporated and/or fraudulently licensed and/or operated, with nominal owners listed on the certificates of incorporation filed with the Department of State, concealing the true beneficial owners, it is respectfully requested that this Court issue an order declaring that the Fraudulently Owned PCs are ineligible to recover benefits under the New York State No-fault Law and, therefore, Allstate is under no obligation to pay any of Fraudulently Owned PCs' No-fault claims because of the Fraudulently Owned PCs' illegal corporate structure.

879. Allstate has no adequate remedy at law.

880. The Fraudulently Owned PCs will continue to bill Allstate for No-fault services despite their illegal corporate form and fraudulent incorporation absent a declaration by this Court that their activities are unlawful and that Allstate has no obligation to pay the pending, previously-denied and any future No-fault claims submitted by the Fraudulently Owned PCs due to their illegal corporate structure.

**TWENTY-THIRD CLAIM FOR RELIEF**

**AGAINST ALL DEFENDANTS**

**(Declaratory Judgment under 28 U.S.C. § 2201)**
**(Fraudulent Billing Scheme)**

881.     The allegations of paragraphs 1 through 557 are hereby repeated and realleged as though fully set forth herein.

882.     At all relevant times mentioned herein, each and every bill mailed by the Defendants in their individual names and/or through the Fraudulently Owned PCs, to Plaintiffs sought reimbursement for services that were never rendered, not of any diagnostic or treatment value and/or reflected a pattern of billing for services that were medically unnecessary.

883.     At all times relevant herein, the Defendants exploited the No-fault Law through the utilization of various deceptive billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiffs, in particular, through the submission of fraudulent billing documents pursuant to a fraudulent treatment protocol irrespective of medical necessity.

884.     In view of the Defendants' submission of fraudulent bills to Plaintiffs, Plaintiffs contend that the Defendants have no right to receive payment for any pending bills they have submitted because:

- The Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement for services that were never rendered, not rendered as billed, not of any diagnostic or treatment value and/or reflected a pattern of billing for services that were medically unnecessary;

- The Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs as to the medical necessity of billed-for services, when such services, if performed at all, were performed

pursuant to a pre-determined treatment protocol designed solely to maximize reimbursement for the Defendants;

- The Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for services performed pursuant to illegal referral and/or financial arrangement(s) between the Defendants.

885. As the Defendants have knowingly made the foregoing false and fraudulent misrepresentations about the services purportedly provided to No-fault Claimants and the amounts they were entitled to be reimbursed, it is respectfully requested that this Court issue an order declaring that the Defendants are not entitled to receive payment on any pending, previously-denied and/or submitted unpaid claims and Plaintiffs, therefore, are under no obligation to pay any of Defendants' No-fault claims.

886. Plaintiffs have no adequate remedy at law.

887. The Defendants will continue to bill Plaintiffs for false and fraudulent claims for reimbursement absent a declaration by this Court that Plaintiffs have no obligation to pay the pending, previously-denied and/or submitted unpaid claims, regardless of whether such unpaid claims were ever denied, regardless of the purported dates of service.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE,** Plaintiffs demand judgment as follows:

i) Compensatory damages in an amount in excess of $1,800,000, the exact amount to be determined at trial, together with prejudgment interest;

ii) Punitive damages in such amount as the Court deems just;

iii) Treble damages, costs and reasonable attorneys' fees on the First through Eighteenth Claims for Relief, together with prejudgment interest;

iv) Compensatory and punitive damages on the Nineteenth and Twentieth Claims for Relief, together with prejudgment interest;

v)      Compensatory damages on the Twenty-First Claim for Relief, together with prejudgment interest;

vi)     Declaratory Relief on the Twenty-Second Claim for Relief declaring that Plaintiffs are under no obligation to pay any of the Fraudulently Owned PCs' No-fault claims because of their illegal corporate structure;

vii)    Declaratory Relief on the Twenty-Third Claim for Relief declaring that Plaintiffs are under no obligation to pay any of the Defendants' No-fault claims that were for services that were never rendered, not of any diagnostic or treatment value and/or reflected a pattern of billing for services that were medically unnecessary; and

viii)   Costs, reasonable attorneys' fees and such other relief that the Court deems just and proper.

Dated: New York, New York,
       July 28, 2022

                                    Morrison Mahoney LLP


                                    By:   /s/ Lee Pinzow_____
                                          Robert A. Stern
                                          James A. McKenney
                                          Lee Pinzow
                                          Wall Street Plaza
                                          88 Pine Street, Suite 1900
                                          New York, NY 10005
                                          Phone:   (212) 825-1212
                                          Fax:     (212) 825-1313
                                          *Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE & CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, AND ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY,** | |
| **PLAINTIFFS,** | **22-CV-4441** |
| -against- | |
| **TATIANA M. RYBAK, OLEG RYBAK, FABIOLA G. PERNIER AS EXECUTOR OF THE ESTATE OF JEAN PIERRE CLAUDE PERNIER, M.D., FRANCOIS JULES PARISIEN, M.D., FRANCIS JOSEPH LACINA, M.D., KSENIA PAVLOVA, D.O., ALFORD A. SMITH, M.D., DARREN THOMAS MOLLO, D.C., CHARLES DENG, L.AC., MARIA SHEILA BUSLON A/K/A MARIA MASIGLA, P.T., JPC MEDICAL, P.C., JPF MEDICAL SERVICES, P.C., JULES MEDICAL, P.C. N/K/A GIBBONS MEDICAL, P.C., JP MEDICAL SERVICES P.C., JFL MEDICAL CARE P.C., ALLAY MEDICAL SERVICES, P.C., FJL MEDICAL SERVICES P.C., PFJ MEDICAL CARE P.C., RA MEDICAL SERVICES P.C., KP MEDICAL CARE P.C., ALFORD A. SMITH MD, P.C., STRATEGIC MEDICAL INITIATIVES P.C., ACH CHIROPRACTIC, P.C., ENERGY CHIROPRACTIC, P.C., ISLAND LIFE CHIROPRACTIC PAIN CARE, PLLC, CHARLES DENG ACUPUNCTURE, P.C., MSB PHYSICAL THERAPY, P.C., JOHN DOES 1 THROUGH 20, AND ABC CORPORATIONS 1 THROUGH 20,** | **COMPLAINT** |
| | **(TRIAL BY JURY DEMANDED)** |
| **DEFENDANTS.** | |

---

## COMPLAINT

---

**MORRISON MAHONEY LLP**
**WALL STREET PLAZA**
**88 PINE STREET, SUITE 1900**
**PHONE: 212-825-1212**
**FAX: 212-825-1313**
**ATTORNEYS FOR PLAINTIFFS**